UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------------------------

ORAL NICHOLAS HILLARY,

                      Plaintiff,

             -against-

ST. LAWRENCE COUNTY, ST. LAWRENCE COUNTY DISTRICT ATTORNEY'S OFFICE, ST. LAWRENCE COUNTY DISTRICT ATTORNEY MARY E. RAIN, Individually and in her Official Capacity, UNIDENTIFIED JANE/JOHN DOE #1-10 ST. LAWRENCE COUNTY EMPLOYEES, UNIDENTIFIED JANE/JOHN DOE #11-20 ST. LAWRENCE COUNTY DISTRICT ATTORNEY EMPLOYEES, ST. LAWRENCE COUNTY SHERIFF KEVIN M. WELLS, Individually and in his Official Capacity, ST. LAWRENCE COUNTY DEPUTY SHERIFF JOHN E. JONES, JR., Individually and in his Official Capacity, UNIDENTIFIED JANE/JOHN DOE #21-30 ST. LAWRENCE COUNTY SHERIFF EMPLOYEES,

VILLAGE OF POTSDAM, VILLAGE OF POTSDAM POLICE DEPARTMENT, VILLAGE OF POTSDAM FORMER CHIEF OF POLICE EDWARD TISCHLER, Individually and in his Official Capacity, VILLAGE OF POTSDAM FORMER CHIEF OF POLICE KEVIN M. BATES, VILLAGE OF POTSDAM FORMER POLICE LIEUTENANT (presently Acting Chief of Police) MARK MURRAY, Individually and in his Official Capacity, UNIDENTIFIED JANE/JOHN DOE VILLAGE OF POTSDAM EMPLOYEES #31-40,

ONONDAGA COUNTY, ONONDAGA DISTRICT ATTORNEY WILLIAM FITZPATRICK,

NEW YORK STATE POLICE, NEW YORK STATE POLICE OFFICER GARY SNELL, Individually and in his Official Capacity, NEW YORK STATE POLICE INVESTIGATOR THEODORE LEVINSON, NEW YORK STATE POLICE INVESTIGATOR TIM PEETS, RAY WICKENHEISER, individually and in his Official Capacity as Director, Crime Lab System, New York State Police Forensic Investigation Center, JULIE PIZZIKETTI, individually and in her Official Capacity as Director of Biological Science, New York State Police Forensic Investigation Center, UNIDENTIFIED JANE/JOHN DOE #41-50 NEW YORK STATE POLICE EMPLOYEES,

                    Defendants.
--------------------------------------------------------------------------------

<u>COMPLAINT</u>

DOCKET NO.:
17-2952

<u>JURY TRIAL
DEMANDED</u>

1

## COMPLAINT

The Plaintiff, complaining of the Defendants, by his attorneys, AMY MARION, ESQ. and BRUCE BARKET, ESQ. respectfully shows to this Court and alleges that he was deprived his civil rights and sustained injury as a result of the deprivations of his civil rights.

## PRELIMINARY STATEMENT

1.      On October 24, 2011, in the Village of Potsdam, New York, a twelve-year old boy named Garrett Phillips was found dead.

2.      Plaintiff, Mr. Hillary, had previously dated Garrett Phillips' mother, Tandy Cyrus (also known as Tandy Collins).

3.      Two days after the boy's death, Mr. Hillary was taken into police custody and detained from approximately 8:00 a.m. until approximately 6:00 p.m. before being released; no charges were brought against him at that time.

4.      More than two and one half years later, on May 15, 2014, Mr. Hillary was charged with the death of Garrett Phillips.

5.      Two years after that, on September 28, 2016, Mr. Hillary was acquitted following a bench trial.

6.      This is a civil rights action seeking damages arising out of Defendants' violation of the rights secured by the First, Fourth and Fourteenth Amendment of the United States Constitution pursuant to 42 U.S.C. § 1983 and arising under the laws and State of New York, and arising out of Defendants' defamatory statements.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction pursuant to 28 U.S.C. § 1331, over claims arising under 42 U.S.C. § 1983.

8.     Supplemental jurisdiction over Plaintiff's state law claims exists pursuant to 28 U.S.C. § 1367(a).

9.     Venue is proper in the Eastern District of New York under 28 U.S.C. § 1391(b), because that is the judicial district in which the Plaintiff resides.

## JURY DEMAND

10.     Pursuant to the Seventh Amendment of the United States Constitution, Plaintiff requests a jury trial on all issues and claims set forth in this Complaint.

## CONDITIONS PRECEDENT

11.     On December 21, 2016, Notices of Claim and a Notice of Intention were sent to Defendants.

12.     As a result of some of the Notices being returned as "undelivered", Plaintiff filed two separate motions for leave to file late notice of claim, one before the Supreme Court for the County of St. Lawrence and one before the Supreme Court for the County of Onondaga.

13.     The Supreme Court for St. Lawrence granted Plaintiff's application and the motion before the Supreme Court for Onondaga County is still pending.

14.     Plaintiff re-served the Notices of Claim pursuant to the St. Lawrence Court's order and has also informed counsel for Onondaga County Defendants, St. Lawrence County Defendants and Village of Potsdam Defendants that Plaintiff will submit to an examination after a ruling is received from the Supreme Court for St. Lawrence County.

## PARTIES

15.     Plaintiff, Oral Nicholas Hillary is a resident of Kings County in the State of New York.

16.     The individually named St. Lawrence County Defendants were at all times employed by the County of St. Lawrence and were acting in their capacity as St. Lawrence County employees all times relevant and pertinent to Plaintiff's complaint.

17.     At all times relevant to this complaint, St. Lawrence County District Attorney Defendants were duly appointed and acting as District Attorneys and/or agents of the St. Lawrence County District Attorney, acting under color of state law, within the scope of their employment, pursuant to the statutes, ordinances, regulations, policies, customs and usage of the County of St. Lawrence and the State of New York.

18.     Defendant County of St. Lawrence is a body politic and corporate empowered to exercise home rule.

19.     The County of St. Lawrence County Legislature, the County's policymaker, has delegated final policymaking authority for the supervision and control of the County of St. Lawrence District Attorney's Office to the duly appointed District Attorney of the County of St. Lawrence.

20.     At all times relevant to this complaint, St. Lawrence County Sheriff Defendants were duly appointed and acting as St. Lawrence County Sheriffs and/or agents of the St. Lawrence County Sheriff's Department, acting under color of state law, within the scope of their employment, pursuant to the statutes, ordinances, regulations, policies, customs and usage of the County of St. Lawrence and the State of New York.

21.     The County of St. Lawrence County Legislature, the County's policymaker, has delegated final policymaking authority for the supervision and control of the County of St. Lawrence Sheriff's Department to the duly appointed Sheriff of the County of St. Lawrence.

22.   The individually named Village of Potsdam Defendants were at all times employed by the Village of Potsdam and were acting in their capacity as Village of Potsdam employees all times relevant and pertinent to Plaintiff's complaint.

23.   At all times relevant to this complaint, Village of Potsdam Police Department Defendants were duly appointed and acting as Police Officers and/or agents of the Village of Potsdam Police Department, acting under color of state law, within the scope of their employment, pursuant to the statutes, ordinances, regulations, policies, customs and usage of the County of St. Lawrence and the State of New York.

24.   Defendant County of Village of Potsdam is a body politic and corporate empowered to exercise home rule.

25.   The Village of Potsdam Board of trustees, the Village's policymaker, has delegated final policymaking authority for the supervision and control of the Village of Potsdam to the duly appointed Board of trustees for the Village of Potsdam.

26.   The individually named Onondaga County Defendants were at all times employed by the County of Onondaga and were acting in their capacity as Onondaga County employees all times relevant and pertinent to Plaintiff's complaint.

27.   At all times relevant to this complaint, Onondaga District Attorney Defendants were duly appointed and acting as District Attorneys and/or agents of the Onondaga County District Attorney, acting under color of state law, within the scope of their employment, pursuant to the statutes, ordinances, regulations, policies, customs and usage of the County of Onondaga and the State of New York.

28.   Defendant County of Onondaga is a body politic and corporate empowered to exercise home rule.

29.    The County of Onondaga County Legislature, the County's policymaker, has delegated final policymaking authority for the supervision and control of the County of Onondaga's District Attorney's Office to the duly appointed District Attorney of the County of Onondaga.

30.    Defendant New York State Police is an executive agency of the State of New York with an office located at 1220 Washington Avenue, Building 22, Albany, New York 12226-2252.

31.    The individually named New York State Trooper/Officer/Investigator/Crime Lab Defendants were at all times employed by the State of New York and were acting in their capacity as New York State Police employees at all times relevant and pertinent to Plaintiff's complaint.

32.    At all times relevant to this complaint, New York State Trooper/Officer/Investigator/Crime Lab Defendants were duly appointed and acting as New York State Troopers/Officers/Investigators/Crime Lab Defendants and/or agents of New York State Troopers/Officers/Investigators/Crime Lab Defendants, acting under color of state law, within the scope of their employment, pursuant to the statutes, ordinances, regulations, policies, customs and usage of the State of New York.

33.    Defendant Ray Wickenheiser sued herein individually and in his official capacity as Director Crime Lab System, New York State Police Forensic Investigation Center [New York State Crime Lab], is a resident of the State of New York and at all times relevant herein was duly employed and employee of the New York State Police.

34.    Defendant Julie A. Pizziketti sued herein individually and in her official capacity as Assistant Director/Director of Biological Sciences New York State Police Forensic

Investigation Center [New York State Crime Lab], is a resident of the State of New York and at all times relevant herein was duly employed and employee of the New York State Police.

## FACTUAL ALLEGATIONS

35.     On October 24, 2011 at 5:07 p.m. a call was received by the Potsdam Police Department from a caller located in an apartment at 100 Market Street, stating that she had heard a bang and someone say "help" or "no" in a neighboring apartment.

36.     Garrett Phillips, along with his mother and brother, were living in an apartment (apartment "4") at 100 Market Street in Potsdam, New York.

37.     Police Officer ("PO") Wentworth of the Potsdam Police Department responded to the call.

38.      With the assistance of the landlord, PO Wentworth entered the apartment where he found Garret Phillips lying on the floor in a bedroom, not moving or breathing.

39.     PO Wentworth called the dispatch and told them to send a squad and Officer McCargar; he told the landlord, Rick Dumas, to start doing chest compressions, and he went down to his car to get his emergency equipment.

40.     Garrett Phillips was taken to the hospital, and two hours later he was pronounced dead.

## PLAINTIFF IS TARGETED

41.      Two days after Garrett Phillips' death, Mr. Hillary was taken into police custody, strip searched, and held for ten hours.

42.     Purportedly other individuals who had a relationship with the Garrett Phillips or his mother voluntarily gave statements, were fingerprinted and gave DNA samples.

43.     None of those individuals were held for ten hours or strip searched.

44.     In October of 2011, Mr. Hilary was the men's soccer coach for Clarkson University which is located in Potsdam, New York.

45.     At the time, he had known Garrett Phillips for one year.

46.     Mr. Hillary had met Garrett's mother, Tandy Cyrus, in October of 2010; they had become friends, dated, lived together for a brief period of time, and by September of 2011 they were living apart.

47.     Even though they were living apart, Mr. Hillary considered Ms. Cyrus a friend.

48.     Mr. Hillary, who is of Jamaican decent, was immediately targeted as a suspect in the death of Tandy Cyrus' son.

49.     Defendant John E. Jones, a Deputy Sheriff of St. Lawrence County, had also dated Garrett Phillips' mother.

50.     Potsdam Police Department notes of video surveillance obtained from the scene indicate that Defendant Jones pulled his truck into a driveway twenty-seven (27) seconds before "a kid" (later identified as Garrett Phillips) was seen skateboarding down the road. *See* Exhibit A

51.     Those same notes also indicate that four (4) minutes before the 911 call was placed, Defendant Jones is seen walking on the street with his dog.  *Id*.

52.     Defendant Jones was not pursued as a suspect; instead, he actively participated in targeting Nick Hillary.

53.     Two days after the incident, Defendant Jones went to the police command where the incident took place and gave the Sergeant a key to Tandy Cyrus' apartment "to compare w/ keys found during [the] search of Hillary's residence and office."  *See* Exhibit B

54.     A lead sheet from two days after the incident indicates that Jones is listed as the source informing the police of a witness who remembers Nick Hillary getting a key made at his

store.  *See* Exhibit C.

55.      Additionally, the lead sheet from November 4, 2011, eleven days after the incident, indicates that Defendant John Jones called Chief of Police Tischler and as a result of that call, the Chief sent an officer to Nick Hillary's apartment to conduct an investigation.  *See* attached Exhibit D.

56.      Defendant Jones was permitted to accompany and remain with Tandy Cyrus while she was interviewed by Chief Tischler and Lieutenant Mark Murry; he obviously was not considered a suspect.  *See* Exhibit E.

### CAUSE FOR RETALIATION

57.      On January 20, 2012, Mr. Hillary filed a Notice of Claim as a result of the deprivation of his rights on October 26, 2011.

58.      A Summons and Complaint was filed in September of 2012 in the Supreme Court, St. Lawrence County and was removed to the United States District Court for the Northern District of New York shortly thereafter.

59.      The action was brought against the Village of Potsdam, the Chief of Police of the Village and several individually named Village of Potsdam police officers.

60.       The Village of Potsdam is located in St. Lawrence County, New York.

61.      In March of 2013, six months after Mr. Hillary commenced his lawsuit, Mary E. Rain, a former police officer for over 15 years, announced that she would be seeking election for St. Lawrence County District Attorney; explaining that she was "encouraged" to do so by "local law enforcement officials and officers."[1]

[1] http://www.watertowndailytimes.com/article/20130306/NEWS07/703059740

62.     Presumably, the "local "local law enforcement officials and officers"[2] who had "encouraged" Mary Rain to run for office, were not pleased with sitting St. Lawrence County District Attorney Nicole M. Duvé who had not lodged any accusations against Mr. Hillary or convened a grand jury.

63.     Village of Potsdam Lt. Murray told Duvé that Mr. Hillary was "a high high person of interest or potential suspect."  *See* Exhibit F.

64.     Ms. Duvé was surly aware that there was no evidence that placed Mr. Hillary at the crime scene, as testified to by former Village of Potsdam Chief of Police Edward F. Tischler. *See* Exhibit G.

65.     But that did not stop Mary Rain who commenced "a vicious campaign" against Ms. Duvé, claiming that her office had not been as cooperative with police agencies as it should be; accusing her of "incompetence, mismanagement, and the failure to investigate the Garrett Phillips killing."[3]

66.     "Rain pledged to solve the case and bring the killer to justice.  Indeed, Rain in many of her campaign events had Garrett's mother at her side."  *Id.*

67.     Before ever entering the District Attorney's Office, Mary Rain was already actively pursuing an arrest in Garrett Phillips' case.

68.     When she announced an indictment in the case within six months of winning her election, she gave thanks to "the fabulous job done by Potsdam PD and New York State Police,"[4] the local law enforcement who were being sued by Mr. Hillary and who had "encouraged her to run for the job."[5]

---

[2] http://www.watertowndailytimes.com/article/20130306/NEWS07/703059740
[3] http://www.huffingtonpost.com/bennett-l-gershman/the-most-dangerous-prosec_b_12085240.html
[4] *See* Exhibit H.
[5] http://www.watertowndailytimes.com/article/20130306/NEWS07/703059740

69.     Mr. Hillary was charged with Garrett Phillips' murder on the same day that dispositive motions in his case against the Village of Potsdam were filed.

70.     Ms. Rain posted, "it was great to see Oral Nicholas Hillary in handcuffs."  *See* Exhibit H.

71.     Unrelenting, Mr. Hillary remained in jail because the District Attorney questioned the value of the properties offered for collateral for the bond, "as well as the validity of the bond company, even though according to Judge Richards' office (sic), the bond company in question has been used before in his courtroom."[6]

## THE CONSPIRACY

72.     Potsdam Police Department Chief Ed Tischler, along with the assistance of "State Police forensic units" who were collecting the evidence, the "staff of the St. Lawrence County District Attorney's Office," and "the Sheriff's Department," pursued a course to target Nick Hillary for Garrett Phillips' murder.[7]

73.     Deputy Sheriff Jones steered the investigation by setting before them warrantless, prejudicial and unlawful allegations which all of the Defendants promptly pursued.

74.     The problem for them was that former District Attorney Duvé would not sign off on these baseless accusations which were not supported by a shred of evidence.

75.     However, with Mary Rain's successful win, they had a champion for their cause.

76.     Ms. Rain did not care that nine months before Garrett Phillips' death, his mother, Tandy Cyrus, had made a complaint against Jones, stating that "John has been acting in various ways that causes me to fear for the safety of myself and my sons."  *See* Exhibit I.

---

[6] https://www.northcountrypublicradio.org/news/story/25400/20140711/after-two-months-hillary-bail-hearing-set-to-resume
[7]
https://m.facebook.com/story.php?story_fbid=2456925670173&id=103382899700373&refsrc=https%3A%2F%2Fm.facebook.com%2F1340WMSA%2Fvideos%2F2456925670173%2F&_rdr

77.     Ms. Rain ignored this and told the press that "John Jones had no issue, because he was getting along fine with Tandy . . . ."[8]

78.     Apparently, John Jones' law suit against Tandy Cyrus, which was pending at the time of Garrett Phillips' death, was not an issue for Ms. Rain either.  *See* Exhibit I; *see also* Exhibit J.

79.     True to her promise, and consistent with her vengeful campaign, Mary Rain swore in an affidavit that Oral "Nick" Hillary was the last person seen with Garrett Phillips; that was an outright lie.  *See* Exhibit K.

80.     Defendant Mark Murray testified under oath that video surveillance shows Mr. Hillary "stalking" Garrett Phillips ten minutes before the murder; that was not true.  *See* Exhibit F, pg. 139.

81.     Defendant Mark Murray gave this testimony at a deposition for Mr. Hillary's civil suit filed against him, along with Chief Tischler and other officers, three months before Mr. Hillary was arrested.

82.     Defendant Murray claimed that "the videotape of Mr. Hillary stalking Garrett, you know literally 10 minutes before his death . . . seals it for [him]."  *Id.*

83.     When questioned for specifics about this claim, he was forced to admit that he did not see Mr. Hillary in the video.  *Id*. at pg. 145.

84.     However, the video does show Defendant Jones pulling his truck into his driveway within seconds of Garrett Phillips skateboarding by; and, it also shows Jones walking on the street in the location of, and at the time of, the murder.

---

[8] https://www.northcountrypublicradio.org/news/story/28539/20150605/why-is-justice-for-garrett-phillips-so-complicated

85.     The Defendants just simply ignore this, let alone characterize it as stalking or other incriminating behavior.  Defendant Jones' presence – within seconds of Garrett Phillips' presence at the same location and, his presence on the street at the time of the murder, didn't seal the deal for Defendant Murray.

86.     But, Mr. Hillary's car in a parking lot, ten minutes before the murder, did.

87.     Ms. Rain did her part by poisoning the public as well, announcing that Mr. Hillary was "a habitual marijuana smoker" and that he had been "arrested for having a pound or more of marijuana in 2000 that was reduced to a misdemeanor" without there ever having been a hearing as to the admissibility of these charges or the underlying bad acts.[9]

88.     She threatened one of Mr. Hillary's alibi witnesses with obstruction and the other with a grand jury subpoena, forcing the witness to reveal privileged attorney-client communications.

89.     The police told Mr. Fairlie, one of the alibi witnesses, that the District Attorney was listening and watching their conversation; telling him that she was "looking into obstruction of charges (sic) that they thought [the witness] was withholding something or lying about something or knew information that the [witness] didn't [know]."  *See* Exhibit L. Fairlie.

90.     Defendant Peets yelled at this witness, telling him "that they knew Nick did it" and that he "didn't have to stand up for him," telling him that Nick didn't do anything for him and he doesn't have to do anything for Nick.  *Id.*

---

[9] http://www.watertowndailytimes.com/article/20140520/NEWS07/705209836

91.    Defendant Murray and Defendant Snell went to this witness' home, several times unannounced, and told this witness that if he changed his alibi statement given on October 26, 2011 he wouldn't get in trouble.[10]  *See* Exhibit L.

92.    As for Mr. Hillary's other alibi witness, his daughter Shanna, her grand jury testimony "covered 80 pages."  *See* Exhibit M.

93.    Ms. Rain was admonished by the Court for her conduct when examining this witness.

94.    The Judge explained that "[t]he problems arose when the prosecutor asked Shanna about her conversation with her lawyer, within a week after Garrett died.  In the grand jury preceding it was unquestionably improper and prejudicial for Ms. Rain to ask her what her lawyer had told her, and then to press her, in cross-examining fashion, telling Shanna that she had to answer because she was under subpoena."  *Id*.

95.    "When this questioning persisted, Shanna disclosed that the attorney with whom she spoke was the same attorney who had represented Defendant in his civil claim against the police officers."  *Id*.

96.    "[W]ith this line of questions, Ms. Rain was trying both to undermine a potential alibi defense and at the same time portray witnesses who could provide a potential alibi defense as lying to protect Defendant."  *Id*.

97.    "The prosecutor's expression of bias by her disbelief of the witness' testimony for all intents and purposes took out of the jury's hands a determination of what the proved facts were in that regard."  *Id*.

---

[10] https://www.northcountrypublicradio.org/news/story/28539/20150605/why-is-justice-for-garrett-phillips-so-complicated

98.    "Worst of all, Ms. Rain asked Shanna essentially the same question thirteen times as to how she could "explain the unrefuted proof" that established that Defendant was not in Shanna's home at or around (a specific time changed with each question) on the day of the homicide.  This testimony was bullying a seventeen-year old girl, who clearly stated that she did not understand what Ms. Rain meant by 'unrefuted proof.'" *Id*.

99.    "Ms. Rain did not explain what she meant by that, and moreover, it was extremely prejudicial to use words like 'unrefuted proof' in the grand jury while questioning a witness. These questions invaded the fact-finding role of the grand jurors, and told them what Ms. Rain thought that the proof showed." *Id*.

100.    "The question was so improper that it could not have been asked at trial . . . The prosecutor's question clearly stated to the grand jury what her belief was regarding the fact at issue and was an improper attempt to influence the grand jurors." *Id*.

101.    Judge Richards stated that the "prosecutor seemed to put aside any neutrality and balanced judgment – duties imposed on her by case law – in questioning two witnesses who were later identified as potential alibi witnesses.  Any indictment returned on such facts as were presented to the grand jury must be the product of unquestioned fairness, precisely because the meaning of the events described is not conclusive proof of guilt.  Here, that was not the case." *Id*.

102.    Judge Richard's ruling regarding the "eye-witness or forensic evidence" was that:

> There was a great deal of testimony about video surveillance cameras showing either Garrett Phillips or Oral Hillary at different locations, some of them fairly near Garrett's residence, at times within several hours to within minutes before or after the probable time of the crime. Many of the foundation questions for introducing the videos into evidence lacked an adequate foundation. For example, repeatedly the prosecutors asked a foundation witness whether the things shown in the videos

> accurately showed the scene as it looked on the particular date and
> time. No factual basis was provided for the 'yes' response provided
> by many of these witnesses.

*See* Exhibit M.

103.    Judge Richards found that Ms. Rain's questioning of Tandy Cyrus clearly suggested that "the prosecutor wanted to portray Defendant either as uncaring or as having a motive to avoid contact with Garrett's surviving family." *Id.* Finding that "[t]he question was improper and highly prejudicial." *Id.*

104.    On October 16, 2014, the Honorable Jerome J. Richards dismissed the indictment based upon prosecutorial misconduct in the grand jury. *Id.*

105.    On that day, Mary Rain complained to the press that she was "deeply troubled by the judge's decision . . . ."[11]

106.    At that time, in October of 2014, Mary Rain stated that she was deciding whether or not to appeal the court's dismissal of the indictment or to reconvene a new grand jury. *Id.*

107.    However, on November 17, 2014, "[t]he process to re-indict" started over. *See* Exhibit N.

108.    By January 21, 2015, the case had been presented to a different grand jury which returned an indictment charging Mr. Hillary once again with the murder of Garrett Phillips.[12]

109.    Persistent in her vengeful crusade, in September of 2015, Ms. Rain charged Mr. Hillary with second-degree criminal contempt for purportedly violating an order of protection which had been issued in favor of Tandy Cyrus; and, at the same time sought to have Mr.

---

[11] http://northcountrynow.com/news/da-deeply-troubled-dismissal-murder-indictment-against-potsdam-man-isnt-giving-case-0127254

[12] http://www.watertowndailytimes.com/news05/hillary-statement-about-ankle-suppressed-earlier-interview-by-police-is-admissible-20150926

Hillary's defense attorney removed from the case and sanctioned for the bail posted as a result of this new charge[13].

110.    **Mary Rain charged Mr. Hillary** with criminal contempt based upon Mr. Hillary's visit to his local bank, the Potsdam branch of SeaComm Bank.  *Id.*

111.    Tandy Cyrus worked at SeaComm and the order of protection stated that Mr. Hillary should stay away from Ms. Cyrus' place of business; however, Tandy Cyrus did not work at the Potsdam branch when the order of protection was issued, she worked at a different branch many miles from Potsdam.  *Id.*

112.    The Court, recognizing these known facts, stated that Mr. Hillary "has a right to know" if Ms. Cyrus changes her work location and, that "it is reasonable to assume [that Mr. Hillary's appearance at his bank in Potsdam] was a mistake."  *Id.*

113.    Once again, Ms. Rain publicly disagreed with the Court's ruling, complaining that it was "disingenuous" to say that Mr. Hillary did not know that Ms. Cyrus had *relocated* to the Potsdam branch.  *Id.*

114.    Ms. Rain's statement however, is a clear admission that Ms. Cyrus was not working at the Potsdam branch and, more importantly, that she had not been working at the address which was listed in the order of protection.  *Id.*

115.    Nevertheless, Ms. Rain persisted in maliciously charging Mr. Hillary with criminal contempt in the second degree, a charge which is still pending to this day.

---

[13] http://www.watertowndailytimes.com/news05/hillary-statement-about-ankle-suppressed-earlier-interview-by-police-is-admissible-20150926

## FABRICATION OF EVIDENCE

116.    Within four days of obtaining the first indictment which was dismissed, Mary Rain made an application to employ District Attorney Fitzpatrick, citing "the low-copy DNA, video surveillance, and dozens of witness interviews and statements."  *See* Exhibit K.

117.    On October 25, 2011, the day after Garrett Phillips' death, Potsdam Chief of Police Tischler had indicated that it was the "State Police forensic units" who assisted the Village of Potsdam Defendants in collecting and analyzing the evidence.[14]

118.    The DNA analysis was crucial to this case - there was no evidence linking Nick Hillary to this crime scene.

119.    Emphasizing the importance of this, Village of Potsdam Police Lt. Mark Murray stated three months before Nick Hillary was charged, that "[t]he DNA reports, if you really read into them, for instance, the DNA profile, it's neither inclusive nor exclusive . . . so you know there's potential that maybe down the road there's better DNA processes that would be able to, you know, definitely exclude him or include him."  *See* Exhibit F.

120.    "[I]f he's included or excluded, I just want him to be either cleared if he didn't do this or charged if he did do this."  *Id*.

121.    Upon information and belief, before District Attorney Fitzpatrick was even employed on the case, both he and Mary Rain were aware that "there was no statistical support for a match between the fingernail scrapings from the left hand of the victim Garrett Phillips (item 550C2) and suspect Oral Hillary (Items 21, 22 and 24)."[15]

---

[14]

https://m.facebook.com/story.php?story_fbid=2456925670173&id=103382899700373&refsrc=https%3A%2F%2Fm.facebook.com%2F1340WMSA%2Fvideos%2F2456925670173%2F&_rdr

[15] https://www.cybgen.com/information/newsroom/2016/dec/Cybergenetics-responds-to-letter-from-Hillary-prosecutor.shtml

122.    And, Defendant Murray's statement reflects that he knew this as well.  But he, like all of the Defendants herein, was not satisfied with that answer.  They were going to make sure that they got a definite answer, whatever the cost.

123.    At that time, the New York State Crime Lab used the Combined Probability of Inclusion (CPI) to statistically evaluate DNA mixtures.  *See Shannon Morris, et al. v. New York State Police, et al.*, 16-CV-00164 (DNH/DJS) (N.D.N.Y. 2016), D.E. 1.

124.    "The CPI statistical method requires forensic scientists to subjectively analyze DNA results."  *Id*.

125.    "The subjectivity required in the CPI method in a mixed source DNA has been criticized for being inexact thereby resulting in inculpatory and exculpatory inaccuracy."  *Id*.

126.    "The Scientific Working Group on DNA Analysis Methods (SWGDSAM) approved Autosomal STR Typing by Forensic DNA Testing Laboratories in 2010 which resulted in the introduction of the stochastic threshold in the analyzing of DNA data."  *Id*.

127.    "The interpretation guidelines for implementation of the stochastic threshold with the CPI method results in mixed DNA profiles that are inconclusive."  *Id*.

128.    "Inconclusive results in a case necessarily results in the inability to use DNA data to enter and search profiles in the Combined DNA Index System."  *Id*.

129.    "Inconclusive results in a case necessarily results in the inability to identify a suspect."  *Id*.

130.    "The use of the CPI method in the Crime Lab resulted in a debate within the Crime Lab as to whether a match statistic could be arrived at from certain mixed sources of DNA."  *Id*.

131.    "If a match statistic could not be obtained the report was inconclusive."  *Id*.

132.    "If a match statistic could be obtained, the result would be reported to prosecutors in a DNA report." *Id*.

133.    "When analyzing DNA data using the CPI method all conclusions about a profile are supposed to be made without a reference sample, meaning the analysts should not be suspect-centric by using a reference profile to interpret DNA." *Id*.

134.    "The State of New York entered into a contract with Cybergenetics[16] to train its forensic scientist in the TrueAllele software." *Id*.

135.    "TrueAllele, created by Cybergenetics, is a computerized DNA interpretation system that infers genetic profiles from DNA samples." *Id*.

136.    "TrueAllele involved a completely different method of analyzing DNA evidence; it varied from the methods previously used by [Defendant Pizziketti, Defendant Wickenheiser] and the other forensic scientists in the Crime Lab." *Id*.

137.    "TrueAllele removes the subjective component from the analysis of DNA evidence." *Id*.

138.    "TrueAllele does not use a stochastic threshold and this results in less inconclusive results than the CPI method." *Id*.

139.    "Between 2001 and 2014, New York State was committed to replacing the CPI method with TrueAllele." *Id*.

140.    "Despite this commitment, there were certain elements in New York State Police, including but not limited to Defendant Pizziketti, Defendant Wickenheiser . . . and John Doe[s] . . . that were attempting to undermine the implementation of TrueAllele." *Id*.

---

[16] https://www.cybgen.com/

141.   "It was expected that DNA evidence previously analyzed using the CPI method would be reanalyzed using the TrueAllele software." *Id.*

142.   "It was further expected that the TrueAllele software would show that in a large percentage of cases in which the DNA was obtained from a mixed source, the statistic obtained using the CPI method was not accurate." *Id*.

143.   "In a small percentage of these cases, TrueAllele would show that the DNA evidence used in a criminal conviction was actually exculpatory rather than inculpatory." *Id*.

144.   "Upon information and belief, Defendant John Doe [#41] was aware that TrueAllele would reveal that the prosecutors used inaccurate DNA evidence results to prosecute a criminal case." *Id*.

145.   "Upon information and belief, Defendant John Doe [#41] opposed the implementation of TrueAllele in the Crime Lab because he did not want previous criminal convictions questioned." *Id*.

146.   "Defendant Pizziketti opposed the implementation of TrueAllele in the Crime Lab." *Id*.

147.   "Defendant Pizziketti's opposition to Trueallele was due to the fact that TrueAllele would diminish the workforce and the result in re-analyzing cases thereby disclosing improper activity on her part." *Id*.

148.   Beginning in 2012 through December of 2015, the Associate Director of Biological Sciences for the New York State Forensic Investigation Center openly criticized Defendant Julie Pizziketti for allowing scientists to provide questionable DNA statistics in criminal cases and for allowing staff members to perform questionable casework examinations. *Id*.

149.     Defendant Julie Pizziketti "allowed scientists to testify to questionable DNA results." *Id*.

150.     It is alleged that Defendant Julie Pizziketti herself was testifying in criminal cases in which she was neither competent nor proficient to testify.  *Id*.

151.     Cybergenetics claims that in 2011 and in 2014 it informed Mr. Fitzpatrick that the methodology of "combined probability of inclusion (CPI) match statistic for DNA mixtures is not accepted as valid science[17] [and that all of the] DNA convictions that used CPI are at risk, either because of unreported potentially exculpatory "inconclusive" results, or inaccurate inculpatory match statistics used at trial."  *Id*.

## WITHHOLDING OF EXCULPATORY MATERIAL

152.     On January 25, 2016, during a conference with the Court, District Attorney Fitzpatrick informed the Court that he did not know whether or not the State Police used TrueAllele.  *See* Transcript January 25, 2016.

153.     The Judge informed Mr. Fitzpatrick that "if TrueAllele was asked to do any work on this sample . . . I agree with defense counsel, you're obligated to turn it over, regardless of what it is, and let them do with it as they feel it's appropriate."  *Id*. at pg. 20.

154.     The Judge continued by stating that if it turns out that "this has never been referred to TrueAllele . . . the book's closed."  *Id* at pg. 21.

155.     Cybergenetics had helped Mr. Fitzpatrick in the past and had testified in his County about these issues[18].

---

[17] https://www.cybgen.com/information/newsroom/2016/dec/Cybergenetics-responds-to-letter-from-Hillary-prosecutor.shtml
[18] https://www.cybgen.com/information/newsroom/2016/dec/Cybergenetics-responds-to-letter-from-Hillary-prosecutor.shtml

156.    Cybergenetics had offered to review all of Mr. Fitzpatrick's past DNA mixture cases, explaining that its motivation in Mr. Hillary's case was,

> to help prevent a grave scientific injustice.  The company worked pro bono on the case, conducting a quarter of a million dollars worth of service without pay.  Our scientists examined the data from all hundred and fifty items of DNA evidence, not just one fingernail item.
>
> Over a three-year period, Cybergenetics assisted the police, prosecution and defense in understanding the DNA evidence. TrueAllele doesn't take sides.  Our Hillary involvement did not help business. The company generally breaks even, investing heavily in science and pro bono justice.[19]

157.    Four months before Mr. Fitzpatrick had informed the Court that he didn't know if TrueAllele interpretation had been done by the State, he had received a copy of a report which Cybergenetics had performed for the State in Mr. Hillary's case.  *See* Exhibit Q (email attached thereto indicating that in September of 2015 Mr. Fitzpatrick received an email with a copy of report which had been sent to the State).

158.    Defendant Julie Pizziketti and Defendant Wickenheiser surly knew that TrueAllele had been used as "New York State was committed to replacing the CPI method with TrueAllele" from early on as 2001[20].

159.    Furthermore, in an email correspondence dated November 3, 2015, three months before Mr. Fitzpatrick made these statements to the Court, he was informed that he had been told by TrueAllele on September 10, 2015, via email, that they advised retesting and, he was informed that the State lab was also informed of this via an email correspondence.  *Id.*

---

[19] https://www.cybgen.com/information/newsroom/2016/dec/Cybergenetics-responds-to-letter-from-Hillary-prosecutor.shtml

[20] *See Shannon Morris, et al. v. New York State Police, et al.,* 16-CV-00164 (DNH/DJS) (N.D.N.Y. 2016), D.E. 1.

160.   The report which was sent to the State by Cybergenetics and which had been forwarded to Mr. Fitzpatrick "found no statistical support for a match between the fingernail scrapings from the left hand of the victim Garrett Phillips (item 550C2) and suspect Oral Hillary (Items 21, 22 and 24)." *Id.*

161.   Yet, on January 25, 2016, Mr. Fitzpatrick informed the Court that he would check with Defendant Julie Pizziketti "and if there's some communication, some report, some inconclusive thing," he would get it to the defense. *Id.* at pg. 18.

162.   Two months after this conference, in April of 2016, Judge Richards recused himself from all criminal cases involving District Attorney Rain after filing a complaint against her with the Committee on Professional Standards.[21]

163.   And, on April 18, 2016, the St. Lawrence County Board of Legislators voted no confidence in District Attorney Rain citing "lapses in judgement and unethical behavior."[22]

164.   In August of 2016, the defense motions to preclude the DNA analysis were granted by the Honorable Felix J. Catena, County Court Judge for Montgomery County who was assigned to the case after Judge Richard's recusal.

165.   The decision precluded the prosecution from calling a witness to testify regarding conclusions reached by the interpretation methodology employed (ultimately STRmix) based upon the prosecution's failure to "lay a foundation for the introduction of evidence that had not been internally validated". *See* Exhibit O.

---

[21] http://northcountrynow.com/news/st-lawrence-county-judge-recuses-self-current-cases-after-filing-complaint-against-da-0168962
[22] http://www.twcnews.com/nys/watertown/news/2016/04/18/-no-confidence--vote-against-da-rain-could-mean-state-investigation.html;   http://www.twcnews.com/nys/watertown/news/2016/12/6/st-lawrence-county-no-confidence-district-attorney-mary-rain.html.

166. The Court also precluded the prosecution from offering expert testimony as to any statistical results obtained by using the random match probability on the composite minor component of mixture. *Id.*

167. Mr. Hillary's case was tried before Judge Catena, who on September 28, 2016, acquitted him of the single count in the indictment, murder in the second degree.

168. Unrelenting, even after the verdict was handed down, District Attorney Fitzpatrick wrote that "a demonstrably guilty Defendant went free" and, "it is my everlasting regret that I was unable to convince a Judge (Catena) about the value of this DNA evidence and as a result, a sociopathic killer of a helpless 12 year old boy now walks among us." *See* Exhibit P.

169. Two months after the verdict, the County legislators voted on a resolution asking Mary Rain to resign.

## DAMAGES

170. The unlawful, intentional, willful, deliberately indifferent, reckless, and/or bad-faith acts and omissions of the Defendants caused Plaintiff to be wrongly seized, falsely arrested, incarcerated, and maliciously prosecuted.

171. The unlawful, intentional, willful, deliberately indifferent, reckless, negligent, and/or bad-faith acts and omissions of the Defendants caused Plaintiff the following injuries and damages, which were foreseeable to the Defendants at the time of their acts and omissions, and which continue to date into the future: physical pain and suffering, mental anguish, emotional distress, damage to reputation, loss of liberty, loss of employment, loss of personal associations and the benefits of liberty, humiliation, harassment, scorn, loss of professional opportunity, loss of income, legal expenses, indignities, embarrassment, and degradation for

which he is entitled to monetary relief.

172.   All the alleged acts, misdeeds and omissions committed by the individual Defendants described herein for which liability is claimed were done negligently, intentionally, willfully, purposefully, knowingly, unlawfully, maliciously, wantonly, recklessly, and/or with bad faith, and said proscribed conduct of the individual Defendants meets all of the standards for imposition of punitive damages.

173.   Damages are in the amount to be determined at trial but are in excess of One Hundred and Fifty Thousand ($150,000.00) Dollars exclusive of interest and costs.

## FIRST CAUSE OF ACTION

### 42 U.S.C. § 1983 – FALSE ARREST

174.   Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows.

175.   Defendants acted under color of law and deprived Plaintiff his civil, constitutional and statutory rights to be free from unreasonable search and seizure, specifically, plaintiff's right to be free from false arrest and imprisonment, when they detained and imprisoned plaintiff without probable cause or reasonable suspicion, and are liable to plaintiff under 42 U.S.C. § 1983.

176.   Plaintiff was aware of his confinement and did not consent to it and it was not otherwise privileged.

177.   That the said acts, were caused by the Defendants and unidentified Defendants without any legal justification.

178.   Plaintiff has been damaged as a result of Defendants' wrongful acts.

179.   That by reason of the aforesaid, the Plaintiff has each been damaged in a sum to be determined by a jury and an award of attorney's fees is appropriate pursuant to 42 U.S.C. §1988.

## SECOND CAUSE OF ACTION

### 42 U.S.C. §1983 - MALICIOUS PROSECUTION

180.   All other paragraphs in this complaint are here incorporated by reference.

181.   That the Plaintiff's rights have been violated pursuant to the United States Constitution.

182.   That the said acts, were caused by the Defendants and unidentified Defendants without any legal justification.

183.   That the said malicious and continuing prosecutions were instigated by the Defendants, their agents, servants and employees, without any legal justification to wit, without probable cause and based upon the Defendants' knowingly false statement that Plaintiff committed the crime of murder in the second degree.

184.   Defendants' false statements and false information caused the initiation of criminal proceedings against the Plaintiff.

185.   That Defendants' fabrication of evidence caused the initiation of criminal proceedings against the Plaintiff.

186.   That the Defendants' continued fabrication of evidence and post-arrest falsification of evidence caused the continued prosecution against Plaintiff.

187.   Plaintiff was arraigned on criminal charges and criminal prosecutions continued against him.

188.   That the said initiation and continuation of criminal proceedings was instigated and caused by the Defendants and by Defendants' providing false information, without authority of the law and without any legal basis or probable cause to believe that Plaintiff was in fact guilty of crimes.

189.   There was no information sufficient to support a reasonable belief that Plaintiff committed the murder of Garrett Phillips.

190.   The Defendants' acts were shocking and were performed by the Defendants with deliberate and reckless disregard for the truth and with malice.

191.   In fact, the charge against Plaintiff was dismissed.

192.   As a direct and proximate result of Defendants' actions, Mr. Hillary suffered loss of liberty and was imprisoned.

193.   That by reason of this malicious prosecution, Plaintiff incurred physical, emotional and pecuniary harms, suffered humiliation, mental anguish, embarrassment, loss of employment and he was otherwise injured.

194.   That by reason of the aforesaid, the Plaintiff has each been damaged in a sum to be determined by a jury and an award of attorney's fees is appropriate pursuant to 42 U.S.C. §1988.

### THIRD CAUSE OF ACTION

### 42 U.S.C. § 1983-CONSPIRACY

195.   All other paragraphs in this complaint are here incorporated by reference.

196.   Defendants, all state actors, acted in concert to inflict the unconstitutional injuries upon Plaintiff; and, they performed overt acts in furtherance of that goal causing the damages set forth herein.

197.    Mary Rain agreed to run for District Attorney at the behest of and encouragement of local law enforcement officers who she promptly thanked once she was elected.

198.    The local law enforcement officers, Village of Potsdam and New York State Defendants, along with the St. Lawrence Sheriff Defendants, were set in their determination to target, arrest and prosecute Mr. Hillary.

199.    They backed Ms. Rain to run for District Attorney and she agreed and ran her campaign based upon the promise to bring about an arrest in Garrett Phillips' death.

200.    She did so within six months of her election.

201.    The New York State Defendants encouraged Ms. Rain as they were also supporting someone who would become their ally in their quest to prevent TrueAllele from exposing their incompetence.

202.    Ms. Rain was just that person, with Garrett's mother at her side campaigning, she was determined to see this through regardless of the fact that there was no physical evidence of Mr. Hillary at the scene and the DNA analysis showed that there was no statistical support for a match between fingernail scrapings from Garrett Phillips and Mr. Hillary.

203.    Ms. Rain recruited Mr. Fitzpatrick, who, upon information and belief, had already seen the State Lab results before he was ever brought on the case and before there was ever an indictment.

204.    Ms. Rain, along with the State Defendants, the Village of Potsdam Defendants, and the St. Lawrence Defendants all worked together, with the same goal and the same blind malice, to bring about an indictment.

205.    Ms. Rain, along with the State Defendants, the Village of Potsdam Defendants, the Onondaga Defendant, and the St. Lawrence Defendants all worked together with the same goal and the same blind malice, to prosecute Mr. Hillary.

206.   The Defendants conspired among themselves for the purpose of depriving Plaintiff, either directly or indirectly, of equal protection of the laws, or equal privileges and immunities under the law, including the privilege to be free from false arrest and unjust and malicious prosecution.

207.   Defendants performed acts in furtherance of the conspiracy.

208.   Defendants' acts injured Plaintiff in his person or property and deprived him of a right or privilege of a citizen of the United States.

## FOURTH CAUSE OF ACTION

### 42 U.S.C. § 1983 –FABRICATION OF EVIDENCE CLAIM

209.   All other paragraphs in this complaint are here incorporated by reference.

210.   That the Plaintiff's rights have been violated pursuant to the United States Constitution.

211.   That the said acts, were caused by the Defendants and unidentified Defendants without any legal justification.

212.   That the deprivation of Plaintiff's liberty was caused by the Defendants' fabrication of evidence.

213.   That the Defendants' post-arrest fabrication and/or falsification of evidence caused the deprivation of Plaintiff's liberty.

214.   That by reason of the fabrication and/or falsification of evidence, Plaintiff incurred physical, emotional and pecuniary harms, suffered humiliation, mental anguish, embarrassment, loss of employment and he was otherwise injured.

215.   That by reason of the aforesaid, the Plaintiff has each been damaged in a sum to be determined by a jury and an award of attorney's fees is appropriate pursuant to 42 U.S.C. §1988.

## FIFTH CAUSE OF ACTION

### 42 U.S.C. § 1983 – FAILURE TO DISCLOSE EXCULPATORY EVIDENCE

216.   All other paragraphs in this complaint are here incorporated by reference.

217.   That the Plaintiff's rights have been violated pursuant to the United States Constitution.

218.   That the said acts, were caused by the Defendants and unidentified Defendants without any legal justification.

219.   That the deprivation of Plaintiff's liberty was caused by the Defendants' withholding of and/or failure to disclose exculpatory evidence.

220.   That by reason of the withholding of and/or failure to disclose exculpatory evidence Plaintiff incurred physical, emotional and pecuniary harms, suffered humiliation, mental anguish, embarrassment, loss of employment and he was otherwise injured.

221.   That by reason of the aforesaid, the Plaintiff has each been damaged in a sum to be determined by a jury and an award of attorney's fees is appropriate pursuant to 42 U.S.C. §1988.

## SIXTH CAUSE OF ACTION

**42 U.S.C. § 1983 – FOR VIOLATIONS OF PLAINTIFF'S FOURTEENTH AMENDMENT EQUAL PROTECTION RIGHTS**

222.    All other paragraphs in this complaint are here incorporated by reference.

223.    The policies of the municipal Defendants and the New York State Police Defendants have violated Plaintiff's constitutional right to have police and law enforcement services administered in a nondiscriminatory manner.  The unequal treatment Plaintiff received from the State of New York Police, the Village of Potsdam, the County of St. Lawrence and/or the County of Onondaga was based upon the fact that he was a Black individual of Jamaican decent as opposed to the more favorable treatment accorded similarly situated Caucasian individuals.

224.    The municipalities' unwritten but long standing policies selectively denied its constitutional guarantees to certain disfavored minorities like Plaintiff.

225.    Plaintiff was treated differently from other similarly situated individuals, based on impermissible considerations such as race, and Defendants' actions or inactions were at least in part because of, not merely in spite of, their adverse effects upon by Plaintiff by reason of illegitimate consideration of Plaintiff's race.

226.    The State of New York Police, the Village of Potsdam, the County of St. Lawrence and/or the County of Onondaga have been deliberately indifferent to the constitutional rights of individuals who come into contact with its employees and/or agents, as these municipalities have had a policy permitting its employees and/or agents to arrest and prosecute individuals without any legal justification.

227.   That by reason of the aforesaid, the Plaintiff has each been damaged in a sum to be determined by a jury and an award of attorney's fees is appropriate pursuant to 42 U.S.C. §1988.

## SEVENTH CAUSE OF ACTION

### 42 U.S.C. § 1983 – RETALIATORY PROSECUTION CLAIM FOR VIOLATIONS OF PLAINTIFF'S FIRST AMENDMENT RIGHT OF FREE EXPRESSION

228.   Plaintiff repeats, reiterates and realleges each and every allegation contained in the prior paragraphs with the same force and effect as if more fully and at length set forth herein.

229.   Plaintiff's rights in initiating a law suit against the Village of Potsdam Defendants for a violation of his Fourth Amendment rights on October 26, 2011 was conduct which is constitutionally protected.

230.   Plaintiff's initiation of this law suit was a substantial factor and/or motivating factor in the Defendants' prosecution of Plaintiff.

231.   There was no probable cause for Plaintiff's prosecution.

232.   Plaintiff would not have been prosecuted in the absence of the retaliatory motive of Defendants.

233.   That by reason of the aforesaid, the Plaintiff has each been damaged in a sum to be determined by a jury and an award of attorney's fees is appropriate pursuant to 42 U.S.C. §1988.

## EIGHTH CAUSE OF ACTION

### 42 U.S.C. § 1983 - DUE PROCESS AND STIGMA-PLUS DEFAMATION

234.   Plaintiff repeats, reiterates and realleges each and every allegation contained in the prior paragraphs with the same force and effect as if more fully and at length set forth herein.

235.   Defendants published Plaintiff's name and made false claims, referring to him as a "sociopathic killer" and as the murderer of Garrett Phillips.

236.   These statements are false.

237.   As a result of these statements, Plaintiff was unable to rent housings, Plaintiff was told to vacate his apartment, he has suffered public humiliation, damage to his reputation, loss of employment, loss of personal associations and loss of the benefits of liberty.

238.   The publishing of Plaintiff's name and reference to him as a "sociopathic killer" and/or Garrett Phillips' murderer was maintained or disseminated in a fashion that resulted in the above stated losses.

239.   By reason of the aforesaid, the Plaintiff was defamed, suffered stigmatizing-plus injuries related to public humiliation, damage to his reputation, loss of employment, loss of personal associations and loss of the benefits of liberty, and as a result, his rights to due process were thereby violated.

240.   That by reason of the aforesaid, the Plaintiff has each been damaged in a sum to be determined by a jury and an award of attorney's fees is appropriate pursuant to 42 U.S.C. §1988.

### <u>NINTH CAUSE OF ACTION</u>

### 42 U.S.C. § 1983- MUNICIPAL AND CORPORATE LIABILITY FOR THE VIOLATIONS OF PLAINTIFF'S FIRST, FOURTH AND FOURTEENTH AMENDMENT RIGHTS

241.   All other paragraphs in this complaint are here incorporated by reference.

242.   The State of New York, the Village of Potsdam, the County of St. Lawrence and/or the County of Onondaga through its respective high level policy makers, has made a deliberate, conscious choice to allow its employees to engage in law enforcement activities,

without the training in the proper predicates for law enforcement, probable cause, reasonable cause, gathering of evidence, analyzing of evidence, proper procedures, and constitutional mandates.

243.   The State of New York, the Village of Potsdam, the County of St. Lawrence and the County of Onondaga are liable for the damages suffered by Plaintiff because each of these municipalities has created policies and customs under which unconstitutional practices regularly occur and even thrive.

244.   The practices described in this Complaint comprise both formal policies, and practices so consistent and widespread that, although not expressly authorized, constitute a custom or usage of which supervising policy-makers must have been aware, and policymakers failed to provide adequate training or supervision to subordinates to such an extent that it amounted to deliberate indifference to the rights of those who come into contact with employees and/or agents of the State of New York, the Village of Potsdam, the County of St. Lawrence and/or the County of Onondaga.

245.   Many of the Defendants are themselves policy-makers and thus their conduct and unconstitutional acts and omissions constituted the policy and practice of their respective municipalities.

246.   The deliberate indifference on the part of the State of New York, the Village of Potsdam, the County of St. Lawrence and/or the County of Onondaga caused Plaintiff's injuries.

247.   The State of New York, the Village of Potsdam, the County of St. Lawrence and/or the County of Onondaga have failed to train its member in legal justifications for citizens' arrests.

248.   By reason of the aforesaid, the Plaintiff was defamed, suffered stigmatizing-plus injuries related to public humiliation, damage to his reputation, loss of employment, loss of personal associations and loss of the benefits of liberty, and as a result, his rights to due process were thereby violated.

249.   That by reason of the aforesaid, the Plaintiff has each been damaged in a sum to be determined by a jury and an award of attorney's fees is appropriate pursuant to 42 U.S.C. §1988.

## TENTH CAUSE OF ACTION

### 42 U.S.C. § 1983 - SUPERVISOR LIABILITY
### IN VIOLATION OF THE FIRST, FOURTH AND FOURTEENTH AMENDMENTS

250.   Plaintiff repeats, reiterates and realleges each and every allegation contained in the prior paragraphs with the same force and effect as if more fully and at length set forth herein.

251.   That the Plaintiff's rights have been violated under the First, Fourth and Fourteenth Amendments to the United States Constitution by the Defendants and John Doe Defendants who were supervisors of the Defendants.

252.   That these Defendants, who were supervisors had actual and constructive knowledge of the illegal seizure, false arrest, malicious prosecution and abuse of process which was being committed by their subordinates against the Plaintiff.

253.   That the Defendant supervisors did cause the Plaintiff's harms by failing to remedy the patterns of false arrest, malicious prosecution and abuse of process and other constitutional violations the Defendants committed after learning of them, by creating a policy and custom under which unconstitutional practices occurred and were tolerated and, by being grossly negligent in managing their subordinates.

254.   That by reason of the unlawful seizure and detention, Plaintiff incurred mental anguish, emotional distress, physical pain and injury, loss of professional opportunity, loss of income, legal expenses, loss of reputation, humiliation, indignities,  embarrassment, and degradation and he was otherwise injured.

255.   That by reason of the aforesaid, the Plaintiff has been damaged in an amount to be determined by a jury and an award of attorney's fees is appropriate pursuant to 42 U.S.C. §1988.

## ELEVENTH CAUSE OF ACTION

### NEW YORK STATE TORT LAW –NEGLIGENT HIRING, TRAINING, SUPERVISION AND RETENTION

256.   Plaintiff repeats, reiterates and realleges each and every allegation contained in the prior paragraphs with the same force and effect as if more fully and at length set forth herein.

257.   That the Defendants were negligent, careless, reckless and deliberately indifferent in hiring, retaining, properly training and supervising, as and for its employees, named and unidentified Defendants herein, in that the Defendants knew or should have known that the individually named and unnamed employees lacked the skill, ability and training to act appropriately in investigations and criminal prosecutions.

258.   The Defendants failed to exercise due care and caution in their hiring practices, and in particular, in hiring the Defendant employees who lacked the maturity, mental capacity and the ability to function as employees of the aforementioned Defendants and were wholly unqualified in that the named and unidentified Defendants lacked the training, knowledge, and expertise to be employed when hired to be employees.

259.   The Defendants failed to establish proper guidelines and procedures for screening and investigating law enforcement officials.

260.   That the Defendants failed to train its employees in the proper criteria for establishing probable cause to arrest; the proper criteria for establishing reasonable suspicion to believe that a certain individual committed a criminal act, the proper criteria for conducting a criminal investigation, the legal competence to uphold the constitution and properly prosecute a case; and that the Defendants, their agents, servants and employees were otherwise reckless, careless, deliberately indifferent and negligent.

261.   The aforesaid occurrence and resulting injuries to mind and body therefrom, were caused wholly and solely by reason of the negligence, recklessness and carelessness of the Defendants, their agents, servants and employees without any negligence on the part of the Plaintiff.

262.   The aforesaid injuries were the result of the negligence, recklessness and carelessness of the Defendants.

263.   The aforesaid injuries did not result from any negligence or fault on the part of the Plaintiff herein.

264.   The limitations on liability set forth in CPLR § 1601 do not apply by reason of one or more of the exemptions set forth in CPLR § 1602.

265.   By reason of the foregoing, Plaintiff has been damaged as set forth above.

## TWELFTH CAUSE OF ACTION

### NEW YORK STATE TORT FALSE IMPRISONMENT/FALSE ARREST

266.   Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows.

267.   That the Plaintiff's right to be free from unreasonable search and seizure has been violated pursuant to Article I Section 12 of the New York New York State Constitution in that the Defendants instigated and caused the arrest of the Plaintiff.

268.   There was no information sufficient to support a reasonable belief that Plaintiff committed the murder of Garrett Phillips.

269.   That the said false arrest was instigated and caused by the Defendants, their agents, servants and employees, without any legal justification to wit, without probable cause and by providing knowingly false information which resulted in the Plaintiff's confinement based upon the Defendants' insistence that Plaintiff had committed the murder.

270.   That the Plaintiff was conscious of the confinement, Plaintiff did not consent to the confinement and the confinement was not otherwise privileged.

271.   That by reason of the unlawful seizure and false arrest, Plaintiff has been damaged as set forth above.

## THIRTEENTH CAUSE OF ACTION

### NEW YORK STATE TORT ABUSE OF PROCESS

272.   Plaintiff repeats, reiterates and realleges each and every allegation contained in the prior paragraphs with the same force and effect as if more fully and at length set forth herein.

273.   The Defendants and/or John Doe Defendants issued legal process to place Plaintiff under arrest.

274.   That the policy and custom among Defendants was at the time of Plaintiff's arrest to make an immediate arrest regardless of whether reasonable or probable cause existed for the arrest.

275.   That there was absolutely no reasonable or probable cause for Plaintiff's arrest, Plaintiff committed no crime, Plaintiff did not engage in any criminal activity, nor was there any legitimate basis to believe that Plaintiff had engaged in any criminal conduct.

276.   Defendants aimed to achieve a collateral purpose beyond criminal prosecution, such purpose being the furtherance of the unconstitutional policy and/or custom of making an immediate arrest regardless of whether reasonable or probable cause existed for the arrest.

277.   Probable cause for Plaintiff's arrest was lacking, and thus malice or any improper or wrongful motive may be inferred from the lack of probable cause.  Defendants might have acted in the honest and reasonable belief that Plaintiff was guilty of some crime, but their good faith does not exonerate them as the facts themselves and as presented to them did not constitute any criminal conduct.

278.   That the Defendants acts intended to cause harm to the Plaintiff and did cause harm to Plaintiff without excuse or justification.

279.   That Defendants' aforementioned actions were conscience shocking and placed Plaintiff in apprehension of emotional injuries.

280.   That by reason of the abuse of process, the Plaintiff incurred mental anguish, emotional distress, physical pain, loss of professional opportunity, loss of income, legal expenses, loss of reputation, humiliation, indignities,  embarrassment, and degradation and he was otherwise injured.

**WHEREFORE**, Plaintiff prays as follows:

A.     That the Court award compensatory damages to him and against the Defendants jointly and severally, in an amount to be determined at trial;

B.     That the Court award punitive damages to Plaintiff, and against all non-municipal Defendants, in an amount, to be determined at trial, that will deter such conduct by Defendants in the future;

C.     For a trial by jury;

D.     For a pre-judgment and post-judgment interest and recovery of his costs, including reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 for all 42 U.S.C. § 1983 claims; and

E.   For any and all other relief to which he may be entitled.

Dated: May 15, 2017
       Garden City, New York

                                    BARKET MARION EPSTEIN & KEARON



                      By:     _____
                              Amy B. Marion, Esq.
                              666 Old County Road-Suite 700
                              Garden City, N.Y.  11530
                              (516) 745-1500