| | |
|---|---|
| UNITED STATES DISTRICT COURT<br>EASTERN DISTRICT OF NEW YORK<br>------------------------------------------------------------------------------------------<br><br>ORAL NICHOLAS HILLARY,<br><br>Plaintiff,<br><br>-against-<br><br>ST. LAWRENCE COUNTY, ST. LAWRENCE COUNTY DISTRICT ATTORNEY'S OFFICE, ST. LAWRENCE COUNTY DISTRICT ATTORNEY MARY E. RAIN, Individually and in her Official Capacity, UNIDENTIFIED JANE/JOHN DOE #1-10 ST. LAWRENCE COUNTY EMPLOYEES, UNIDENTIFIED JANE/JOHN DOE #11-20 ST. LAWRENCE COUNTY DISTRICT ATTORNEY EMPLOYEES, ST. LAWRENCE COUNTY SHERIFF KEVIN M. WELLS, Individually and in his Official Capacity, ST. LAWRENCE COUNTY DEPUTY SHERIFF JOHN E. JONES, JR., Individually and in his Official Capacity, UNIDENTIFIED JANE/JOHN DOE #21-30 ST. LAWRENCE COUNTY SHERIFF EMPLOYEES,<br><br>VILLAGE OF POTSDAM, VILLAGE OF POTSDAM POLICE DEPARTMENT, VILLAGE OF POTSDAM FORMER CHIEF OF POLICE EDWARD TISCHLER, Individually and in his Official Capacity, VILLAGE OF POTSDAM FORMER CHIEF OF POLICE KEVIN M. BATES, VILLAGE OF POTSDAM FORMER POLICE LIEUTENANT (presently Acting Chief of Police) MARK MURRAY, Individually and in his Official Capacity, UNIDENTIFIED JANE/JOHN DOE VILLAGE OF POTSDAM EMPLOYEES #31-40,<br><br>ONONDAGA COUNTY, ONONDAGA DISTRICT ATTORNEY WILLIAM FITZPATRICK,<br><br>NEW YORK STATE POLICE, NEW YORK STATE POLICE OFFICER GARY SNELL, Individually and in his Official Capacity, NEW YORK STATE POLICE INVESTIGATOR THEODORE LEVINSON, NEW YORK STATE POLICE INVESTIGATOR TIM PEETS, RAY WICKENHEISER, individually and in his Official Capacity as Director, Crime Lab System, New York State Police Forensic Investigation Center, JULIE PIZZIKETTI, individually and in her Official Capacity as Director of Biological Science, New York State Police Forensic Investigation Center, UNIDENTIFIED JANE/JOHN DOE #41-50 NEW YORK STATE POLICE EMPLOYEES,<br><br>Defendants.<br>------------------------------------------------------------------------------------------X | <u>COMPLAINT</u><br><br>DOCKET NO.:<br>17-2952<br><br><br><br><br><br><br><br><br><br><br><br><u>JURY TRIAL</u><br><u>DEMANDED</u> |

## COMPLAINT

The Plaintiff, complaining of the Defendants, by his attorneys, AMY MARION, ESQ. and BRUCE BARKET, ESQ. respectfully shows to this Court and alleges that he was deprived his civil rights and sustained injury as a result of the deprivations of his civil rights.

## PRELIMINARY STATEMENT

1.      On October 24, 2011, in the Village of Potsdam, New York, a twelve-year old boy named Garrett Phillips was found dead.

2.      Plaintiff, Mr. Hillary, had previously dated Garrett Phillips' mother, Tandy Cyrus (also known as Tandy Collins).

3.      Two days after the boy's death, Mr. Hillary was taken into police custody and detained from approximately 8:00 a.m. until approximately 6:00 p.m. before being released; no charges were brought against him at that time.

4.      More than two and one half years later, on May 15, 2014, Mr. Hillary was charged with the death of Garrett Phillips.

5.      Two years after that, on September 28, 2016, Mr. Hillary was acquitted following a bench trial.

6.      This is a civil rights action seeking damages arising out of Defendants' violation of the rights secured by the First, Fourth and Fourteenth Amendment of the United States Constitution pursuant to 42 U.S.C. § 1983 and arising under the laws and State of New York, and arising out of Defendants' defamatory statements.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction pursuant to 28 U.S.C. § 1331, over claims arising under 42 U.S.C. § 1983.

8.      Supplemental jurisdiction over Plaintiff's state law claims exists pursuant to 28 U.S.C. § 1367(a).

9.      Venue is proper in the Eastern District of New York under 28 U.S.C. § 1391(b), because that is the judicial district in which the Plaintiff resides.

**JURY DEMAND**

10.     Pursuant to the Seventh Amendment of the United States Constitution, Plaintiff requests a jury trial on all issues and claims set forth in this Complaint.

**CONDITIONS PRECEDENT**

11.     On December 21, 2016, Notices of Claim and a Notice of Intention were sent to Defendants.

12.     As a result of some of the Notices being returned as "undelivered", Plaintiff filed two separate motions for leave to file late notice of claim, one before the Supreme Court for the County of St. Lawrence and one before the Supreme Court for the County of Onondaga.

13.     The Supreme Court for St. Lawrence granted Plaintiff's application and the motion before the Supreme Court for Onondaga County is still pending.

14.     Plaintiff re-served the Notices of Claim pursuant to the St. Lawrence Court's order and has also informed counsel for Onondaga County Defendants, St. Lawrence County Defendants and Village of Potsdam Defendants that Plaintiff will submit to an examination after a ruling is received from the Supreme Court for St. Lawrence County.

**PARTIES**

15.     Plaintiff, Oral Nicholas Hillary is a resident of Kings County in the State of New York.

16.     The individually named St. Lawrence County Defendants were at all times employed by the County of St. Lawrence and were acting in their capacity as St. Lawrence County employees all times relevant and pertinent to Plaintiff's complaint.

17.     At all times relevant to this complaint, St. Lawrence County District Attorney Defendants were duly appointed and acting as District Attorneys and/or agents of the St. Lawrence County District Attorney, acting under color of state law, within the scope of their employment, pursuant to the statutes, ordinances, regulations, policies, customs and usage of the County of St. Lawrence and the State of New York.

18.     Defendant County of St. Lawrence is a body politic and corporate empowered to exercise home rule.

19.     The County of St. Lawrence County Legislature, the County's policymaker, has delegated final policymaking authority for the supervision and control of the County of St. Lawrence District Attorney's Office to the duly appointed District Attorney of the County of St. Lawrence.

20.     At all times relevant to this complaint, St. Lawrence County Sheriff Defendants were duly appointed and acting as St. Lawrence County Sheriffs and/or agents of the St. Lawrence County Sheriff's Department, acting under color of state law, within the scope of their employment, pursuant to the statutes, ordinances, regulations, policies, customs and usage of the County of St. Lawrence and the State of New York.

21.     The County of St. Lawrence County Legislature, the County's policymaker, has delegated final policymaking authority for the supervision and control of the County of St. Lawrence Sheriff's Department to the duly appointed Sheriff of the County of St. Lawrence.

22.     The individually named Village of Potsdam Defendants were at all times employed by the Village of Potsdam and were acting in their capacity as Village of Potsdam employees all times relevant and pertinent to Plaintiff's complaint.

23.     At all times relevant to this complaint, Village of Potsdam Police Department Defendants were duly appointed and acting as Police Officers and/or agents of the Village of Potsdam Police Department, acting under color of state law, within the scope of their employment, pursuant to the statutes, ordinances, regulations, policies, customs and usage of the County of St. Lawrence and the State of New York.

24.     Defendant County of Village of Potsdam is a body politic and corporate empowered to exercise home rule.

25.     The Village of Potsdam Board of trustees, the Village's policymaker, has delegated final policymaking authority for the supervision and control of the Village of Potsdam to the duly appointed Board of trustees for the Village of Potsdam.

26.     The individually named Onondaga County Defendants were at all times employed by the County of Onondaga and were acting in their capacity as Onondaga County employees all times relevant and pertinent to Plaintiff's complaint.

27.     At all times relevant to this complaint, Onondaga District Attorney Defendants were duly appointed and acting as District Attorneys and/or agents of the Onondaga County District Attorney, acting under color of state law, within the scope of their employment, pursuant to the statutes, ordinances, regulations, policies, customs and usage of the County of Onondaga and the State of New York.

28.     Defendant County of Onondaga is a body politic and corporate empowered to exercise home rule.

29.     The County of Onondaga County Legislature, the County's policymaker, has delegated final policymaking authority for the supervision and control of the County of Onondaga's District Attorney's Office to the duly appointed District Attorney of the County of Onondaga.

30.     Defendant New York State Police is an executive agency of the State of New York with an office located at 1220 Washington Avenue, Building 22, Albany, New York 12226-2252.

31.     The individually named New York State Trooper/Officer/Investigator/Crime Lab Defendants were at all times employed by the State of New York and were acting in their capacity as New York State Police employees at all times relevant and pertinent to Plaintiff's complaint.

32.     At all times relevant to this complaint, New York State Trooper/Officer/Investigator/Crime Lab Defendants were duly appointed and acting as New York State Troopers/Officers/Investigators/Crime Lab Defendants and/or agents of New York State Troopers/Officers/Investigators/Crime Lab Defendants, acting under color of state law, within the scope of their employment, pursuant to the statutes, ordinances, regulations, policies, customs and usage of the State of New York.

33.     Defendant Ray Wickenheiser sued herein individually and in his official capacity as Director Crime Lab System, New York State Police Forensic Investigation Center [New York State Crime Lab], is a resident of the State of New York and at all times relevant herein was duly employed and employee of the New York State Police.

34.     Defendant Julie A. Pizziketti sued herein individually and in her official capacity as Assistant Director/Director of Biological Sciences New York State Police Forensic

Investigation Center [New York State Crime Lab], is a resident of the State of New York and at all times relevant herein was duly employed and employee of the New York State Police.

## FACTUAL ALLEGATIONS

35.     On October 24, 2011 at 5:07 p.m. a call was received by the Potsdam Police Department from a caller located in an apartment at 100 Market Street, stating that she had heard a bang and someone say "help" or "no" in a neighboring apartment.

36.     Garrett Phillips, along with his mother and brother, were living in an apartment (apartment "4") at 100 Market Street in Potsdam, New York.

37.     Police Officer ("PO") Wentworth of the Potsdam Police Department responded to the call.

38.      With the assistance of the landlord, PO Wentworth entered the apartment where he found Garret Phillips lying on the floor in a bedroom, not moving or breathing.

39.     PO Wentworth called the dispatch and told them to send a squad and Officer McCargar; he told the landlord, Rick Dumas, to start doing chest compressions, and he went down to his car to get his emergency equipment.

40.     Garrett Phillips was taken to the hospital, and two hours later he was pronounced dead.

## PLAINTIFF IS TARGETED

41.      Two days after Garrett Phillips' death, Mr. Hillary was taken into police custody, strip searched, and held for ten hours.

42.     Purportedly other individuals who had a relationship with the Garrett Phillips or his mother voluntarily gave statements, were fingerprinted and gave DNA samples.

43.     None of those individuals were held for ten hours or strip searched.

44.   In October of 2011, Mr. Hilary was the men's soccer coach for Clarkson University which is located in Potsdam, New York.

45.   At the time, he had known Garrett Phillips for one year.

46.   Mr. Hillary had met Garrett's mother, Tandy Cyrus, in October of 2010; they had become friends, dated, lived together for a brief period of time, and by September of 2011 they were living apart.

47.   Even though they were living apart, Mr. Hillary considered Ms. Cyrus a friend.

48.   Mr. Hillary, who is of Jamaican decent, was immediately targeted as a suspect in the death of Tandy Cyrus' son.

49.   Defendant John E. Jones, a Deputy Sheriff of St. Lawrence County, had also dated Garrett Phillips' mother.

50.   Potsdam Police Department notes of video surveillance obtained from the scene indicate that Defendant Jones pulled his truck into a driveway twenty-seven (27) seconds before "a kid" (later identified as Garrett Phillips) was seen skateboarding down the road. *See* Exhibit A

51.   Those same notes also indicate that four (4) minutes before the 911 call was placed, Defendant Jones is seen walking on the street with his dog.  *Id.*

52.   Defendant Jones was not pursued as a suspect; instead, he actively participated in targeting Nick Hillary.

53.   Two days after the incident, Defendant Jones went to the police command where the incident took place and gave the Sergeant a key to Tandy Cyrus' apartment "to compare w/ keys found during [the] search of Hillary's residence and office."  *See* Exhibit B

54.   A lead sheet from two days after the incident indicates that Jones is listed as the source informing the police of a witness who remembers Nick Hillary getting a key made at his

8

store.  *See* Exhibit C.

55.      Additionally, the lead sheet from November 4, 2011, eleven days after the incident, indicates that Defendant John Jones called Chief of Police Tischler and as a result of that call, the Chief sent an officer to Nick Hillary's apartment to conduct an investigation.  *See* attached Exhibit D.

56.      Defendant Jones was permitted to accompany and remain with Tandy Cyrus while she was interviewed by Chief Tischler and Lieutenant Mark Murry; he obviously was not considered a suspect.  *See* Exhibit E.

## CAUSE FOR RETALIATION

57.      On January 20, 2012, Mr. Hillary filed a Notice of Claim as a result of the deprivation of his rights on October 26, 2011.

58.      A Summons and Complaint was filed in September of 2012 in the Supreme Court, St. Lawrence County and was removed to the United States District Court for the Northern District of New York shortly thereafter.

59.      The action was brought against the Village of Potsdam, the Chief of Police of the Village and several individually named Village of Potsdam police officers.

60.      The Village of Potsdam is located in St. Lawrence County, New York.

61.      In March of 2013, six months after Mr. Hillary commenced his lawsuit, Mary E. Rain, a former police officer for over 15 years, announced that she would be seeking election for St. Lawrence County District Attorney; explaining that she was "encouraged" to do so by "local law enforcement officials and officers."[1]

---

[1] http://www.watertowndailytimes.com/article/20130306/NEWS07/703059740

62.     Presumably, the "local "local law enforcement officials and officers"[2] who had "encouraged" Mary Rain to run for office, were not pleased with sitting St. Lawrence County District Attorney Nicole M. Duvé who had not lodged any accusations against Mr. Hillary or convened a grand jury.

63.     Village of Potsdam Lt. Murray told Duvé that Mr. Hillary was "a high high person of interest or potential suspect." *See* Exhibit F.

64.     Ms. Duvé was surly aware that there was no evidence that placed Mr. Hillary at the crime scene, as testified to by former Village of Potsdam Chief of Police Edward F. Tischler. *See* Exhibit G.

65.     But that did not stop Mary Rain who commenced "a vicious campaign" against Ms. Duvé, claiming that her office had not been as cooperative with police agencies as it should be; accusing her of "incompetence, mismanagement, and the failure to investigate the Garrett Phillips killing."[3]

66.     "Rain pledged to solve the case and bring the killer to justice.  Indeed, Rain in many of her campaign events had Garrett's mother at her side." *Id.*

67.     Before ever entering the District Attorney's Office, Mary Rain was already actively pursuing an arrest in Garrett Phillips' case.

68.     When she announced an indictment in the case within six months of winning her election, she gave thanks to "the fabulous job done by Potsdam PD and New York State Police,"[4] the local law enforcement who were being sued by Mr. Hillary and who had "encouraged her to run for the job."[5]

---

[2] http://www.watertowndailytimes.com/article/20130306/NEWS07/703059740
[3] http://www.huffingtonpost.com/bennett-l-gershman/the-most-dangerous-prosec_b_12085240.html
[4] *See* Exhibit H.
[5] http://www.watertowndailytimes.com/article/20130306/NEWS07/703059740

69.     Mr. Hillary was charged with Garrett Phillips' murder on the same day that dispositive motions in his case against the Village of Potsdam were filed.

70.     Ms. Rain posted, "it was great to see Oral Nicholas Hillary in handcuffs."  *See* Exhibit H.

71.     Unrelenting, Mr. Hillary remained in jail because the District Attorney questioned the value of the properties offered for collateral for the bond, "as well as the validity of the bond company, even though according to Judge Richards' office (sic), the bond company in question has been used before in his courtroom."[6]

## THE CONSPIRACY

72.     Potsdam Police Department Chief Ed Tischler, along with the assistance of "State Police forensic units" who were collecting the evidence, the "staff of the St. Lawrence County District Attorney's Office," and "the Sheriff's Department," pursued a course to target Nick Hillary for Garrett Phillips' murder.[7]

73.     Deputy Sheriff Jones steered the investigation by setting before them warrantless, prejudicial and unlawful allegations which all of the Defendants promptly pursued.

74.     The problem for them was that former District Attorney Duvé would not sign off on these baseless accusations which were not supported by a shred of evidence.

75.     However, with Mary Rain's successful win, they had a champion for their cause.

76.     Ms. Rain did not care that nine months before Garrett Phillips' death, his mother, Tandy Cyrus, had made a complaint against Jones, stating that "John has been acting in various ways that causes me to fear for the safety of myself and my sons."  *See* Exhibit I.

---

[6] https://www.northcountrypublicradio.org/news/story/25400/20140711/after-two-months-hillary-bail-hearing-set-to-resume
[7]
https://m.facebook.com/story.php?story_fbid=2456925670173&id=103382899700373&refsrc=https%3A%2F%2Fm.facebook.com%2F1340WMSA%2Fvideos%2F2456925670173%2F&_rdr

77.     Ms. Rain ignored this and told the press that "John Jones had no issue, because he was getting along fine with Tandy . . . ."[8]

78.     Apparently, John Jones' law suit against Tandy Cyrus, which was pending at the time of Garrett Phillips' death, was not an issue for Ms. Rain either.  *See* Exhibit I; *see also* Exhibit J.

79.     True to her promise, and consistent with her vengeful campaign, Mary Rain swore in an affidavit that Oral "Nick" Hillary was the last person seen with Garrett Phillips; that was an outright lie.  *See* Exhibit K.

80.     Defendant Mark Murray testified under oath that video surveillance shows Mr. Hillary "stalking" Garrett Phillips ten minutes before the murder; that was not true.  *See* Exhibit F, pg. 139.

81.     Defendant Mark Murray gave this testimony at a deposition for Mr. Hillary's civil suit filed against him, along with Chief Tischler and other officers, three months before Mr. Hillary was arrested.

82.     Defendant Murray claimed that "the videotape of Mr. Hillary stalking Garrett, you know literally 10 minutes before his death . . . seals it for [him]."  *Id.*

83.     When questioned for specifics about this claim, he was forced to admit that he did not see Mr. Hillary in the video.  *Id.* at pg. 145.

84.     However, the video does show Defendant Jones pulling his truck into his driveway within seconds of Garrett Phillips skateboarding by; and, it also shows Jones walking on the street in the location of, and at the time of, the murder.

---

[8] https://www.northcountrypublicradio.org/news/story/28539/20150605/why-is-justice-for-garrett-phillips-so-complicated

85.     The Defendants just simply ignore this, let alone characterize it as stalking or other incriminating behavior.  Defendant Jones' presence – within seconds of Garrett Phillips' presence at the same location and, his presence on the street at the time of the murder, didn't seal the deal for Defendant Murray.

86.     But, Mr. Hillary's car in a parking lot, ten minutes before the murder, did.

87.     Ms. Rain did her part by poisoning the public as well, announcing that Mr. Hillary was "a habitual marijuana smoker" and that he had been "arrested for having a pound or more of marijuana in 2000 that was reduced to a misdemeanor" without there ever having been a hearing as to the admissibility of these charges or the underlying bad acts.[9]

88.     She threatened one of Mr. Hillary's alibi witnesses with obstruction and the other with a grand jury subpoena, forcing the witness to reveal privileged attorney-client communications.

89.     The police told Mr. Fairlie, one of the alibi witnesses, that the District Attorney was listening and watching their conversation; telling him that she was "looking into obstruction of charges (sic) that they thought [the witness] was withholding something or lying about something or knew information that the [witness] didn't [know]."  *See* Exhibit L. Fairlie.

90.     Defendant Peets yelled at this witness, telling him "that they knew Nick did it" and that he "didn't have to stand up for him," telling him that Nick didn't do anything for him and he doesn't have to do anything for Nick.  *Id.*

---

[9] http://www.watertowndailytimes.com/article/20140520/NEWS07/705209836

91.     Defendant Murray and Defendant Snell went to this witness' home, several times unannounced, and told this witness that if he changed his alibi statement given on October 26, 2011 he wouldn't get in trouble.[10]  *See* Exhibit L.

92.     As for Mr. Hillary's other alibi witness, his daughter Shanna, her grand jury testimony "covered 80 pages."  *See* Exhibit M.

93.     Ms. Rain was admonished by the Court for her conduct when examining this witness.

94.     The Judge explained that "[t]he problems arose when the prosecutor asked Shanna about her conversation with her lawyer, within a week after Garrett died.  In the grand jury preceding it was unquestionably improper and prejudicial for Ms. Rain to ask her what her lawyer had told her, and then to press her, in cross-examining fashion, telling Shanna that she had to answer because she was under subpoena."  *Id*.

95.     "When this questioning persisted, Shanna disclosed that the attorney with whom she spoke was the same attorney who had represented Defendant in his civil claim against the police officers."  *Id*.

96.     "[W]ith this line of questions, Ms. Rain was trying both to undermine a potential alibi defense and at the same time portray witnesses who could provide a potential alibi defense as lying to protect Defendant."  *Id*.

97.     "The prosecutor's expression of bias by her disbelief of the witness' testimony for all intents and purposes took out of the jury's hands a determination of what the proved facts were in that regard."  *Id*.

---

[10] https://www.northcountrypublicradio.org/news/story/28539/20150605/why-is-justice-for-garrett-phillips-so-complicated

98.    "Worst of all, Ms. Rain asked Shanna essentially the same question thirteen times as to how she could "explain the unrefuted proof" that established that Defendant was not in Shanna's home at or around (a specific time changed with each question) on the day of the homicide.  This testimony was bullying a seventeen-year old girl, who clearly stated that she did not understand what Ms. Rain meant by 'unrefuted proof.'"  *Id*.

99.    "Ms. Rain did not explain what she meant by that, and moreover, it was extremely prejudicial to use words like 'unrefuted proof' in the grand jury while questioning a witness. These questions invaded the fact-finding role of the grand jurors, and told them what Ms. Rain thought that the proof showed."  *Id*.

100.    "The question was so improper that it could not have been asked at trial . . . The prosecutor's question clearly stated to the grand jury what her belief was regarding the fact at issue and was an improper attempt to influence the grand jurors."  *Id*.

101.    Judge Richards stated that the "prosecutor seemed to put aside any neutrality and balanced judgment – duties imposed on her by case law – in questioning two witnesses who were later identified as potential alibi witnesses.  Any indictment returned on such facts as were presented to the grand jury must be the product of unquestioned fairness, precisely because the meaning of the events described is not conclusive proof of guilt.  Here, that was not the case."  *Id*.

102.    Judge Richard's ruling regarding the "eye-witness or forensic evidence" was that:

> There was a great deal of testimony about video surveillance cameras showing either Garrett Phillips or Oral Hillary at different locations, some of them fairly near Garrett's residence, at times within several hours to within minutes before or after the probable time of the crime. Many of the foundation questions for introducing the videos into evidence lacked an adequate foundation. For example, repeatedly the prosecutors asked a foundation witness whether the things shown in the videos

accurately showed the scene as it looked on the particular date and time. No factual basis was provided for the 'yes' response provided by many of these witnesses.

*See* Exhibit M.

103.　Judge Richards found that Ms. Rain's questioning of Tandy Cyrus clearly suggested that "the prosecutor wanted to portray Defendant either as uncaring or as having a motive to avoid contact with Garrett's surviving family." *Id.* Finding that "[t]he question was improper and highly prejudicial." *Id.*

104.　On October 16, 2014, the Honorable Jerome J. Richards dismissed the indictment based upon prosecutorial misconduct in the grand jury. *Id.*

105.　On that day, Mary Rain complained to the press that she was "deeply troubled by the judge's decision . . . ."[11]

106.　At that time, in October of 2014, Mary Rain stated that she was deciding whether or not to appeal the court's dismissal of the indictment or to reconvene a new grand jury. *Id.*

107.　However, on November 17, 2014, "[t]he process to re-indict" started over. *See* Exhibit N.

108.　By January 21, 2015, the case had been presented to a different grand jury which returned an indictment charging Mr. Hillary once again with the murder of Garrett Phillips.[12]

109.　Persistent in her vengeful crusade, in September of 2015, Ms. Rain charged Mr. Hillary with second-degree criminal contempt for purportedly violating an order of protection which had been issued in favor of Tandy Cyrus; and, at the same time sought to have Mr.

---

[11] http://northcountrynow.com/news/da-deeply-troubled-dismissal-murder-indictment-against-potsdam-man-isnt-giving-case-0127254

[12] http://www.watertowndailytimes.com/news05/hillary-statement-about-ankle-suppressed-earlier-interview-by-police-is-admissible-20150926

Hillary's defense attorney removed from the case and sanctioned for the bail posted as a result of this new charge[13].

110.    **Mary Rain charged Mr. Hillary** with criminal contempt based upon Mr. Hillary's visit to his local bank, the Potsdam branch of SeaComm Bank.  *Id*.

111.    Tandy Cyrus worked at SeaComm and the order of protection stated that Mr. Hillary should stay away from Ms. Cyrus' place of business; however, Tandy Cyrus did not work at the Potsdam branch when the order of protection was issued, she worked at a different branch many miles from Potsdam.  *Id*.

112.    The Court, recognizing these known facts, stated that Mr. Hillary "has a right to know" if Ms. Cyrus changes her work location and, that "it is reasonable to assume [that Mr. Hillary's appearance at his bank in Potsdam] was a mistake."  *Id*.

113.    Once again, Ms. Rain publicly disagreed with the Court's ruling, complaining that it was "disingenuous" to say that Mr. Hillary did not know that Ms. Cyrus had *relocated* to the Potsdam branch.  *Id*.

114.    Ms. Rain's statement however, is a clear admission that Ms. Cyrus was not working at the Potsdam branch and, more importantly, that she had not been working at the address which was listed in the order of protection.  *Id*.

115.    Nevertheless, Ms. Rain persisted in maliciously charging Mr. Hillary with criminal contempt in the second degree, a charge which is still pending to this day.

---

[13] http://www.watertowndailytimes.com/news05/hillary-statement-about-ankle-suppressed-earlier-interview-by-police-is-admissible-20150926

## FABRICATION OF EVIDENCE

116.    Within four days of obtaining the first indictment which was dismissed, Mary

Rain made an application to employ District Attorney Fitzpatrick, citing "the low-copy DNA,

video surveillance, and dozens of witness interviews and statements."  *See* Exhibit K.

117.    On October 25, 2011, the day after Garrett Phillips' death, Potsdam Chief of

Police Tischler had indicated that it was the "State Police forensic units" who assisted the

Village of Potsdam Defendants in collecting and analyzing the evidence.[14]

118.    The DNA analysis was crucial to this case - there was no evidence linking Nick

Hillary to this crime scene.

119.    Emphasizing the importance of this, Village of Potsdam Police Lt. Mark Murray

stated three months before Nick Hillary was charged, that "[t]he DNA reports, if you really read

into them, for instance, the DNA profile, it's neither inclusive nor exclusive . . . so you know

there's potential that maybe down the road there's better DNA processes that would be able to,

you know, definitely exclude him or include him."  *See* Exhibit F.

120.    "[I]f he's included or excluded, I just want him to be either cleared if he didn't do

this or charged if he did do this."  *Id*.

121.    Upon information and belief, before District Attorney Fitzpatrick was even

employed on the case, both he and Mary Rain were aware that "there was no statistical support

for a match between the fingernail scrapings from the left hand of the victim Garrett Phillips

(item 550C2) and suspect Oral Hillary (Items 21, 22 and 24)."[15]

---

[14]

https://m.facebook.com/story.php?story_fbid=2456925670173&id=103382899700373&refsrc=https%3A%2F%2F
m.facebook.com%2F1340WMSA%2Fvideos%2F2456925670173%2F&_rdr

[15] https://www.cybgen.com/information/newsroom/2016/dec/Cybergenetics-responds-to-letter-from-Hillary-
prosecutor.shtml

122.   And, Defendant Murray's statement reflects that he knew this as well.  But he, like all of the Defendants herein, was not satisfied with that answer.  They were going to make sure that they got a definite answer, whatever the cost.

123.   At that time, the New York State Crime Lab used the Combined Probability of Inclusion (CPI) to statistically evaluate DNA mixtures.  *See Shannon Morris, et al. v. New York State Police, et al.*, 16-CV-00164 (DNH/DJS) (N.D.N.Y. 2016), D.E. 1.

124.   "The CPI statistical method requires forensic scientists to subjectively analyze DNA results."  *Id*.

125.   "The subjectivity required in the CPI method in a mixed source DNA has been criticized for being inexact thereby resulting in inculpatory and exculpatory inaccuracy."  *Id*.

126.   "The Scientific Working Group on DNA Analysis Methods (SWGDSAM) approved Autosomal STR Typing by Forensic DNA Testing Laboratories in 2010 which resulted in the introduction of the stochastic threshold in the analyzing of DNA data."  *Id*.

127.   "The interpretation guidelines for implementation of the stochastic threshold with the CPI method results in mixed DNA profiles that are inconclusive."  *Id*.

128.   "Inconclusive results in a case necessarily results in the inability to use DNA data to enter and search profiles in the Combined DNA Index System."  *Id*.

129.   "Inconclusive results in a case necessarily results in the inability to identify a suspect."  *Id*.

130.   "The use of the CPI method in the Crime Lab resulted in a debate within the Crime Lab as to whether a match statistic could be arrived at from certain mixed sources of DNA."  *Id*.

131.   "If a match statistic could not be obtained the report was inconclusive."  *Id*.

132.   "If a match statistic could be obtained, the result would be reported to prosecutors in a DNA report." *Id*.

133.   "When analyzing DNA data using the CPI method all conclusions about a profile are supposed to be made without a reference sample, meaning the analysts should not be suspect-centric by using a reference profile to interpret DNA." *Id*.

134.   "The State of New York entered into a contract with Cybergenetics[16] to train its forensic scientist in the TrueAllele software." *Id*.

135.   "TrueAllele, created by Cybergenetics, is a computerized DNA interpretation system that infers genetic profiles from DNA samples." *Id*.

136.    "TrueAllele involved a completely different method of analyzing DNA evidence; it varied from the methods previously used by [Defendant Pizziketti, Defendant Wickenheiser] and the other forensic scientists in the Crime Lab." *Id*.

137.   "TrueAllele removes the subjective component from the analysis of DNA evidence." *Id*.

138.    "TrueAllele does not use a stochastic threshold and this results in less inconclusive results than the CPI method." *Id*.

139.    "Between 2001 and 2014, New York State was committed to replacing the CPI method with TrueAllele." *Id*.

140.   "Despite this commitment, there were certain elements in New York State Police, including but not limited to Defendant Pizziketti, Defendant Wickenheiser . . . and John Doe[s] . . . that were attempting to undermine the implementation of TrueAllele." *Id*.

---

[16] https://www.cybgen.com/

141.    "It was expected that DNA evidence previously analyzed using the CPI method would be reanalyzed using the TrueAllele software." *Id*.

142.    "It was further expected that the TrueAllele software would show that in a large percentage of cases in which the DNA was obtained from a mixed source, the statistic obtained using the CPI method was not accurate." *Id*.

143.    "In a small percentage of these cases, TrueAllele would show that the DNA evidence used in a criminal conviction was actually exculpatory rather than inculpatory." *Id*.

144.    "Upon information and belief, Defendant John Doe [#41] was aware that TrueAllele would reveal that the prosecutors used inaccurate DNA evidence results to prosecute a criminal case." *Id*.

145.    "Upon information and belief, Defendant John Doe [#41] opposed the implementation of TrueAllele in the Crime Lab because he did not want previous criminal convictions questioned." *Id*.

146.    "Defendant Pizziketti opposed the implementation of TrueAllele in the Crime Lab." *Id*.

147.    "Defendant Pizziketti's opposition to Trueallele was due to the fact that TrueAllele would diminish the workforce and the result in re-analyzing cases thereby disclosing improper activity on her part." *Id*.

148.    Beginning in 2012 through December of 2015, the Associate Director of Biological Sciences for the New York State Forensic Investigation Center openly criticized Defendant Julie Pizziketti for allowing scientists to provide questionable DNA statistics in criminal cases and for allowing staff members to perform questionable casework examinations. *Id*.

149.    Defendant Julie Pizziketti "allowed scientists to testify to questionable DNA results." *Id.*

150.    It is alleged that Defendant Julie Pizziketti herself was testifying in criminal cases in which she was neither competent nor proficient to testify. *Id.*

151.    Cybergenetics claims that in 2011 and in 2014 it informed Mr. Fitzpatrick that the methodology of "combined probability of inclusion (CPI) match statistic for DNA mixtures is not accepted as valid science[17] [and that all of the] DNA convictions that used CPI are at risk, either because of unreported potentially exculpatory "inconclusive" results, or inaccurate inculpatory match statistics used at trial." *Id.*

## WITHHOLDING OF EXCULPATORY MATERIAL

152.    On January 25, 2016, during a conference with the Court, District Attorney Fitzpatrick informed the Court that he did not know whether or not the State Police used TrueAllele. *See* Transcript January 25, 2016.

153.    The Judge informed Mr. Fitzpatrick that "if TrueAllele was asked to do any work on this sample . . . I agree with defense counsel, you're obligated to turn it over, regardless of what it is, and let them do with it as they feel it's appropriate." *Id.* at pg. 20.

154.    The Judge continued by stating that if it turns out that "this has never been referred to TrueAllele . . . the book's closed." *Id* at pg. 21.

155.    Cybergenetics had helped Mr. Fitzpatrick in the past and had testified in his County about these issues[18].

---

[17] https://www.cybgen.com/information/newsroom/2016/dec/Cybergenetics-responds-to-letter-from-Hillary-prosecutor.shtml
[18] https://www.cybgen.com/information/newsroom/2016/dec/Cybergenetics-responds-to-letter-from-Hillary-prosecutor.shtml

156.    Cybergenetics had offered to review all of Mr. Fitzpatrick's past DNA mixture

cases, explaining that its motivation in Mr. Hillary's case was,

> to help prevent a grave scientific injustice.  The company worked
> pro bono on the case, conducting a quarter of a million dollars
> worth of service without pay.  Our scientists examined the data
> from all hundred and fifty items of DNA evidence, not just one
> fingernail item.
>
> Over a three-year period, Cybergenetics assisted the police,
> prosecution and defense in understanding the DNA evidence.
> TrueAllele doesn't take sides.  Our Hillary involvement did not help
> business. The company generally breaks even, investing heavily in
> science and pro bono justice.[19]

157.    Four months before Mr. Fitzpatrick had informed the Court that he didn't know if

TrueAllele interpretation had been done by the State, he had received a copy of a report which

Cybergenetics had performed for the State in Mr. Hillary's case.  *See* Exhibit Q (email attached

thereto indicating that in September of 2015 Mr. Fitzpatrick received an email with a copy of

report which had been sent to the State).

158.    Defendant Julie Pizziketti and Defendant Wickenheiser surly knew that

TrueAllele had been used as "New York State was committed to replacing the CPI method with

TrueAllele" from early on as 2001[20].

159.    Furthermore, in an email correspondence dated November 3, 2015, three months

before Mr. Fitzpatrick made these statements to the Court, he was informed that he had been told

by TrueAllele on September 10, 2015, via email, that they advised retesting and, he was

informed that the State lab was also informed of this via an email correspondence.  *Id.*

---

[19] https://www.cybgen.com/information/newsroom/2016/dec/Cybergenetics-responds-to-letter-from-Hillary-prosecutor.shtml
[20] *See Shannon Morris, et al. v. New York State Police, et al.*, 16-CV-00164 (DNH/DJS) (N.D.N.Y. 2016), D.E. 1.

160.    The report which was sent to the State by Cybergenetics and which had been forwarded to Mr. Fitzpatrick "found no statistical support for a match between the fingernail scrapings from the left hand of the victim Garrett Phillips (item 550C2) and suspect Oral Hillary (Items 21, 22 and 24)." *Id*.

161.    Yet, on January 25, 2016, Mr. Fitzpatrick informed the Court that he would check with Defendant Julie Pizziketti "and if there's some communication, some report, some inconclusive thing," he would get it to the defense. *Id*. at pg. 18.

162.    Two months after this conference, in April of 2016, Judge Richards recused himself from all criminal cases involving District Attorney Rain after filing a complaint against her with the Committee on Professional Standards.[21]

163.    And, on April 18, 2016, the St. Lawrence County Board of Legislators voted no confidence in District Attorney Rain citing "lapses in judgement and unethical behavior."[22]

164.    In August of 2016, the defense motions to preclude the DNA analysis were granted by the Honorable Felix J. Catena, County Court Judge for Montgomery County who was assigned to the case after Judge Richard's recusal.

165.    The decision precluded the prosecution from calling a witness to testify regarding conclusions reached by the interpretation methodology employed (ultimately STRmix) based upon the prosecution's failure to "lay a foundation for the introduction of evidence that had not been internally validated". *See* Exhibit O.

---

[21] http://northcountrynow.com/news/st-lawrence-county-judge-recuses-self-current-cases-after-filing-complaint-against-da-0168962

[22] http://www.twcnews.com/nys/watertown/news/2016/04/18/-no-confidence--vote-against-da-rain-could-mean-state-investigation.html;   http://www.twcnews.com/nys/watertown/news/2016/12/6/st-lawrence-county-no-confidence-district-attorney-mary-rain.html.

166.   The Court also precluded the prosecution from offering expert testimony as to any statistical results obtained by using the random match probability on the composite minor component of mixture. *Id.*

167.   Mr. Hillary's case was tried before Judge Catena, who on September 28, 2016, acquitted him of the single count in the indictment, murder in the second degree.

168.   Unrelenting, even after the verdict was handed down, District Attorney Fitzpatrick wrote that "a demonstrably guilty Defendant went free" and, "it is my everlasting regret that I was unable to convince a Judge (Catena) about the value of this DNA evidence and as a result, a sociopathic killer of a helpless 12 year old boy now walks among us." *See* Exhibit P.

169.   Two months after the verdict, the County legislators voted on a resolution asking Mary Rain to resign.

## DAMAGES

170.   The unlawful, intentional, willful, deliberately indifferent, reckless, and/or bad-faith acts and omissions of the Defendants caused Plaintiff to be wrongly seized, falsely arrested, incarcerated, and maliciously prosecuted.

171.   The unlawful, intentional, willful, deliberately indifferent, reckless, negligent, and/or bad-faith acts and omissions of the Defendants caused Plaintiff the following injuries and damages, which were foreseeable to the Defendants at the time of their acts and omissions, and which continue to date into the future: physical pain and suffering, mental anguish, emotional distress, damage to reputation, loss of liberty, loss of employment, loss of personal associations and the benefits of liberty, humiliation, harassment, scorn, loss of professional opportunity, loss of income, legal expenses, indignities, embarrassment, and degradation for

which he is entitled to monetary relief.

172.   All the alleged acts, misdeeds and omissions committed by the individual Defendants described herein for which liability is claimed were done negligently, intentionally, willfully, purposefully, knowingly, unlawfully, maliciously, wantonly, recklessly, and/or with bad faith, and said proscribed conduct of the individual Defendants meets all of the standards for imposition of punitive damages.

173.   Damages are in the amount to be determined at trial but are in excess of One Hundred and Fifty Thousand ($150,000.00) Dollars exclusive of interest and costs.

## FIRST CAUSE OF ACTION

## 42 U.S.C. § 1983 – FALSE ARREST

174.   Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows.

175.   Defendants acted under color of law and deprived Plaintiff his civil, constitutional and statutory rights to be free from unreasonable search and seizure, specifically, plaintiff's right to be free from false arrest and imprisonment, when they detained and imprisoned plaintiff without probable cause or reasonable suspicion, and are liable to plaintiff under 42 U.S.C. § 1983.

176.   Plaintiff was aware of his confinement and did not consent to it and it was not otherwise privileged.

177.   That the said acts, were caused by the Defendants and unidentified Defendants without any legal justification.

178.   Plaintiff has been damaged as a result of Defendants' wrongful acts.

179.   That by reason of the aforesaid, the Plaintiff has each been damaged in a sum to be determined by a jury and an award of attorney's fees is appropriate pursuant to 42 U.S.C. §1988.

## SECOND CAUSE OF ACTION

### 42 U.S.C. §1983 - MALICIOUS PROSECUTION

180.   All other paragraphs in this complaint are here incorporated by reference.

181.   That the Plaintiff's rights have been violated pursuant to the United States Constitution.

182.   That the said acts, were caused by the Defendants and unidentified Defendants without any legal justification.

183.   That the said malicious and continuing prosecutions were instigated by the Defendants, their agents, servants and employees, without any legal justification to wit, without probable cause and based upon the Defendants' knowingly false statement that Plaintiff committed the crime of murder in the second degree.

184.   Defendants' false statements and false information caused the initiation of criminal proceedings against the Plaintiff.

185.   That Defendants' fabrication of evidence caused the initiation of criminal proceedings against the Plaintiff.

186.   That the Defendants' continued fabrication of evidence and post-arrest falsification of evidence caused the continued prosecution against Plaintiff.

187.   Plaintiff was arraigned on criminal charges and criminal prosecutions continued against him.

188.    That the said initiation and continuation of criminal proceedings was instigated and caused by the Defendants and by Defendants' providing false information, without authority of the law and without any legal basis or probable cause to believe that Plaintiff was in fact guilty of crimes.

189.    There was no information sufficient to support a reasonable belief that Plaintiff committed the murder of Garrett Phillips.

190.    The Defendants' acts were shocking and were performed by the Defendants with deliberate and reckless disregard for the truth and with malice.

191.    In fact, the charge against Plaintiff was dismissed.

192.    As a direct and proximate result of Defendants' actions, Mr. Hillary suffered loss of liberty and was imprisoned.

193.    That by reason of this malicious prosecution, Plaintiff incurred physical, emotional and pecuniary harms, suffered humiliation, mental anguish, embarrassment, loss of employment and he was otherwise injured.

194.    That by reason of the aforesaid, the Plaintiff has each been damaged in a sum to be determined by a jury and an award of attorney's fees is appropriate pursuant to 42 U.S.C. §1988.

## THIRD CAUSE OF ACTION

### 42 U.S.C. § 1983-CONSPIRACY

195.    All other paragraphs in this complaint are here incorporated by reference.

196.    Defendants, all state actors, acted in concert to inflict the unconstitutional injuries upon Plaintiff; and, they performed overt acts in furtherance of that goal causing the damages set forth herein.

197.   Mary Rain agreed to run for District Attorney at the behest of and encouragement of local law enforcement officers who she promptly thanked once she was elected.

198.   The local law enforcement officers, Village of Potsdam and New York State Defendants, along with the St. Lawrence Sheriff Defendants, were set in their determination to target, arrest and prosecute Mr. Hillary.

199.   They backed Ms. Rain to run for District Attorney and she agreed and ran her campaign based upon the promise to bring about an arrest in Garrett Phillips' death.

200.   She did so within six months of her election.

201.   The New York State Defendants encouraged Ms. Rain as they were also supporting someone who would become their ally in their quest to prevent TrueAllele from exposing their incompetence.

202.   Ms. Rain was just that person, with Garrett's mother at her side campaigning, she was determined to see this through regardless of the fact that there was no physical evidence of Mr. Hillary at the scene and the DNA analysis showed that there was no statistical support for a match between fingernail scrapings from Garrett Phillips and Mr. Hillary.

203.   Ms. Rain recruited Mr. Fitzpatrick, who, upon information and belief, had already seen the State Lab results before he was ever brought on the case and before there was ever an indictment.

204.   Ms. Rain, along with the State Defendants, the Village of Potsdam Defendants, and the St. Lawrence Defendants all worked together, with the same goal and the same blind malice, to bring about an indictment.

205.    Ms. Rain, along with the State Defendants, the Village of Potsdam Defendants, the Onondaga Defendant, and the St. Lawrence Defendants all worked together with the same goal and the same blind malice, to prosecute Mr. Hillary.

206.    The Defendants conspired among themselves for the purpose of depriving Plaintiff, either directly or indirectly, of equal protection of the laws, or equal privileges and immunities under the law, including the privilege to be free from false arrest and unjust and malicious prosecution.

207.    Defendants performed acts in furtherance of the conspiracy.

208.    Defendants' acts injured Plaintiff in his person or property and deprived him of a right or privilege of a citizen of the United States.

## FOURTH CAUSE OF ACTION

### 42 U.S.C. § 1983 –FABRICATION OF EVIDENCE CLAIM

209.    All other paragraphs in this complaint are here incorporated by reference.

210.    That the Plaintiff's rights have been violated pursuant to the United States Constitution.

211.    That the said acts, were caused by the Defendants and unidentified Defendants without any legal justification.

212.    That the deprivation of Plaintiff's liberty was caused by the Defendants' fabrication of evidence.

213.    That the Defendants' post-arrest fabrication and/or falsification of evidence caused the deprivation of Plaintiff's liberty.

214.   That by reason of the fabrication and/or falsification of evidence, Plaintiff incurred physical, emotional and pecuniary harms, suffered humiliation, mental anguish, embarrassment, loss of employment and he was otherwise injured.

215.   That by reason of the aforesaid, the Plaintiff has each been damaged in a sum to be determined by a jury and an award of attorney's fees is appropriate pursuant to 42 U.S.C. §1988.

## FIFTH CAUSE OF ACTION

### 42 U.S.C. § 1983 – FAILURE TO DISCLOSE EXCULPATORY EVIDENCE

216.   All other paragraphs in this complaint are here incorporated by reference.

217.   That the Plaintiff's rights have been violated pursuant to the United States Constitution.

218.   That the said acts, were caused by the Defendants and unidentified Defendants without any legal justification.

219.   That the deprivation of Plaintiff's liberty was caused by the Defendants' withholding of and/or failure to disclose exculpatory evidence.

220.   That by reason of the withholding of and/or failure to disclose exculpatory evidence Plaintiff incurred physical, emotional and pecuniary harms, suffered humiliation, mental anguish, embarrassment, loss of employment and he was otherwise injured.

221.   That by reason of the aforesaid, the Plaintiff has each been damaged in a sum to be determined by a jury and an award of attorney's fees is appropriate pursuant to 42 U.S.C. §1988.

## SIXTH CAUSE OF ACTION

### 42 U.S.C. § 1983 – FOR VIOLATIONS OF PLAINTIFF'S FOURTEENTH AMENDMENT EQUAL PROTECTION RIGHTS

222.   All other paragraphs in this complaint are here incorporated by reference.

223.   The policies of the municipal Defendants and the New York State Police Defendants have violated Plaintiff's constitutional right to have police and law enforcement services administered in a nondiscriminatory manner.  The unequal treatment Plaintiff received from the State of New York Police, the Village of Potsdam, the County of St. Lawrence and/or the County of Onondaga was based upon the fact that he was a Black individual of Jamaican decent as opposed to the more favorable treatment accorded similarly situated Caucasian individuals.

224.   The municipalities' unwritten but long standing policies selectively denied its constitutional guarantees to certain disfavored minorities like Plaintiff.

225.   Plaintiff was treated differently from other similarly situated individuals, based on impermissible considerations such as race, and Defendants' actions or inactions were at least in part because of, not merely in spite of, their adverse effects upon by Plaintiff by reason of illegitimate consideration of Plaintiff's race.

226.   The State of New York Police, the Village of Potsdam, the County of St. Lawrence and/or the County of Onondaga have been deliberately indifferent to the constitutional rights of individuals who come into contact with its employees and/or agents, as these municipalities have had a policy permitting its employees and/or agents to arrest and prosecute individuals without any legal justification.

227.   That by reason of the aforesaid, the Plaintiff has each been damaged in a sum to be determined by a jury and an award of attorney's fees is appropriate pursuant to 42 U.S.C. §1988.

## SEVENTH CAUSE OF ACTION

### 42 U.S.C. § 1983 – RETALIATORY PROSECUTION CLAIM FOR VIOLATIONS OF PLAINTIFF'S FIRST AMENDMENT RIGHT OF FREE EXPRESSION

228.   Plaintiff repeats, reiterates and realleges each and every allegation contained in the prior paragraphs with the same force and effect as if more fully and at length set forth herein.

229.   Plaintiff's rights in initiating a law suit against the Village of Potsdam Defendants for a violation of his Fourth Amendment rights on October 26, 2011 was conduct which is constitutionally protected.

230.   Plaintiff's initiation of this law suit was a substantial factor and/or motivating factor in the Defendants' prosecution of Plaintiff.

231.   There was no probable cause for Plaintiff's prosecution.

232.   Plaintiff would not have been prosecuted in the absence of the retaliatory motive of Defendants.

233.   That by reason of the aforesaid, the Plaintiff has each been damaged in a sum to be determined by a jury and an award of attorney's fees is appropriate pursuant to 42 U.S.C. §1988.

## EIGHTH CAUSE OF ACTION

### 42 U.S.C. § 1983 - DUE PROCESS AND STIGMA-PLUS DEFAMATION

234.   Plaintiff repeats, reiterates and realleges each and every allegation contained in the prior paragraphs with the same force and effect as if more fully and at length set forth herein.

235. Defendants published Plaintiff's name and made false claims, referring to him as a "sociopathic killer" and as the murderer of Garrett Phillips.

236. These statements are false.

237. As a result of these statements, Plaintiff was unable to rent housings, Plaintiff was told to vacate his apartment, he has suffered public humiliation, damage to his reputation, loss of employment, loss of personal associations and loss of the benefits of liberty.

238. The publishing of Plaintiff's name and reference to him as a "sociopathic killer" and/or Garrett Phillips' murderer was maintained or disseminated in a fashion that resulted in the above stated losses.

239. By reason of the aforesaid, the Plaintiff was defamed, suffered stigmatizing-plus injuries related to public humiliation, damage to his reputation, loss of employment, loss of personal associations and loss of the benefits of liberty, and as a result, his rights to due process were thereby violated.

240. That by reason of the aforesaid, the Plaintiff has each been damaged in a sum to be determined by a jury and an award of attorney's fees is appropriate pursuant to 42 U.S.C. §1988.

## NINTH CAUSE OF ACTION

### 42 U.S.C. § 1983- MUNICIPAL AND CORPORATE LIABILITY FOR THE VIOLATIONS OF PLAINTIFF'S FIRST, FOURTH AND FOURTEENTH AMENDMENT RIGHTS

241. All other paragraphs in this complaint are here incorporated by reference.

242. The State of New York, the Village of Potsdam, the County of St. Lawrence and/or the County of Onondaga through its respective high level policy makers, has made a deliberate, conscious choice to allow its employees to engage in law enforcement activities,

without the training in the proper predicates for law enforcement, probable cause, reasonable cause, gathering of evidence, analyzing of evidence, proper procedures, and constitutional mandates.

243.   The State of New York, the Village of Potsdam, the County of St. Lawrence and the County of Onondaga are liable for the damages suffered by Plaintiff because each of these municipalities has created policies and customs under which unconstitutional practices regularly occur and even thrive.

244.   The practices described in this Complaint comprise both formal policies, and practices so consistent and widespread that, although not expressly authorized, constitute a custom or usage of which supervising policy-makers must have been aware, and policymakers failed to provide adequate training or supervision to subordinates to such an extent that it amounted to deliberate indifference to the rights of those who come into contact with employees and/or agents of the State of New York, the Village of Potsdam, the County of St. Lawrence and/or the County of Onondaga.

245.   Many of the Defendants are themselves policy-makers and thus their conduct and unconstitutional acts and omissions constituted the policy and practice of their respective municipalities.

246.   The deliberate indifference on the part of the State of New York, the Village of Potsdam, the County of St. Lawrence and/or the County of Onondaga caused Plaintiff's injuries.

247.   The State of New York, the Village of Potsdam, the County of St. Lawrence and/or the County of Onondaga have failed to train its member in legal justifications for citizens' arrests.

248.   By reason of the aforesaid, the Plaintiff was defamed, suffered stigmatizing-plus injuries related to public humiliation, damage to his reputation, loss of employment, loss of personal associations and loss of the benefits of liberty, and as a result, his rights to due process were thereby violated.

249.   That by reason of the aforesaid, the Plaintiff has each been damaged in a sum to be determined by a jury and an award of attorney's fees is appropriate pursuant to 42 U.S.C. §1988.

## TENTH CAUSE OF ACTION

### 42 U.S.C. § 1983 - SUPERVISOR LIABILITY
### IN VIOLATION OF THE FIRST, FOURTH AND FOURTEENTH AMENDMENTS

250.   Plaintiff repeats, reiterates and realleges each and every allegation contained in the prior paragraphs with the same force and effect as if more fully and at length set forth herein.

251.   That the Plaintiff's rights have been violated under the First, Fourth and Fourteenth Amendments to the United States Constitution by the Defendants and John Doe Defendants who were supervisors of the Defendants.

252.   That these Defendants, who were supervisors had actual and constructive knowledge of the illegal seizure, false arrest, malicious prosecution and abuse of process which was being committed by their subordinates against the Plaintiff.

253.   That the Defendant supervisors did cause the Plaintiff's harms by failing to remedy the patterns of false arrest, malicious prosecution and abuse of process and other constitutional violations the Defendants committed after learning of them, by creating a policy and custom under which unconstitutional practices occurred and were tolerated and, by being grossly negligent in managing their subordinates.

254.   That by reason of the unlawful seizure and detention, Plaintiff incurred mental anguish, emotional distress, physical pain and injury, loss of professional opportunity, loss of income, legal expenses, loss of reputation, humiliation, indignities,  embarrassment, and degradation and he was otherwise injured.

255.   That by reason of the aforesaid, the Plaintiff has been damaged in an amount to be determined by a jury and an award of attorney's fees is appropriate pursuant to 42 U.S.C. §1988.

## ELEVENTH CAUSE OF ACTION

**NEW YORK STATE TORT LAW –NEGLIGENT HIRING, TRAINING, SUPERVISION AND RETENTION**

256.   Plaintiff repeats, reiterates and realleges each and every allegation contained in the prior paragraphs with the same force and effect as if more fully and at length set forth herein.

257.   That the Defendants were negligent, careless, reckless and deliberately indifferent in hiring, retaining, properly training and supervising, as and for its employees, named and unidentified Defendants herein, in that the Defendants knew or should have known that the individually named and unnamed employees lacked the skill, ability and training to act appropriately in investigations and criminal prosecutions.

258.   The Defendants failed to exercise due care and caution in their hiring practices, and in particular, in hiring the Defendant employees who lacked the maturity, mental capacity and the ability to function as employees of the aforementioned Defendants and were wholly unqualified in that the named and unidentified Defendants lacked the training, knowledge, and expertise to be employed when hired to be employees.

259.   The Defendants failed to establish proper guidelines and procedures for screening and investigating law enforcement officials.

260.   That the Defendants failed to train its employees in the proper criteria for establishing probable cause to arrest; the proper criteria for establishing reasonable suspicion to believe that a certain individual committed a criminal act, the proper criteria for conducting a criminal investigation, the legal competence to uphold the constitution and properly prosecute a case; and that the Defendants, their agents, servants and employees were otherwise reckless, careless, deliberately indifferent and negligent.

261.   The aforesaid occurrence and resulting injuries to mind and body therefrom, were caused wholly and solely by reason of the negligence, recklessness and carelessness of the Defendants, their agents, servants and employees without any negligence on the part of the Plaintiff.

262.   The aforesaid injuries were the result of the negligence, recklessness and carelessness of the Defendants.

263.   The aforesaid injuries did not result from any negligence or fault on the part of the Plaintiff herein.

264.   The limitations on liability set forth in CPLR § 1601 do not apply by reason of one or more of the exemptions set forth in CPLR § 1602.

265.   By reason of the foregoing, Plaintiff has been damaged as set forth above.

## TWELFTH CAUSE OF ACTION

## NEW YORK STATE TORT FALSE IMPRISONMENT/FALSE ARREST

266.   Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows.

267.   That the Plaintiff's right to be free from unreasonable search and seizure has been violated pursuant to Article I Section 12 of the New York New York State Constitution in that the Defendants instigated and caused the arrest of the Plaintiff.

268.   There was no information sufficient to support a reasonable belief that Plaintiff committed the murder of Garrett Phillips.

269.   That the said false arrest was instigated and caused by the Defendants, their agents, servants and employees, without any legal justification to wit, without probable cause and by providing knowingly false information which resulted in the Plaintiff's confinement based upon the Defendants' insistence that Plaintiff had committed the murder.

270.   That the Plaintiff was conscious of the confinement, Plaintiff did not consent to the confinement and the confinement was not otherwise privileged.

271.   That by reason of the unlawful seizure and false arrest, Plaintiff has been damaged as set forth above.

## THIRTEENTH CAUSE OF ACTION

## NEW YORK STATE TORT ABUSE OF PROCESS

272.   Plaintiff repeats, reiterates and realleges each and every allegation contained in the prior paragraphs with the same force and effect as if more fully and at length set forth herein.

273.   The Defendants and/or John Doe Defendants issued legal process to place Plaintiff under arrest.

274.   That the policy and custom among Defendants was at the time of Plaintiff's arrest to make an immediate arrest regardless of whether reasonable or probable cause existed for the arrest.

275.    That there was absolutely no reasonable or probable cause for Plaintiff's arrest, Plaintiff committed no crime, Plaintiff did not engage in any criminal activity, nor was there any legitimate basis to believe that Plaintiff had engaged in any criminal conduct.

276.    Defendants aimed to achieve a collateral purpose beyond criminal prosecution, such purpose being the furtherance of the unconstitutional policy and/or custom of making an immediate arrest regardless of whether reasonable or probable cause existed for the arrest.

277.    Probable cause for Plaintiff's arrest was lacking, and thus malice or any improper or wrongful motive may be inferred from the lack of probable cause.  Defendants might have acted in the honest and reasonable belief that Plaintiff was guilty of some crime, but their good faith does not exonerate them as the facts themselves and as presented to them did not constitute any criminal conduct.

278.    That the Defendants acts intended to cause harm to the Plaintiff and did cause harm to Plaintiff without excuse or justification.

279.    That Defendants' aforementioned actions were conscience shocking and placed Plaintiff in apprehension of emotional injuries.

280.    That by reason of the abuse of process, the Plaintiff incurred mental anguish, emotional distress, physical pain, loss of professional opportunity, loss of income, legal expenses, loss of reputation, humiliation, indignities,  embarrassment, and degradation and he was otherwise injured.

**WHEREFORE**, Plaintiff prays as follows:

A.      That the Court award compensatory damages to him and against the Defendants jointly and severally, in an amount to be determined at trial;

B.      That the Court award punitive damages to Plaintiff, and against all non-municipal Defendants, in an amount, to be determined at trial, that will deter such conduct by Defendants in the future;

C.      For a trial by jury;

D.      For a pre-judgment and post-judgment interest and recovery of his costs, including reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 for all 42 U.S.C. § 1983 claims; and

E.   For any and all other relief to which he may be entitled.

Dated: May 15, 2017
Garden City, New York

BARKET MARION EPSTEIN & KEARON

By:   _____
Amy B. Marion, Esq.
666 Old County Road-Suite 700
Garden City, N.Y.  11530
(516) 745-1500

# EXHIBIT A

# EXHIBIT A

11/07/11   JDR notes

Review of CPH video facing Cottage Street / Rehab   (camera 11)

— 4:00 pm - 5:00 pm

4:08:27 , Possible vehicle - toward school
4:16:30      ''     ''        away from school
4:29:07   Pedestrian walking from school / stops second entrance
4:29:52   Possible vehicle
4:30:05   Pedestrian walks back toward school
4:34:74   Possible vehicle   away from school

4:48:17   Possible vehicle   away from school
4:50:02   Black truck pulls in driveway across street   (Jones?)
4:50:29   Kid on skateboard going down road

— 5:00 pm - 6:00 pm
5:03    Jones returns home with dog carrying umbrella
5:28:03 Pm   Possible + vehicle - toward school
5:39:17 Pm   Possible   ''     ''     ''
5:50    Ambulance arrives with lights on   to ER
        Dave Sharp - Animal Control officer pull in right behind ambulance
5:54:33   Potsdam PD patrol pulls in

— 3:00 pm - 4:00 pm

3:23:52 - Possible vehicle toward school
3:49:37 - Truck starts in driveway across street (Jones)
3:51:08   Truck pulls out and leave away from school   (Jones)

# EXHIBIT B

# EXHIBIT B

10/26/11    8:15 pm

John Jones arrived at incident Command &
gave me a Key to Tandy's apt. to compare
w/ Keys found during search of Hillary's residence
and office.

Sgt. ___ S. B___ #



STATE OF NEW YORK: COUNTY OF ST. LAWRENCE
JUSTICE COURT VILLAGE OF POTSDAM

SEARCH WARRANT

TO:    The Potsdam Police Department and the New York State Police or any police officer
employed or having general jurisdiction to act as a police officer in the County of St. Lawrence,
New York.

You are hereby directed to conduct a search of the residence of Oral N. Hillary, located at
Meadow East Apartments, 118 Leroy Street, Apartment E6, Potsdam, New York which is
described as the third floor western most apartment located in building E and numbered E6, a
multiple dwelling, residential structure, wooden framed, three story building; for the following
designated property or kinds of property and for the purpose of seizing same:

Any evidence of crimes in violation of New York State Penal Law Articles 120, 125, and/or 140
including but not limited to the homicide of Garrett J. Phillips and including but not limited to
black colored track pants with possible material damage, muddy, soiled, or wet clothing, DNA
transfer, key or keys to 100 Market Street, Apartment 4, Potsdam, New York; muddy sneakers or
shoes, bandages or first aid items, ace bandages, used ice packs, receipts for recent purchases of
same, or evidence of injuries that may have been sustained while inflicting injury to the victim of
the crime and while fleeing the crime scene, blood, hair, fibers and other trace evidence thereon;
and any physical or trace evidence that connects Oral N. Hillary with the victim Garrett J. Phillips
which may be found in or upon the following designated or described place .
You are directed to execute this warrant between the hours of 6:00 A.M. and 9:00 P.M. OR: This
Court having specially so determined, you are authorized to execute this warrant at any time of the
day or night.
The applicant makes further request that such search warrant be made executable at any time of
the day or night on the grounds that there is reasonable cause to believe that such search warrant
cannot be fully executed between the hours of 6:00AM and 9:00PM due to the type of evidence
being sought, the fact the evidence is readily able to be destroyed, and the length of time it will
take to complete the search.

You are directed to return and deliver this warrant and any property seized pursuant thereto to this
Court without unnecessary delay.

This warrant is issued this 26th day of October, 2011.

_____    8:46pm

Hon. Nicholas Pignone

Potsdam Village Justice

# EXHIBIT C

# EXHIBIT C

Page ___1___ of ___1___

Date ___10/26/11___

# POTSDAM POLICE DEPARTMENT
17 Raymond Street · Potsdam, New York 13676
(315) 265-2121 · Fax (315) 265-3150

Lead No. ___55___

Complaint No. ___54742___

Urgent ☐     Patrol ☐

## LEAD SHEET

Source _____ JOHN JONES _____

Address _____

_____

| METHOD OF CONTACT | |
|---|---|
| In Person ☐ | Written ☐ |
| Phone ☐ | Observation ☐ |

Phone No. (home) _____ (work) _____

Lead Taken By ___BATES_____ Badge No. _____ Time _____

Brief Narrative ___BOBBY FARNS - BICKNELL BUILDING SUPPLY, KNOWS___

___HILLARY - GOT A KEY MADE THERE A COUPLE WEEKS AGO___

_____

Lead Assigned___ DISALVO _____ Badge No. _____ Time ___10/27/11 8:15 AM___

_____ Badge No. _____

Lead _____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

Lead Completed (date) _____ Time _____

Reviewed By _____

WHITE - Original     YELLOW - Desk Copy     PINK - Goes With Officer

# EXHIBIT D

# EXHIBIT D

Page ___1___ of __1__

Date __11/4/11__

Urgent ☐    Patrol ☐

**POTSDAM POLICE DEPARTMENT**
17 Raymond Street • Potsdam, New York 13676
(315) 265-2121 • Fax (315) 265-3150

**LEAD SHEET**

Lead No. __235__

Complaint No. _____

Source ___JOHN JONES → TOMMY SIMON___

Address _____

_____

| METHOD OF CONTACT | |
|---|---|
| In Person ☐ | Written ☐ |
| Phone ☐ | Observation ☐ |

Phone No. (home) _____ (work) _____

Lead Taken By ___TISCHLER___ Badge No. _____ Time __2:44 pm__

Brief Narrative _Chief took call from J. Jones who took call from T. Simon._
_Simon saw a male w/ a Blue S-10 P/u loading boxes from Hillary's Apt. Chief sent_
_Off. Wentworth to look for the vehicle & ID driver._

Lead Assigned_____ Badge No. _____ Time _____

_____ Badge No. _____

Lead __11/4/11   3:45pm   PER OFF. WENTWORTH -__
_- UNABLE TO LOCATE VEHICLE_

Lead Completed (date) __11/4/11__ Time __4:00 pm__

Reviewed By _____

WHITE - Original    YELLOW - Desk Copy    PINK - Goes With Officer

# EXHIBIT E

# EXHIBIT E

11-28-11  Interview w/ Tandy Cyrus - Lt MPD  1025 - 1125

\* Who touched the windows?

✓ SW photos

✓ SW clothes

- Dynamics b/w kids

✓ If Stacia thought you and Nick were back together, how would she react?

- Was Nick protective of his kids? How Much?

MJ

Gloves - off brand from Walmart - Men's M or L glove - writing down the side.
L identified in 5° Photor #1167 on desk

of Link up

Laundry - 1 a week? To the one by CJ's once.

Shanna stayed w/ Tandy's parents when she went to Jamaica.
Lori would ask.

- on and off again (Stacia/Nick) for 15 years.

- Gold band Nick wore

Aaron to Tandy's brother       Eric Paul 29

working on:
Masters.

Interview

11-18-11

LT's office { Chief
                Lt
                Tandy Cyrus
                John Jones

Ian Fairlie    23, 24?    3rd year as ass't coach

- no g/f
- hung w/ Moe quite a bit
- coming from back apts.
- group of friends from back apts.

- Nick taught in FL and MD    FC, then back to Canton
.
=

Bridget Dillon's daughter is friends w/ Shanna

Female dealer w/ boyfriend?
Nick pointed out house on Grove St. - possibly weed connection
        Charlie Cunha
check    Robert Fowler?    twice a month?
P.O.    Elizabeth Fowler

=

Stacia freaked out ...    went to Nick's work end of Nov. - early
Copy 379.0379        she went to Steve Yonikas            Dec. 20
Charlie / Corbin dealt with that - where Stacia showed up @
                                            Tandy's Apt.
Play "Noon Ball" indoor soccer at Walker Center w/ Ian

* Jeff James - Nick stops couple times a week

# EXHIBIT F

# EXHIBIT F

1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

ORAL HILLARY,

    Plaintiff,

-vs-                          Docket#:  12-CV-01669

VILLAGE OF POTSDAM, EDWARD TISCHLER,
Individually and in his Official
Capacity, MARK MURRAY, Individually and
in his Official Capacity, CHARLIE
DANIELS, Individually and in his
Official Capacity, MICHAEL AMES,
Individually and in his Official
Capacity, POLICE OFFICERS JOHN DOE
1-100, Individually and in their
Official Capacity,

    Defendants.

---

DEPOSITION OF:      MARK R. MURRAY

                       Potsdam, New York 13676

DATE:              February 4, 2014

TIME:              2:00 p.m. to 5:55 p.m.

LOCATION:         2 Park Street

                       Potsdam, New York 13676

TAKEN BY:        Counsel for the Plaintiff

ORIGINAL

M. Murray; 2/4/14; Potsdam, NY
Examination by Mr. Tafari

135

1          Q.   Okay.  Lieutenant Murray, did you ever apply for an

2      arrest warrant for Mr. Hillary?

3          A.   No.

4          Q.   Okay.  Did you ever speak to former DA Nicole Duve

5      about the -- about the Garrett Phillips case?

6          A.   We've discussed the Garrett Phillips case several

7      times, yes.

8          Q.   Did you ever discuss inch Mr. Hillary with -- with

9      former DA Nicole Duve?

10         A.   Yes.

11         Q.   And did you ever ask her whether or not Mr. Hillary

12     would be arrested?

13         A.   I don't think I specifically asked her that

14     question.  We talked about the pitfalls of potential

15     prosecution of the case and obviously discussed our physical

16     evidence, DNA evidence, circumstantial evidence, all the

17     merits of the case and how it -- how it would go in a

18     prosecution.

19         Q.   Did you discuss the prosecution of Mr. Hillary with

20     former DA Nicole Duve?

21         A.   I don't -- I'm not sure I understand.  Specifically

22     Oral Hillary?

23         Q.   Correct.

Burnham Reporting  (315) 379-0205

M. Murray; 2/4/14; Potsdam, NY
Examination by Mr. Tafari

136

1          A.   The case itself, he was discussed as a high, high

2     person of interest or potential suspect, yes.

3          Q.   Okay.  Now, just to be clear, there were never any

4     witnesses that saw Mr. Hillary harm Garrett Phillips?

5          A.   Depending on your definition of harm.  I mean,

6     there's different kinds of, you know, psychological harm or

7     physical harm.  There are depositions that articulate what

8     people perceive as Mr. Hillary treated Garrett as less than

9     ideal.

10         Q.   Okay.

11         A.   People's perceptions of their relationship was

12    different than Mr. Hillary describes it I guess is how I'd

13    say.

14         Q.   All right.  Has anyone -- is there any physical

15    evidence that connects Mr. Hillary to the Garrett Phillips

16    homicide?

17         A.   Yes.

18         Q.   What would that be?

19         A.   I would offer his ankle injury as highly suspicious

20    given its nature and method of discovery and how it seems to

21    be very congruent with the method of egress from the homicide

22    scene window.

23         Q.   So in your opinion, Mr. Hillary's ankle injury

M. Murray; 2/4/14; Potsdam, NY
Examination by Mr. Tafari

137

1          connects him to the Garrett Phillips homicide?

2               A.    Yes.

3               Q.    Any other physical injury that connects -- any

4     other physical connection between Mr. Hillary and the Garrett

5     Phillips homicide?

6                    MR. MORTATI:   Objection to form.   You can answer.

7               A.    Any other physical evidence that links Mr. Hillary

8     to the homicide of Garrett Phillips?   Depending on your

9     definition of physical evidence, I mean, obviously there's a

10    lot of circumstantial factual basis for my feeling that he's

11    linked to the case.   The DNA reports, if you really read into

12    them, for instance, the DNA profile, it's neither inclusive

13    nor exclusive.   He can neither be included nor excluded from

14    the crime scene in certain spots so, you know, there's

15    potential that maybe down the road there's better DNA

16    processes that would be able to, you know, definitively

17    exclude him or include him.   I mean, I'm hopeful for that.

18              Q.    You're hopeful for the inclusion or the exclusion?

19              A.    I just want justice.   I don't -- if he's included

20    or excluded, I just want him to be either cleared if he

21    didn't do this or charged if he did do this.

22              Q.    Okay.   So at this point to you Mr. Hillary is not

23    cleared?

Burnham Reporting   (315) 379-0205

M. Murray; 2/4/14; Potsdam, NY
Examination by Mr. Tafari

138

1    A.   Absolutely.  To my point, at this point in time as

2    everything sits, I don't think he is excluded from the

3    investigation, no.

4    Q.   Okay.  So you do not believe Mr. Hillary to be

5    innocent of killing Garrett Phillips?

6         MR. MORTATI:  Objection to form.  You can answer.

7    A.   I do believe that Nick Hillary killed Garrett

8    Phillips, yes.

9    Q.   Is that what your gut tells you?

10         MR. MORTATI:  Objection to form.  You can answer.

11    A.   That's what the facts of this -- that's what the

12    facts of this case speak to me and say, yes.

13    Q.   Okay.  If you were the DA, would you prosecute

14    Mr. Hillary for this murder?

15         MR. MORTATI:  Objection.  Don't answer.  Mani, he's

16         not the DA and he can't make that determination.  You're

17         asking him to answer a hypothetical for a position he

18         can't hold nor could he possibly hold because he doesn't

19         have a law degree, first of all.  Don't answer that

20         question, it's ridiculous.

21         MR. TAFARI:  Mark it for a ruling, please.

22         MR. MORTATI:  Please do.

23    Q.   What's the biggest reason you think -- let me put

Burnham Reporting  (315) 379-0205

M. Murray; 2/4/14; Potsdam, NY
Examination by Mr. Tafari

139

1           it this way:  What's the biggest factor connecting

2           Mr. Hillary to this homicide?

3                     MR. MORTATI:  Objection to form.  You can answer.

4                A.   His disdain for Garrett Phillips.  The fact that

5           that was the only thing standing in the way between -- in Mr.

6           Hillary's opinion that I perceived standing in the way from

7           him having a relationship with Tandy Cyrus, now Tandy

8           Collins.  And just I think he perceived that he was

9           disrespected by having the kids be the reason that their

10          relationship ended.  I think there was a lot of animosity

11          held up that of everything this was the reason -- and maybe

12          it was just the only Tandy used as an excuse, but for

13          whatever reason I think that that really hurt him.

14               Q.   Do you believe everything Ms. Tandy Cyrus has told

15          you during the course of this investigation?

16               A.   No.  And I also forgot to include in the physical

17          evidence part, the most compelling part that really, you

18          know, seals it for me was the videotape of Mr. Hillary

19          stalking Garrett, you know, literally 10 minutes before his

20          death.  That's pretty compelling physical evidence to me.

21               Q.   Okay.  You say the physical evidence.  Did you see

22          Mr. Hillary stalking Garrett Phillips?

23               A.   On videotape, yes.

M. Murray; 2/4/14; Potsdam, NY
Examination by Mr. Tafari

145

1       Q.   But you never showed Mr. Hillary the video;

2   correct?

3       A.   I don't know how I articulate that I can link, you

4   know, known facts to come to a really logical conclusion,

5   but, yes, that's what -- that's how I'm arriving there.

6   Mr. Hillary testified that he's in his vehicle at that

7   parking lot that date, time and location.  He's the only

8   Honda CRV that color, model, make, whatever, at that time

9   period so I'm leaping forward to the conclusion that that was

10  Mr. Hillary in his vehicle, like he said.

11      Q.   So you're making an assumption that that was?

12      A.   No, I'm making a conclusion based on two facts.

13      Q.   Okay.  But the first fact that you're making the

14  conclusion based on, you didn't see the license plate of the

15  vehicle; correct?

16      A.   Correct.

17      Q.   And you didn't see Mr. Hillary sitting in that

18  vehicle; correct?

19      A.   Correct.

20          MR. TAFARI:  All right.  I think that's it unless,

21      if Mr. Mortati has questions, I might have a few more.

22                              EXAMINATION

23  BY MR. MORTATI:

Burnham Reporting   (315) 379-0205

# EXHIBIT G

# EXHIBIT G

1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF NEW YORK

---

ORAL HILLARY,

    Plaintiff,

-vs-                         Docket#:  12-CV-01669

VILLAGE OF POTSDAM, EDWARD TISCHLER,
Individually and in his Official
Capacity, MARK MURRAY, Individually and
in his Official Capacity, CHARLIE
DANIELS, Individually and in his
Official Capacity, MICHAEL AMES,
Individually and in his Official
Capacity, POLICE OFFICERS JOHN DOE
1-100, Individually and in their
Official Capacity,

    Defendants.

---

| | |
|---|---|
| DEPOSITION OF: | EDWARD F. TISCHLER |
| | ███████████ |
| | Canton, New York 13617 |
| DATE: | February 4, 2014 |
| TIME: | 10:48 a.m. to 12:58 p.m. |
| LOCATION: | 2 Park Street |
| | Potsdam, New York 13676 |
| TAKEN BY: | Counsel for the Plaintiff |



E. Tischler; 2/4/14; Potsdam, NY
Examination by Mr. Tafari

77

1       the Garrett Phillips homicide?

2                   MR. MORTATI:  Objection to form.  You can answer.

3           A.   We have no evidence at this point that shows his

4       fingerprints.

5           Q.   You didn't get those results back?

6           A.   No.  We -- the evidence -- the results we got back

7       have not placed him at that crime scene.

8           Q.   Okay.  So you sent Mr. Hillary's fingerprints to a

9       lab; correct?

10          A.   I believe so, yes, correct.

11          Q.   Okay.  And they checked those fingerprints to see

12      whether or not Mr. Hillary was connected to the crime;

13      correct?

14          A.   Correct.

15          Q.   Did you receive results of those fingerprints?

16          A.   As far as?

17          Q.   Did you ever receive any word back on what happened

18      to the fingerprints you sent out?

19          A.   I guess I'm a little confused on what kind of

20      results you -- results of what?

21          Q.   Okay.  Let me ask it this way:  Why did you send

22      Mr. Hillary's fingerprints to the lab?

23          A.   Because he's part of the investigation.

# EXHIBIT H

# EXHIBIT H

## Mary Rain

May 15, 2014 · Canton ·

I want to thank the fabulous job done by the Potsdam PD and New York State Police for a job well done. It was great to see Oral Nicholas Hillary in handcuffs. It was a very emotional week. My prayers continue for Garrett's family.

Share

174

30 shares

 **Charlie Sharlow** Great job Mary!
May 15, 2014 at 5:06pm ·   1

 **Scott Kron** Awesome job....
May 15, 2014 at 5:08pm ·   1

 **Donna Deets** Keep up the great work!
May 15, 2014 at 5:09pm ·   2

 **Mary McIntosh** Keep up the good work Mary times like this is why we all support a great person in your field !!
May 15, 2014 at 5:11pm ·   1

 **Deb Sharlow Williams** Fantastic Job Mary, Never was so happy to see the News Headlines come across the TV
May 15, 2014 at 5:12pm · Edited

 **Kim McPherson** Thank YOU!!!!!!!!!
May 15, 2014 at 5:18pm ·   1

 **John Kennedy** good job..hope he's the one
May 15, 2014 at 5:21pm

 **Ben Ellison** Now how come Duvé couldn't have done this? I think it's because she prolly thought that it would put a bad rep on Clarkson university. Congratulations **Mary Rain** on putting this in the books for good.
May 15, 2014 at 5:21pm ·   4

 **Storm Cilley** If he is guilty, the job is only half done. I'll save the congratulations until after the conviction.
May 15, 2014 at 5:23pm ·   1

 **Denice Smith** Well done!
May 15, 2014 at 5:23pm

 **Volter VonBean**  As I expected from you Mary, great job to you, your staff, all police involved. Nice to see justice being served.
May 15, 2014 at 5:24pm

 **Jill Simms-Wilson** Congrats! A job well done!
May 15, 2014 at 5:25pm

 **Marlene Watson** Amen. This is wonderful news.
May 15, 2014 at 5:32pm

 **Ann Loffler** Great job Mary!
May 15, 2014 at 5:35pm

 **Michele M. Pelusi-Catlin** You kept your promise Mary...thank you
May 15, 2014 at 5:36pm ·   3

 **Brian Mitchell** Job well done!
May 15, 2014 at 5:36pm

 **Cherish McGowan** Proud to call you a friend, **Mary Rain**. Great job.
May 15, 2014 at 5:37pm ·   1

 **Jeffrey Lashomb** Atta Girl Mary!!
May 15, 2014 at 5:38pm ·   2



 **Richard Dillenbeck** Great job Mary.You fulfilled your promise when you ran for office regardless of the outcome - LET JUSTICE BE SERVED!
May 15, 2014 at 5:40pm · **5**

 **Mark T. Dalton** Congratulations and that is Awesome News!
May 15, 2014 at 5:42pm

 **Russ Finley** Well done!
May 15, 2014 at 5:42pm · **1**

 **Tina Tynon Martin** Thank You to all! Job well done!!! Whoop whoop!!! Hope he rots in hell!! Nice try playing racism, Ass! Feel sorry for his children. God bless them.
May 15, 2014 at 5:43pm

 **Michael J Russell** Great job all! Especially our DA! Justice shall prevail!
May 15, 2014 at 5:48pm · **1**

 **Amy Besaw** Ty !
May 15, 2014 at 5:51pm

 **Geraldine L Johnson** YES........Finally.....Now to get some jurors......could be a problem.....after all we all know he is guilty.
May 15, 2014 at 5:52pm

 **Bob Merrifield** Now get him convicted
May 15, 2014 at 5:55pm · **2**

 **Tim Currier** One for the good "guys". Congratulations to all involved! God Bless Garrett's family!
May 15, 2014 at 6:00pm · **2**

 **Jen Shoen-Johnson** I knew you would get him, great job! **Mary Rain**!
May 15, 2014 at 6:03pm

 **Dave Williams** A job well done by a DA office that actually wants to get criminals off the street & does their job. Unlike the previous administration in that position!!
May 15, 2014 at 6:18pm · **2**

 **Dave LaFave** Also a great job done by your team DA Mary.
May 15, 2014 at 6:23pm · Edited

 **Dora Judware Richter** Great job Mary!!!!
May 15, 2014 at 6:29pm

 **James Norton** Bookum Dano
May 15, 2014 at 6:32pm

 **Meridith Ann Spinelli** Great job my friend!!!!
May 15, 2014 at 6:38pm

 **Diane Cashman Snyder** Great job **Mary**
May 15, 2014 at 6:47pm

 **Keith Shaver** Awesome
May 15, 2014 at 6:56pm 

 **Brandi David** Congrats for a great job on finally taking this case to this level
May 15, 2014 at 6:59pm

 **Will Gray** OUTSTANDING!!!! YOU GO GIRL!!!
May 15, 2014 at 7:08pm

 **Will Gray** Thanks for a job well done from my wife **Charlotte Gray** and myself. Outstanding.
May 15, 2014 at 7:09pm

 **Marilyn Cota** Mary, it's about time we got someone in the DA's office that wants to see Justice served...thank you so much....
May 15, 2014 at 7:42pm · **3**

 **Bobbie Jo Jameson** Way to go Mary. IT is all because of YOU. Keep up the good work and for always making us proud.
May 15, 2014 at 8:01pm

 **Matthew Flynn II** Had no doubts. Keep up the good work, Mary!
May 15, 2014 at 8:10pm

 **Jim Bellski** Great job Mary!! Now hammer him to the fullest extent the law allows. Hopefully they get Duve to defend him.
May 15, 2014 at 9:03pm · Edited ·    2

 **Brigett Ritchie** Way to go!!! I'm glad someone is finally stepping up to the plate and getting to the bottom of this - thank you, Mary!
May 15, 2014 at 8:47pm ·    1

 **Donna Maloney** We have needed you on the job for a very long time. Good work.
May 15, 2014 at 9:06pm ·    1

 **Bill Greene** Great job to you and the NY State Police and the Potsdam police
May 15, 2014 at 9:30pm ·    1

 **Kevin Wells** Great interagency and prosecuter work
May 15, 2014 at 10:08pm ·    4

 **Jamie Amo** Superb Job Mary Kudos !!
May 15, 2014 at 10:28pm

 **Fred Jock** i have been praying that the evil person who did this would be exposed.
May 15, 2014 at 10:51pm

 **Tim Amo** Congrats **Mary Rain** on a job well done
May 15, 2014 at 11:03pm

 **Andrea Michelle Lalonde** Great job Mary!!!!
May 15, 2014 at 11:13pm

 **Karen Brennan** Mary you all did the job of professionals and concerned community members. Thank you for all that all of you did for justice.
May 15, 2014 at 11:22pm

 **Pat Gagnon** GREAT JOB MARY !
May 16, 2014 at 8:42am ·    1

 **Neil Willmart** nice work mary
May 16, 2014 at 8:46am

 **Diana Lauson Swanson** I have all the confidence in this world YOU WILL bring justice for Garrett and his family! We so very much have needed a person like you for so long congrats to you and all your staff!
May 16, 2014 at 2:13pm · Edited ·    1

# EXHIBIT I

# EXHIBIT I

1/23/2011


To whom it may Concern:

I, Tandy Cyrus write to make a formal complaint against Mr. John E. Jones Jr. of the Saint Lawrence County Sheriff's Department. John has been acting in various ways that causes me to fear for the safety of myself and my sons.

As a citizen of St. Lawrence County since birth and having been a member of the Potsdam community for the last five years, I report these incidents as I have no other recourse, save for a legal proceeding to address this matter.

The first incident took place on the night of September 24th, 2010 between the hours of 9:00 PM and 9:00 AM on the morning of September 25th, 2010. During that said time period, John went by our previously shared residence that was being occupied by myself and my sons, and physically put our belongings out of the house, and doing so without notifying me. During this same time period John repeatedly sent threatening text messages to my cell phone as a mean of intimidation.

The next incident took place during the month of October, John went to my apartment unannounced and uninvited.  This was after I had repeatedly made it clear that I wanted to be left alone and not to be bothered by him, John.

The final incident, which has clearly demonstrated that John has no intention of quitting his harassing and intimidating behaviors toward me, happened in December of 2010.  On the 9th of December, 2010, John filed a legal claim against me in the Potsdam Village Court. This claim has requested for me to provide compensation for unpaid utility bills and an airline ticket and accommodation, all of which John is responsible for.

With this last incident it shows that John is willing to abuse and misuse the Judicial System to support his personal grudge – that of jealousy!

I have been through the police academy training program and I have a great level of respect for the police force, the Sherriff's department and all it does to keep the citizens of Potsdam safe and secure.

I do feel however that my personal well-being and that of my children are in danger because of the recent string of actions which John has carried out.

I, Tandy Cyrus respectfully ask that actions be taken to address this troubling situation, without the need to turn to other legal remedies.

I am extremely fearful this pattern of behavior will continue or even escalate unless it is addressed, immediately.

Respectfully,



Tandy L. Cyrus

# EXHIBIT J

# EXHIBIT J

State of New York Justice Court, St. Lawrence County, Village of Potsdam Small Claims Part No. 11010010

Notice to defendant:

To: Tandy Cyrus, 118 Leroy St. Apt. G-6, Potsdam, NY 13676

Take Notice That – John E. Jones Jr. Plaintiff asks judgment in this Court against you for $ 1,849.31 together with costs, upon the following claim:

1. $1,422.73 – Plane ticket/hotel accommodation in Hawaii

2. $100.58 – National Grid- stayed at house 1 month with me not living there

3. $219.69 –Water/sewer/trash – she paid this every time while living with me for 3 years

4. $106.31 – Gas bill – for month she lived at my house

In agreement with which the plaintiff hereby signs and demands judgment.

John E. Jones Jr. (signature) 17 Cottage St Potsdam (315) 212 – 0748

There will be a hearing before the Court upon this claim on January 19, 2010 at 3:30 o'clock PM in the Small Claims Part of this Court held at Civic Center, Park St., Potsdam, NY 13676

You must appear and present your defense and any counterclaim you may desire to assert at the time and place above set forth (a corporation must be represented by an attorney or any officer, director or employee). If you do not appear, judgment will be entered against you by default even though you may have a valid defense. If your defense or counterclaim, if any, is supported by witnesses, account books, receipts or other documents, you must produce them at the hearing. The Clerk, if requested, will issue subpoenas for witnesses, without fee thereof.

If you wish to present a counterclaim against the claimant, you must do so by filing with the Clerk of the Court a statement containing such counterclaim within five days of receiving this notice of claim. At the time of such filing you must pay the Clerk a filing fee of $3.00 plus the cost of postage to send your counterclaim by first class mail to the claimant. If you fail to file a counterclaim within this five-day period, you retain the right to file the counterclaim until the time of the hearing, but the claimant may request and obtain an adjournment of the hearing to a later date.

If you admit the claim, but desire time to pay, you must appear personally on the day set for the hearing and state to the Court your reasons for desiring time to pay.

Dated: 12/9/2010                    Shirley Warner (signature) – Clerk

**A Guide to Small Claims Court is available at the court listed above.**

I am here in response to the Notice to Defendant that I have received. After reading over the notice and realizing the claims that have been brought against me I would like to respond as follows. With regards to the water bill I will agree with having to pay my portion which is one half the amount of the water/sewer/trash bill as I have always paid while residing at 17 Cottage St. Potsdam NY.  Reason being I was living there with my two sons (Garrett, who is 11 year old and Aaron 6 year old), as well as Mr. Jones and his son (John E. Jones III, who is 21 year old).

Based on the circumstances under which Mr. Jones and I had parted and the date on which the separation was official, at that time the water bill for that billing period had not yet arrived. The water bill cycle ended at the end of September and I was asked to move out by Mr. Jones prior to the cycle ending, which meant that Mr. Jones would need to notify me of when the bill had arrived as he had done during the time I was living at 17 Cottage Street. I was neither officially nor unofficially notified by Mr. Jones that he had received the water bill that I could have paid my portion of it. Had I been notified I would have been willing to provide Mr. Jones the funds for my portion. However the first time I was aware that Mr. Jones had received the water bill was when I received the notice of appearance.

With regards to both the electric bill (National Grid) and the gas bill (St. Lawrence Gas, Massena NY), these bills have always been paid by Mr. Jones.  Mr. Jones was paying both bills prior to me and my boys moving out of our apartment into 17 Cottage St., which he, Mr. Jones continued to pay throughout the time we lived there.  **{if needed records can be requested to verify that Mr. Jones has always paid these bills}**.   As for the airline ticket and lodging accommodation expenses for the trip to Hawaii, which both Mr. Jones and I took in May of 2010, that was a gift to me from Mr. Jones.  I am surprised Mr. Jones is requesting compensation at this time for the cost of the trip. I had never signed any documents agreeing that I would incur the cost of the trip.  At the time of the trip Mr. Jones and I were still a couple, and I cannot recall being told by Mr. Jones that I was responsible for my share of the trip expense.  The trip to Hawaii was a joint venture on our part as a couple and I have never requested any reimbursement for the expenses that I had incurred while we were on such trip.

# EXHIBIT K

# EXHIBIT K

STATE OF NEW YORK
COUNTY COURT                              COUNTY OF ST. LAWRENCE

IN THE MATTER OF INVESTIGATION OF THE
DEATH OF GARRETT PHILLIPS                    AFFIDAVIT IN
                                             SUPPORT OF APPLICATION
                                             FOR AN ORDER PURSUANT
                                             TO CPL 190.25(4)

MARY E. RAIN, ESQ., being duly sworn, deposes and says:

    1. I am the District Attorney for the County of St. Lawrence. I submit this affidavit in support of the application for an order pursuant to CPL 190.25(4)(a) authorizing the St. Lawrence County District Attorney's Office to disclose certain materials obtained pursuant to grand jury subpoena and transcripts of grand jury testimony to William J. Fitzpatrick, Esq. I make this affidavit upon information and belief, the sources of which are a review of the files of the St. Lawrence County District Attorney's Office and conversations with members of the District Attorneys Association of the State of New York (DAASNY).

    2. Criminal Procedure Law Section 190.25(4) permits this Court to authorize other persons in addition to the District Attorney, the District Attorney's staff and police officers specifically assigned to this investigation, to examine the evidence obtained by the Grand Jury for the purpose of assisting the Grand Jury's investigation.

    3. On or around October 24, 2011, Garrett Phillips, age 12, was found strangled to death. The last person seen with Garrett Phillips was his mother's ex-boyfriend, Oral "Nick" Hillary. Since becoming District Attorney, I have endeavored to investigate and prosecute this case.

    4. As part of my effort to prosecute this case, I have sought the advice of other prosecutors. As Chairman of the Mutual Assistance Committee (MAC), of the District

Attorney's Association of the State of New York (DAASNY), William J. Fitzpatrick led MAC in

assisting my investigation of this case after I came to MAC seeking assistance.

5. That William J. Fitzpatrick, Esq., currently serves as the District Attorney in

Onondaga County, New York, where he has been District Attorney for over 22 years. He served

as a Chief Assistant District Attorney in Onondaga County in charge of the Homicide Bureau

and prosecuted homicide cases before he was elected as District Attorney. He has tried

approximately 125 cases, including more than 75 homicides. The cases that William J.

Fitzpatrick has prosecuted include, People v Cahill (2 NY3d 14 [2003] [where the defendant was

convicted of murder in the first degree, and a jury imposed the sentence of death]), People v

Castor (99 AD3d 1177 [2012] [where the defendant was convicted of murder in the second

degree, attempted murder in the second degree, and offering a false instrument in the first degree

after killing her husband with anti-freeze and attempting to kill her daughter]), People v Hoyt

(210 AD3d 786 [1994] [where William J. Fitzpatrick assisted the Tioga County District Attorney

by spearheading the investigation into the death of the defendant's five children, decades before,

which led to her being convicted of five counts of murder in the second degree], and People v

Sigsbee (68 AD3d 1828 [2009] [a cold case, where the defendant was convicted of murder in the

second degree after he raped and killed a young college student]).

6. The presentation of this case to the Grand Jury will present complex challenges. The

case is approximately two-and-a-half years old, and involves forensic evidence, low-copy DNA,

video surveillance, and dozens of witness interviews and statements. As District Attorney, I will

not only be responsible for this case but also for the prosecution of every other case in St.

Lawrence County during the time of this Grand Jury presentation. Taking into consideration my

other duties, I would be better able to present this complex case to the Grand Jury with the assistance of William J. Fitzpatrick serving as counsel to the District Attorney.

7.  Thus it is respectfully requested that this Court authorize William J. Fitzpatrick to examine the documents, records, and minutes of the testimony of witnesses presented to the Grand Jury in this case.

WHEREFORE, your deponent respectfully requests that an order be issued authorizing the disclosure of Grand Jury minutes and evidence to William J. Fitzpatrick for the limited purposes stated above.

Dated:  May 7th, 2014

Mary E. Rain, Esq.
St. Lawrence County District Attorney

2014 MAY -9  A 9: 45

CLERKS OFC.
ST. LAW. CO.
RECEIVED AT

# EXHIBIT L

# EXHIBIT L

1

1    UNITED STATES DISTRICT COURT

2    NORTHERN DISTRICT OF NEW YORK

3    INDEX # 12-CV-01669

4    _____

5    ORAL HILLARY,

6                            Plaintiff,

7              vs.

8    VILLAGE OF POTSDAM, EDWARD TISCHLER, Individually
     and in his Official Capacity, MARK MURRAY,
9    Individually and in his official capacity,
     CHARLIE DANIELS, Individually and in his Official
10   Capacity, MICHAEL AMES, Individually and in
     his Official Capacity, POLICE OFFICERS JOHN
11   DOE 1-100, Individually and in their Official
     Capacity,
12
                            Defendants.
13   _____

14

15           This is the Examination Before Trial of

16                    **IAN FAIRLIE**

17           held on the 20th day of September, 2013,

18           held at Tioga County Office Building,

19           Owego, New York.

20

21

22           REPORTED BY:    DELORES HAUBER

23                           Shorthand Reporter

24                           Notary Public

IAN FAIRLIE by MR. MORTATI                                    62

1      Q    And what did you and the two

2    investigators discuss this now third interview

3    you've had, correct?

4      A    Similar questions.  Different tone.  I

5    was informed that a DA was kind of overhearing my

6    conversation and were looking into obstruction of

7    charges that they thought I was withholding

8    something or lying about something or knew

9    information that I didn't.

10     Q    Did they tell you what they thought you

11   were withholding?

12     A    Just they, I remember them saying we

13   know, and I'm going to, paraphrasing here, Peets

14   was basically yelling at me saying that they knew

15   Nick did it.  I didn't have to stand up for him.

16   He didn't do anything for me.  I don't have to,

17   kind of need to do this for him.  And that if

18   there is any other information I didn't give

19   them, I should give it to them now again with the

20   kind of threat that the DA was of watching me.

21     Q    Were you, withdrawn.

22          Did you provide any type of written

23   statement at that third interview?

24     A    No.

# EXHIBIT M

# EXHIBIT M

STATE OF NEW YORK
COUNTY COURT: ST. LAWRENCE COUNTY

---

THE PEOPLE OF THE STATE OF NEW YORK

       - against -

ORAL NICHOLAS HILLARY,

                Defendant

ORDER
Indictment # 2014-044
Index # 22300

---

Appearances:  The People by Mary E. Rain, Esq., District Attorney
                Defendant Oral Nicholas Hillary, by Dumas & Narrow, P.C.,
                Edward F. Narrow, Esq., of counsel

JEROME J. RICHARDS, J.

By indictment dated May 15, 2014 and filed on May 16, 2014 defendant is charged with murder in the second degree [Penal Law §125.15(1)], alleging the intentional killing of Garrett Phillips in the Village of Potsdam on October 24, 2011.

On July 24, 2014 this court entered an order resolving issues raised by omnibus motion except for those concerning the legal sufficiency of the grand jury evidence, the sufficiency of the legal instructions to the grand jury, and the integrity of the grand jury proceeding [CPL §210.35]. There has been a duly filed substitution of counsel for defendant, as noted above.

The case was presented to the grand jury over four days, from May 12 - May 15, 2014. Thirty witnesses testified, some over parts of two days. The four folios of the transcript contain 669 pages combining the evidence and the legal instructions.

The sufficiency of the evidence is challenged in this case under CPL §210.20(1)(b) and 210.30(2). This case depends on circumstantial evidence, at least in part. The grand jury heard no testimony from a witness who saw the homicide take place. Although the testimony of several grand jury witnesses implies that there may have been an attempt to assess potential DNA evidence during the investigative phase of the case, no DNA evidence was presented to the grand jury. There was a great deal of testimony about video surveillance cameras showing either Garrett Phillips or Oral Hillary at different locations, some of them fairly near Garrett's

1

residence, at times within several hours to within minutes before or after the probable time of the crime. Many of the foundation questions for introducing the videos into evidence lacked an adequate foundation. For example, repeatedly the prosecutors asked a foundation witness whether the things shown in the videos accurately showed the scene as it looked on the particular date and time. No factual basis was provided for the 'yes' response provided by many of these witnesses.

There was also quite a bit of testimony, some of it hearsay, about the quality of the changing relationship between defendant, the victim and the victim's mother and her family. The thrust of the prosecution case was to show that defendant had a very controlling personality and that he was often heard to correct or criticize the victim for not meeting defendant's expectations. The basis for this line of testimony was to show that the victim's mother had several times broken up with defendant and had told him to leave her apartment, and that he resisted the breakup. The prosecution view is that defendant blamed the victim for defendant's troubled relationship with the victim's mother. The grand jury was invited to conclude that defendant took out his frustration over the relationship with the mother by picking on the victim. Other witnesses, members of the victim's extended family, described Garrett as a happy, relatively care-free boy, who got along well with most people.

As the prosecutor told the grand jury, former defense counsel asked that the grand jury hear testimony from several potential alibi witnesses, including one of defendant's children and a friend and fellow soccer coach. The purpose of such testimony was to suggest that defendant was elsewhere when the crime was allegedly committed. No witness testified to having seen defendant in the apartment building where the victim and his mother lived at the time of the crime. The prosecution therefore focused a great deal of effort and testimony on showing a time sequence of events making it, in the prosecution's view, both plausible and likely that defendant was in the apartment when Garrett died.

The grand jury proceeding is an accusatory process, not a trial. The question to be answered by the grand jury is whether or not there is sufficient legally competent evidence to give the grand jury reasonable cause to believe that defendant murdered the victim. CPL §190.65(1). 'Legally sufficient evidence' is defined in the criminal law in CPL §70.10(1) as

2

'competent (which means admissible) evidence which, if accepted as true, would establish every element of an offense charged and the defendant's commission thereof; except that such evidence is not legally sufficient when corroboration required by law is absent.' 'Reasonable cause to believe that a person has committed an offense' [CPL §70.10(2)] exists when evidence or information which appears reliable discloses facts or circumstances which are collectively of such weight and persuasiveness as to convince a person of ordinary intelligence, judgment and experience that it is reasonably likely that such offense was committed and that such person committed it. Except as otherwise provided in this chapter [the Criminal Procedure Law], such apparently reliable evidence may include or consist of hearsay.' Appellate case law has long explained that while grand jury evidence may *include* hearsay, there must still be competent (i.e., *non-hearsay*) proof of each element of the charged crime. Phrased differently, probable cause may be provided through hearsay information where the individuals providing the information are reliable and have a basis for their knowledge. *People v. Letendre*, 264 AD2d 943 [3 Dept 1999], *affirmed* 94 NY2d 939 [2000].

In reviewing the grand jury evidence the court must also be cognizant of the rule that it is the grand jury, not the reviewing court, that decides whether the evidence meets the reasonable cause test. The court's focus is restricted to the legal sufficiency of the competent evidence. *People v. Jennings*, 69 NY2d 103 [1986]; *People v. Deegan*, 69 NY2d 976 [1987]; *People v. Galatro*, 84 NY2d 160 [1994]; and *People v. Jensen*, 86 NY2d 248 [1995]. As the *Deegan* court noted, "the fact that the proof presented to the grand jury is also susceptible of inferences of innocence is irrelevant as long as the grand jury could rationally have drawn the guilty inference" [*Deegan* at 979, quoted in *Jensen,* 86 NY2d 248, 252].

Bearing in mind that it is not the job of the prosecutor, at this stage of a case, to prove defendant's alleged guilt beyond a reasonable doubt, the court would be predisposed to find the grand jury evidence legally sufficient to provide reasonable cause to believe that defendant committed the charged crime.

However, such a conclusion must be based on a proceeding which conforms to the requirements of article one hundred ninety. CPL §210.35(5). If the proceeding fails to conform to that standard, the integrity of the proceeding is impaired and prejudice to the defendant may

3

result, rendering it defective within the meaning of CPL §210.20(1)(c), requiring dismissal.

Present defense counsel filed an alibi notice on October 9, 2014, stating that at trial the defense intends to introduce proof that at the time of the commission of the crime defendant was at a place or places other than the scene of the crime, which was 100 Market Street, Apartment 4 in the Village of Potsdam. Specifically the notice states that the defense will call Ian Fairlie and defendant's daughter, Shanna-Kay Hillary, to show that defendant was at 118 Leroy Street, Meadow East Apartments, Apartment E-6, and at 16 Gardner Street, in Potsdam. Both of these individuals testified at the grand jury proceeding.

While questioning Tandy Collins, Garrett Phillips' mother, the prosecutor asked her whether defendant attended any of the memorial services for Garrett, and she replied that he had not done so. This information has no probative value on the question of who killed the victim, and clearly suggests that the prosecutor wanted to portray defendant either as uncaring or as having a motive to avoid contact with Garrett's surviving family. The question was improper and highly prejudicial. [TR folio I, page 135].

The questioning of Shanna-Kay Hillary covered approximately 80 pages [TR I-240 – II-322]. The problems arose when the prosecutor asked Shanna about her conversation with her lawyer, within a week after Garrett died. In the grand jury proceeding it was unquestionably improper and prejudicial for Ms. Rain to ask her what her lawyer had told her [TR -II-292], and then to press her, in cross-examining fashion, telling Shanna that she had to answer because she was under subpoena. When this questioning persisted, Shanna disclosed that the attorney with whom she spoke was the same attorney who had represented defendant in his civil claim against police officers. Shanna was not a target of the grand jury investigation, as Ms. Rain eventually stated. What Shanna told her attorney is not relevant to whether Oral Hillary did or did not allegedly kill Garrett Phillips. In effect, with this line of questions, Ms. Rain was trying both to undermine a potential alibi defense and at the same time portray witnesses who could provide a potential alibi defense as lying to protect defendant. The prosecutor's questioning undercut the very essence of the grand jury's fact finding mission. The jury was tasked with believing the proof of the defendant's location near the victim shortly prior to the crime or crediting the alibi witness' testimony that the defendant was home at the time of the crime. The prosecutor's

4

expression of bias by her disbelief of the witness' testimony for all intents and purposes took out of the jury's hands a determination of what the proved facts were in that regard.

Worst of all, Ms. Rain asked Shanna essentially the same question thirteen times as to how she could "explain the unrefuted proof" that established that defendant was not in Shanna's home at or around (a specific time changed with each question) on the day of the homicide. [TR-II-320]. This testimony was bullying a seventeen-year old girl, who clearly stated that she did not understand what Ms. Rain meant by 'unrefuted proof.' Ms. Rain did not explain what she meant by that, and moreover, it was extremely prejudicial to use words like 'unrefuted proof' in the grand jury while questioning a witness. These questions invaded the fact-finding role of the grand jurors, and told them what Ms. Rain thought that the proof showed.  The question was so improper that it could not have been asked at trial.  If it would be improper at trial, it certainly is improper at grand jury.  The prosecutor's question clearly stated to the grand jury what her belief was regarding the fact at issue and was an improper attempt to influence the grand jurors.

As the legal advisor to the grand jury [CPL §130.25(6)] the prosecutor must present the evidence and instruct the jurors as to the applicable law, in conjunction with the court when necessary. Numerous decisions of the New York Court of Appeals, and other courts, have long established that a prosecutor has a duty of fair dealing with witnesses and with the process. Engaging in pervasive misconduct during a grand jury proceeding can impair the integrity of the proceeding and lead to dismissal of the indictment.

The leading case in this area is *People v. Huston*, 88 NY2d 400 [1996]. In that case the court found that the prosecutor's misconduct was intentional, and biased the proceeding against defendant, and therefore dismissed the indictment with leave to resubmit the charges to a different grand jury. In that case defendant was charged with two counts of murder in the second degree. The trial court stated in its review of the grand jury evidence that it was disturbed by the way the prosecutor seemed to be testifying (unsworn), but denied the motion to dismiss for a defective proceeding. The Appellate Division affirmed the eventual conviction, holding that defendant failed to establish any possibility of prejudice from the prosecutor's misconduct. The Court of Appeals reversed.

As former Chief Judge Kaye wrote in *Huston*, "The prosecutor's discretion during grand

5

jury proceedings, however, is not absolute. As legal advisor to the grand jury, the prosecutor performs dual functions: that of public officer and that of advocate. The prosecutor is thus 'charged with the duty not only to secure indictments but also to see that justice is done' (*People v. Lancaster*, 69 NY2d at 26; *see also, People v. Pelchat*, 62 NY2d at 105). With this potent authority, moreover, comes responsibility, including 'the prosecutor's duty of fair dealing' (*People v. Pelchat*, 62 NY2d at 104..." 88 NY2d at 406).

Describing the presentation in the *Huston* case, Judge Kaye wrote: "Where, as here, the charges facing the defendant are of the most serious nature, society's interest in justice is especially great. Nevertheless, the prosecutor who submitted defendant's case to the grand jury disregarded his role as public officer and his 'duty of fair dealing.' The grand jury minutes are rife with instances of the prosecutor imparting his personal opinion regarding the proper inferences to draw from the testimony or physical evidence, asking impermissible and inflammatory questions, and conveying – both directly and indirectly – his belief in defendant's guilt." *Huston*, at 406. The court further noted that the exceptional remedy of dismissal is warranted only where a possibility of prejudice is created, and actual prejudice need not be shown. *People v. Huston,* 88 NY2d 400, 409; *People v. Sayavong*, 83 NY2d 709 [1994]; *People v. DiFalco*, 44 NY2d 482 [1978]; Preiser, Practice Commentary, McKinney's Cons. Laws of NY, Book 11A, CPL 210.35, at 676." *See also, People v. Archie*, 28 Misc 3d 617 [Sup Ct Kings County 2010] [indictment dismissed for defective proceeding].

In *Huston* the Court of Appeals also noted, "In rare cases such as this where irregularities in presenting the case to the Grand Jury rise to the level of impairing those proceedings and creating the risk of prejudice, "the indictment [can]not be permitted to stand even though it is supported by legally sufficient evidence" (*People v. Calbud, Inc.,* 49 N.Y.2d at 395, 426 N.Y.S.2d 238, 402 N.E.2d 1140, *supra*)."

As noted in a later case which also discusses *Huston,* and on markedly different facts reaches a different result, not dismissing the indictment, the court noted that the prosecutor "is not obligated to present the evidence or make statements to the grand jurors in the manner most favorable to the defense." *People v. Thompson*, 22 NY3d 687, 698 [2014]. Indeed, "the statutory test, which does not turn on mere flaw, error or skewing...is very precise and very high (*People v.*

*Darby*, 75 NY2d 449 [1990]." [internal quotation marks omitted]. *Thompson*, at 699. The key difference between *Huston* and *Thompson* seems to be the fact that in *Thompson* the integrity of the proceeding remained intact, and the independent fact-finding job of the grand jurors was not usurped by the prosecutor. *Thompson* was also a 4-3 decision.

The Second Department noted, in *People v. Goldstein*, 73 AD3d 946 [2 Dept 2010] that "The likelihood of prejudice turns on the particular facts of each case, including the weight and nature of the admissible proof adduced to support the indictment and the degree of inappropriate prosecutorial influence or bias." 73 AD3d 946, at 949, quoting *Huston*, 88 NY2d, at 409.

It is particularly troubling to the court that in this serious case, which is so heavily dependent on circumstantial evidence, the prosecutor's improper questions, direct and indirect expression of opinion, and use of numerous exhibits without proper foundation may have impaired the integrity of the proceeding. The prosecutor seemed to put aside any neutrality and balanced judgment – duties imposed on her by case law – in questioning two witnesses who were later identified as potential alibi witnesses. Any indictment returned on such facts as were presented to the grand jury must be the product of unquestioned fairness, precisely because the meaning of the events described is not conclusive proof of guilt. Here, that was not the case.

The indictment is dismissed and the People are given leave to re-present the case to a different grand jury. CPL 210.20(4). This order shall also be deemed to be a securing order, as provided in CPL §210.45(9). The previous securing order is continued.

So ordered.

Enter.

Date: October 16, 2014

JEROME J. RICHARDS, J.C.C.



**STATE OF NEW YORK**
**COUNTY OF ST. LAWRENCE**
**COUNTY COURT CHAMBERS**
48 COURT STREET
CANTON, NY 13617

STEPHEN J. EASTER
Principal Law Clerk

JEROME J. RICHARDS
County Court Judge

315-379-2214
FAX: 315-379-9934

DONNA M. REED
Secretary to Judge

October 16, 2014

Edward F. Narrow, Esq.
Dumas & Narrow, P.C.
20 Park Street
Canton, NY 13617

Re:   The People of the State of New York v. Oral Nicholas Hillary
      Indictment # 2014-044, Index # 22300

Dear Mr. Narrow:

Enclosed please find a copy of an Order regarding the above-entitled matter.

The original Order has been forwarded to the St. Lawrence County Clerk's Office for filing.

Sincerely,

Jerome J. Richards
County Court Judge

cc:   Hon. Mary E. Rain, Esq., District Attorney
      Mary B. Curran, Chief Clerk

2014 OCT 16   A 11: 36
CLERKS OFC.
ST. LAW CO.
RECEIVED AT

# EXHIBIT N

# EXHIBIT N



# St. Lawrence County
# Office of the District Attorney

48 Court Street, County Courthouse
Canton, New York 13617-1169
Telephone: 315-379-2225 ❖ Fax: 315-379-2301

**Mary E. Rain**
District Attorney

---

**FOR IMMEDIATE RELEASE:**                                                                November 13, 2014


### DA MARY RAIN DETERMINED TO RE-INDICT ORAL NICHOLAS HILLARY


After considering all the options and after consulting the Phillips and Collins
family, District Attorney Mary Rain has determined to re-indict Oral Nicholas
Hillary.  When considering the option to appeal, DA Rain said, "it could take an
additional 18 months before the family received justice and that is unacceptable."
The process to re-indict will start Monday.

# EXHIBIT O

# EXHIBIT O

COUNTY COURT
COUNTY OF ST. LAWRENCE      STATE OF NEW YORK

THE PEOPLE OF THE STATE OF NEW YORK,

**DECISION & ORDER**

-against-

DNA Analysis Admissibility
Ind. #: 2015-15

ORAL NICHOLAS HILLARY,

Defendant.

*Mary E. Rain, District Attorney,* Canton, for the People.

*William Fitzpatrick, District Attorney,* Syracuse, for the People.

*The Legal Aid Society,* New York (Jessica Goldthwaite of counsel), for the Defendant.

*The Legal Aid Society,* New York (Richard Torres of counsel), for the Defendant.

*Dumas & Narrow,* Canton (Peter Dumas of counsel), for the Defendant.

*Emery, Celli, Brinckerhoff & Abady,* New York (Earl Ward of counsel), for the Defendant.

*Siegel, Teitelbaum & Evans, LLP,* New York (Norman Siegel of counsel), for the Defendant.

*The Legal Aid Society,* New York (Clinton Hughes of counsel), for the Defendant.

*The Bronx Defenders,* New York (Adnan Omar Sultan of counsel), for the Defendant.

**CATENA, J.:**

A motion was filed by defendant to preclude the prosecution from offering expert testimony

as to the use of, or any results produced by, the forensic software tool STRmix alleging that the use

1

of this software for probabilistic genotyping is not generally accepted in the relevant scientific and legal communities as required by *Frye v. United States*, 293 F. 1013 (*see, People v. Middleton*, 54 NY2d 42 ["the test is not whether a particular procedure is unanimously indorsed by the scientific community, but whether it is generally acceptable as reliable"]). The defendant also filed a motion to preclude the use of a modified random match probability statistic ("RMP"). The defendant also challenged the admissibility of the evidence. The people filed an affirmation in opposition to the motion dated June 24, 2016, and oral argument was held on Friday July 1, 2016. By decision and order dated July 11, 2016, this court granted a limited *Frye* hearing on the issue of whether STRmix can "generate results accepted as reliable within the scientific community generally" on extreme mixture ratios where the DNA from the minor contributor is low template. Trial foundation for the admissibility of the evidence was made part of the hearing (*People v. Wesley*, 83 NY2d 417, 429). The hearing was held on Monday July 25, 2016, at the courthouse in Canton, New York. Further oral argument was held on the record on August 17, 2016.

On October 24, 2011, the Potsdam Police Department received a call from a neighbor of the victim stating that she heard moans and the word "help" coming from the victim's apartment. An officer of the Potsdam Police Department arrived at the apartment at approximately 5:16 p.m., knocked on the door, and heard what sounded like someone walking around the apartment. Shortly thereafter, the Officer entered the apartment with the landlord and found the victim unconscious in the bedroom. No one else was in the apartment and the victim was pronounced dead at 7:18 p.m. that evening. The cause of death was determined to be strangulation.

As part of the investigation, the police collected dozens of samples of DNA from multiple areas in the apartment including the body and clothing of the victim. The police also obtained a

2

sample of the defendant's DNA as he had lived briefly with the victim, having an intimate relationship with the victim's mother. Because this was a New York State Police investigation, the New York State Police crime lab processed the samples. The defendant was excluded from all samples taken at the apartment where comparisons could be made except for a DNA mixture profile from fingernail scrapings taken from the victim's left hand. Due to insufficient genetic information, the defendant could neither be included nor excluded as a possible contributor to the mixture.

Beginning in 2013, the New York State Police crime lab contacted Cybergenetics, Inc., to run the data obtained from the fingernail scrapings through their probabilistic genotyping software program called TrueAllele. The results were inconclusive. Nonetheless, the defendant was indicted for the victim's murder in 2014 and the New York State Police crime lab sent its data at the behest of the prosecution to the Institute of Environmental Science and Research ("ESR") which ran it through their probabilistic genotyping software program called STRmix[1]. The People also requested their expert, Dr. John S. Buckleton, one of the developers of STRmix, to calculate a random match probability statistic which was presented in a report dated July 1, 2016.

Dr. Buckleton conceded at the hearing that no internal validation studies were performed by the New York State Police crime lab for the use of STRmix on casework samples developed at the

[1]District Attorney Fitzpatrick first contacted Dr. Buckleton by email on November 2, 2015, stating in pertinent part "I am currently assisting a colleague in prosecuting a murder case in Saint Lawrence County . . . On 10/24/2011 a 12 year old boy [] was strangled to death in his apartment in Potsdam NY. No physical evidence was discovered at the scene except for [] fingernail scrapings . . . Those scrapings were analyzed at the New York State Police crime lab and the DNA profile generated appears to be consistent with a mixture of two individuals with the victim as the major contributor and the obligate alleles (7) being consistent with the defendant. I am hoping that you or someone you recommend might be able to provide a statistical weight to the results using a likelihood ratio or some other method. I can provide the analyst's report and the electropherograms if you decide to take a look."

lab. As a result Dr. Buckleton was forced to pick and choose data from different "reliable sources"

and input parameters into the program in such a way that he believed the system would tolerate[2].

The reason for this was because the New York State Police crime lab was not authorized by the New

York State Commission on Forensic Science to generate data from DNA samples for STRmix

---

[2]Dr. Buckleton testified that "[a]ll labs in the United States of America are following the SWGDAM guidelines". The Scientific Working Group on DNA Analysis Methods (SWGDAM) provides guidelines for validation of probabilistic genotyping systems such as STRmix. As stated in the guidelines, "[v]alidation is a process by which a procedure is evaluated to determine its efficacy and reliability for forensic casework and/or database analysis." Further, "[i]nternal validation studies is the accumulation of test data within the laboratory to demonstrate that the established parameters, software settings, formulae, algorithms and functions perform as expected . . . In particular, complex mixtures and low-level contributors should be evaluated thoroughly during internal validation, as the data from such samples generally help to define the software's limitations, as well as sample and/or data types which may potentially not be suitable for computer analysis."

STRmix has six laboratory specific parameters to determine prior to its use. Concerning one of these parameters called stutter ratios, Dr. Buckleton testified that he received data from the New York State Police crime lab to look at "forward stutter" which "did not serve the purpose" but nonetheless was used in the April 2016 analysis. Concerning "drop-in" rates, Dr. Buckleton stated that he inputted a zero drop-in rate as the crime lab did not "have a drop-in rate because they do not do low copy number on high sensitivity methods." A "drop-in" rate greater than zero would have benefitted the defendant. And in his affidavit dated August 18, 2016, Dr. Buckleton further stated that he used a "drop-in rate" that was based partly on "our own experience."

Dr. Buckleton further testified that "[b]est practice is clearly validation in the lab specifically, and that is -- the optimal way is the way we recommend. It's not available to me in this case because the New York State lab has not done the relevant validation. I have two options first with that. I have the option of doing the next best practice or not doing anything. I've done next best practice. I've done this a couple times before and I'm not pertaining it's best practice, and I have candidly acknowledged in my statement that exact fact. *What I've done is attempt to take data from different reliable sources that I think applies to the circumstance.* I'm also aware of the forgiveness of the system for slight inaccuracies in certain of the parameters, so I have input parameters in such a way that I believe the forgiveness of the system will tolerate any inaccuracies I've made" (emphasis supplied).

analysis[3]. And although ESR had performed the necessary internal validations to be accredited by

the relevant agencies for the use of STRmix, those validations were specific to data generated by

ESR. Here, the only data generated was from the New York State Police crime lab[4].

"The New York State Commission on Forensic Science (the "Commission") is the

governmental body tasked with developing minimum standards and accreditation programs for all

forensic laboratories in New York State. In addition, the Commission approves forensic laboratories

to perform specific forensic methodologies. The Commission's objectives are to increase and

maintain the effectiveness, efficiency, reliability, and accuracy of forensic laboratories, ensure that

forensic analyses are performed in accordance with the highest scientific standards practicable, and

set forth minimum requirements for the quality and maintenance of equipment. The DNA

Subcommittee of the New York Commission on Forensic Science ("DNA Subcommittee") is the

---

[3]The lab was authorized to generate data for TrueAllele analysis. The People stated at the August 17, 2016, oral argument that "each individual laboratory has to go through essentially an accreditation process to determine whether or not . . . they have the trained [personnel] and expertise to accurately employ [STRmix]". The People further discussed the Onondaga County crime lab stating "Onondaga is going through . . . their own internal validation process to make sure that their people are properly trained to use STRmix, get accurate results with blind proficiency testing and then ultimately will present their process to ASCLD/LAB . . . for the accreditation process. Then that laboratory . . . has to go through a two year accreditation process in front of the Forensic Science Commission for that discipline." It is clear that the New York State Police crime lab had not gone through the accreditation process and, thus, did not have the "trained [personnel] and expertise to accurately employ" STRmix. The People conceded this stating "there [were] no internal validation studies by the State Police regarding STRmix."

[4]The Federal Bureau of Investigation's quality assurance standards for Forensic DNA Testing Laboratories define "Forensic DNA analysis" as "the process of identification and evaluation of biological evidence in criminal matters using DNA technologies." The quality assurance standards further define "internal validation" as "the accumulation of test data within the laboratory to demonstrate that established methods and procedures perform as expected in the laboratory." Quality Assurance Standard 8.1.3 requires that internal validation be performed for forensic casework analysis.

body appointed by the Commission to perform accreditation of all DNA laboratories in New York. Further, the DNA Subcommittee is charged with assessing all DNA methodologies proposed to be used for forensic analysis. It has the sole authority to grant, deny, review, or modify a DNA forensic laboratory accreditation, which the DNA Subcommittee exercises by issuing a binding recommendation to the Commission. While the Commission can request that the DNA Subcommittee reconsider its findings, the DNA Subcommittee is the final decision maker regarding laboratory accreditation" (*U.S. v. Morgan*, 53 F.Supp.3d 732; Executive Law 995-b[1])[5].

The Commission requires laboratories to comply with the standards promulgated by the American Society of Crime Laboratory Directors/ Laboratory Accreditation Board ("ASCLD/LAB") (9 NYCRR §6190.3[b]). These standards require that DNA mixture interpretation be based on validation data (*id.*). Here, by sending its raw data to ESR, an accredited lab for STRmix analysis, the People argue that the New York State Police crime lab could bypass Commission approval for its participation in the STRmix process inasmuch as it did not run the computer program. This minimizes the importance of raw data generation in the STRmix process and emphasizes the People's heavy reliance on the expertise of Dr. Buckleton to account for any deficiencies in the data[6]. Such reliance appears contrary to Commission and ASCLD/LAB requirements (*see, State v.*

---

[5] "'DNA testing methodology' means methods and procedures used to extract and analyze DNA material, as well as the methods, procedures, assumptions, and studies used to draw statistical inferences from the test results" (Executive Law §995[3]).

[6] As the People stated at the August 17, 2016, oral argument "[Dr. Buckleton]'s just saying that, look, I've got this raw data from the State Police. There are some things I don't know, so what I'm doing, what I, John Buckleton, am doing is I am taking the most stringent, conservative approach to my input of the STRmix data."

6

*Wakefield*, 57 Misc.3d 850; *see, People v. Vincent Bullard-Daniel*, Co Ct. Niagara County, March 10, 2016, Murphy, J., Ind. No. 2015-88)[7].

As stated by this court in its earlier order granting the pre-trial hearing herein, "the test pursuant to *Frye v. United States* (293 F 1013) poses the . . . . question of whether the accepted techniques, when properly performed, generate results accepted as reliable within the scientific community generally . . . The issues of proper foundation and of the adequacy of laboratory procedures [] are not before [the Court at a *Frye* hearing]" (*People v. Wesley, supra*). To that end, this court notes that the New York State Commission on Forensic Science issued a binding recommendation for use of STRmix in the analysis of DNA profiles upon recommendation from its DNA Subcommittee (Executive Law §995-a; *People v. Wakefield, supra* at 856 [approval by the Commission constitutes general acceptance]). And STRmix was found by a New York State court after a *Frye* hearing to be generally accepted in the relevant scientific community (*People v. Vincent Bullard-Daniel, supra*). Based upon a review of the record, this court finds that STRmix has been developmentally validated and is generally accepted as reliable within the scientific community (*id.*; *People v. Muhammad*, 14th Cir. Ct., Muskegon Co, Dec. 15, 2015). Issues concerning the manner

---

[7]ASCLD/LAB accreditation requirement 5.4.5.2 from ISO/IEC 17025:2005:

"Procedures for DNA profile interpretation must be based on validation data. The interpretation of a DNA profile containing a mixture of two or more individuals must be guided by a procedure that includes specific defined steps that will enable different analysts in the same laboratory to reach the same conclusion; and a competent person from outside the laboratory using the same procedure to understand how the conclusion was reached. DNA mixture interpretation procedures must be tested on mixture profiles from known contributors representing the range of mixture types (e.g., different numbers of contributors, mixture proportions, and template quantities) to which the procedure will be applied in casework. The results of this validation must be used to define the capabilities and limitations of the procedure and to verify that it produces the expected results (e.g., inclusions and exclusions)."

in which STRmix accounts for stochastic effects in its probability computations where mixture ratios are extreme and the minor contributor's DNA is low template goes to weight (*People v. Debraux*, 50 Misc.3d 247; *People v. Megnath*, 27 Misc.3d 405).

"The issue [now] shifts to a second phase, admissibility of the specific evidence--i.e., the trial foundation--and elements such as how the sample was acquired, whether the chain of custody was preserved and how the tests were made . . . Once *Frye* has been satisfied, the question is 'whether the accepted techniques were employed by the experts in this case'. The focus moves from the general reliability concerns of *Frye* to the specific reliability of the procedures followed to generate the evidence proffered and whether they establish a foundation for the reception of the evidence at trial. The trial court determines, as a preliminary matter of law, whether an adequate foundation for the admissibility of this particular evidence has been established" (*People v. Wesley, supra* at 428-429). Here, the lack of internal validation by the New York State Police crime lab, as candidly admitted by Dr. Buckleton, precludes use of the STRmix results (*id.*; *see, State v. Wakefield, supra*; *see, People v. Vincent Bullard-Daniel, supra*).

Concerning RMP, while this court finds that it has been generally accepted as reliable within the scientific community under certain circumstances, the results produced in this case are unreliable based upon Dr. Buckleton's testimony that it cannot adequately account for the absence of defendant's alleles in the composite profile. As Dr. Buckelton stated, "the exact difficulty that we've come upon in this case and certain circumstances that the *Random Match Probability is not conservative and doesn't do a fair job for the defendant*, and this is one of those circumstances. The specific diagnostic is called a -- it's called a non-major allele between the profile and the accused. And we have a number of those where the accused has an allele that is not seen in the profile and

Random Match Probability is incapable of [punishing] the statistic for non-matches . . . So, in fact, it is the exact weakness of the 2p rule that has motivated me to make a probabilistic genotyping system" (emphasis supplied). Further, the defendant's expert, Dr. Dan E. Krane, testified that "[t]he Random Match Probability is and has been considered generally accepted in many circumstances. The particulars of the evidence sample in this case do not fit within the category of those that would cause to be generally accepted. If I can put it just a different way. I've testified for many years that there is no generally accepted means of attaching a reliable statistical weight to a mixed sample, such as the evidence sample in this case where drop-out may have occurred, which, again, seems very likely to have occurred with the evidence sample in this case. So, on those two counts it would be quite inappropriate to rely upon a Random Match Probability approach to generate a statistical weight."

Given Dr. Krane's testimony, the use of RMP in this case where the People's own expert witness testified that it *"is not conservative and doesn't do a fair job for the* defendant" must be precluded as unreliable (*People v. Wesley, supra*). In any event, even if this court were to agree with the prosecution that "[d]efendant's concern with the methodology used by Dr. Buckleton in calculating the statistic goes to 'the weight of the evidence, not its admissibility'", to allow such evidence would be unduly prejudicial to the defendant (*People v. Morris*, 21 NY3d 588 ["Weighing the evidence's probative value against its potential prejudice to the defendant is a matter of discretion for the trial court"]; *People v. Caban*, 14 NY3d 369 ["Evidence, though relevant, may be excluded where 'it's probative value is substantially outweighed by the danger that it will unfairly prejudice the other side or mislead the jury'"], *quoting People v. Scarola*, 71 NY2d 769, 777). In determining the motions herein, this court is reminded that "[f]orensic DNA analysis should be governed by the

9

highest standards of scientific rigor in analysis and interpretation" (*People v. Wesley, supra*)(Kaye, J., concurring). Neither the STRmix nor the RMP results may be used in this case (*id.*).

It is, therefore,

**ORDERED** that the defendant's motion to preclude the prosecution from calling an expert witness to testify on their direct case regarding any conclusion reached by the use of STRmix is granted as the prosecution cannot lay a foundation for the introduction of evidence that had not been internally validated; and it is further

**ORDERED** that the defendant's motion to preclude the prosecution from offering expert testimony as to any statistical results obtained by using the random match probability on the composite minor component of mixture is granted.

The above constitutes the decision and order of this Court.

Signed this 26th day of August, 2016, at Fonda, New York.

HON. FELIX J. CATENA
County Court Judge

ENTER:

10

# EXHIBIT P

# EXHIBIT P

From: MicheleRobbins@ongov.net [mailto:MicheleRobbins@ongov.net] On Behalf Of
WilliamFitzpatrick@ongov.net
Sent: Thursday, December 08, 2016 3:02 PM
To: perlin@cybgen.com
Subject: Truth on People v Oral Nicholas Hillary

Mark,

Let me respond to your recent request to address the National District Attorneys Association, a request I find astonishing in light of your comments about my prosecution of Nick Hillary. In my business, nothing is more important than the truth, and the truth needs to be told about that case, not the fictitious narrative you have propagated on your website and in your self congratulatory lectures. While I have no doubt you market an excellent product, one my office has employed on multiple occasions, and have altruistic motives, your zealousness in attempting to smear Dr. John Buckleton has far exceeded the bounds of simply promoting one viable product over another. That is so disturbing to me that I make the following observations that I am sharing with my colleagues and associates in the forensic community.

1. Long before the Hillary trial started, you and I discussed the case in my office. You indicated that TruAllele's results regarding the fingernail scrapings were "inconclusive, rather than exclusion." In other words, Hillary could neither be included nor excluded as the donor of the DNA under Garrett's fingernails. You suggested to me various ways the New York State Police Laboratory ("NYSP Lab") might enhance the results and assist you in getting a final conclusion, advice which I followed. I am confused, to say the least, as to why you would even suggest such a course of action if you, as you now opine, felt that the results exonerated Nick Hillary.

We also discussed the overwhelming circumstantial evidence regarding Hillary, which you found to be compelling.

2. After that discussion, you learned that defense counsel were relying on Alan Jamieson, a person you referred to as an "idiot," an opinion you confirmed with other members of my staff.

3. In one of our discussions about this case, I asked you about the 11 foreign alleles under Garrett's fingernails, all above the NYSP Lab 50 RFU analytical threshold and all consistent with the murderer being Nick Hillary. You opined that this was worthless as evidence as you believed RMP analysis (accepted in every courtroom in America except in Saint Lawrence County) was not valid and only TruAllele should be accepted in court.

4. Prior to trial, defense counsel made a motion for a Frye hearing, which was granted by the court. In the decision granting the Frye hearing, the court specifically found that STRmix is absolutely generally accepted in the scientific community, but that a hearing was required to determine "the issue of reliability of the STRmix results in this case given that the portion of DNA found in the fingernail scrapings in the 550C2 sample from the minor contributor was very small and would be termed 'low-template'" (Decision/Order of Hon. Felix Catena dated July 11, 2016). It needs to be mentioned that the same lawyers denouncing STRmix and championing TruAllele were the same lawyers who a few months earlier considered TruAllele junk science. Sorry Mark, but integrity still matters. In addition, the defense's star witness at the Frye hearing was Dan Krane, a person you have referred to as a "liar."

5. Also prior to trial, I consulted a number of nationally recognized DNA experts, people that regularly testify for either the prosecution or the defense, and explained my consternation about a lack of a report from TruAllele and my belief that 11 foreign alleles, all matching defendant, had some significance in this case. They all recommended Dr. John Buckleton, an expert I have long been familiar with. Asking little about the case other than his ability to retrieve the data from the State Police, Dr. Buckleton, employing the STRmix program, rendered an opinion finding a high likelihood ratio that Hillary was the donor of the DNA under Garrett's fingernails. Interestingly enough, Dr. Buckleton was later able to explain why TruAllele had reached a different result, a fact I was looking forward to employing on cross-examination.

6. In a paradoxical decision, the judge precluded STRmix as the NYSP Lab had not done validation studies on the software, which is not surprising as the Lab was not utilizing STRmix. What you have never seemed to realize is that per his decision, TruAllele would have been precluded as well.

Meanwhile, after a jury was waived, a demonstrably guilty defendant went free. It is your reaction to that verdict as an opportunity at self promotion and denigrating Dr. Buckleton—who incidentally has never said an adverse word about you in my presence—that disgusts me.

7. In your September 28, 2016, posting on your website, you suggest that STRmix was rejected by the judge as unreliable. That is demonstrably false.

You also interjected, in a most inappropriate manner, that you were "pleased for Nick Hillary and his family." Mark, don't congratulate yourself too much. Your alliance with lawyers that think TruAllele is junk, a scientist you feel is an "idiot" and another you think is a "liar" helped the killer of a 12 year old boy walk free. Not sure how much pleasure an objective scientist should derive from that.

8. On September 8, 2016, you posted on your website that the "court rejected STRmix as reliable DNA evidence" and it's use of a 50 RFU threshold was unreliable as well. That is totally false. The 50 RFU threshold is used by the NYSP Lab and the judge specifically found STRmix to be reliable. Your zeal to replace STRmix, your #1 competitor, is affecting your rhetoric.

9. Apparently in your preparation for your Legal Aid lecture in front of the same people who denounced you months ago for not revealing your source code or for propagating junk science, you posted "The Jamaican Clarkson University soccer coach was targeted from the outset." This is unquestionably incorrect. I assume you revealed his ethnicity to play into the false narrative that this was a racial prosecution. You also noted "newly elected DA Mary Rain went shopping for another DNA opinion." This is also utterly false. District Attorney Rain delegated the DNA work to me. It is to my everlasting regret that I was unable to convince a judge about the value of this DNA evidence and that as a result of that a sociopathic killer of a helpless 12-year-old boy now walks among us. Based on your website postings Mark, you are no doubt pleased by that.

10. In November, you had a meeting with PCAST. Based on a Newsroom publication on your website, you made the following statement:

"In the Nick Hillary case mentioned by PCAST's report, there was no conflict between TruAllele and STRmix. At 30 RFU and most other threshold levels, STRmix excluded Hillary. However, using a threshold of 50 RFU, along with careful data selection, included him. STRmix conflicted with STRmix. This happened because limited statistical modeling required data choices that introduced human bias"  (  https://www.cybgen.com/information/presentations/2016/PCAST/Perlin-Transparency in-DNA-evidence/page.shtml  ).  This is a blatant misstatement. STRmix generated a higher likelihood ratio at 30 RFU. Unless you somehow obtained the STRmix software and generated your own report, absent training from the developers of STRmix, you have no basis to make this statement. And, as I stated above, Dr. Buckleton used the 50 RFU analytical threshold—the threshold used by the NYSP Lab. I hope for your sake that this comment was based on a misunderstanding or poor editing rather than an intentional act of deception. Maybe you should take some time off from your STRmix bashing tour to look up the following case, Giglio v United States (92 US 763 [1972]). I hope this explains as succinctly as possible my position.

If you in any way have evidence to counter my factual assertions, please sharethem or post them on your website.

From:"Dr. Mark W. Perlin" <perlin@cybgen.com> To:Fitzpatrick William <WilliamFitzpatrick@ongov.net>,
Date:11/01/2016 09:46 AM
Subject:Re: Jamieson
Bill,
Speaking of Allan Jamieson, he is expanding his defense expert business in the US.  Some prosecutors I work with asked for information about him.
Have you collected documents, statements, transcripts, etc. on him?  If so, could you share them with me?

Thanks. - Mark
PS: I testified for the Commonwealth yesterday in Virginia v. David Brown.
The prosecutors urged to me speak at an NDAA forensic evidence program.  I regularly teach to statewide prosecutor groups, and would be happy to lecture for the national group.
=======================

Mark W. Perlin, PhD, MD, PhD
Chief Scientific and Executive Officer perlin@cybgen.com
Cybergenetics
Omega Building, Suite 210
160 North Craig Street
Pittsburgh, PA 15213
USA
412.683.3004
412.683.3005 FAX
www.cybgen.com

# EXHIBIT Q

# EXHIBIT Q

# SILVER & COLLINS

ATTORNEYS AND COUNSELORS AT LAW

ANDREW W. SILVER
JOHN K. COLLINS

HONORABLE
GEORGE E. SILVER
OF COUNSEL

**REPLY TO CANTON OFFICE**

WILLIAM M. DUSKAS
OF COUNSEL

February 8, 2016

Honorable Mary E. Rain
St. Lawrence County District Attorney
48 Court Street
Canton, New York 13617

RE:     People vs. Hillary

Dear Mary:

I write for three reasons. First, I will address your finding the two pages appended to your letter of February 3, 2016 to the Court in previously produced material. Second, and most importantly, I will reveal to you, and by copy of this letter to the Court, reveal to the Court, recently received emails of Mr. Fitzpatrick that clearly exposes the untruthfulness of the prosecution under questioning by the Court on January 25. Third, I need to address and understand more clearly what your most recent letter to the Court actually means.

### Last two pages of subfolder 174

While you are correct that on January 4, 2016, you provided a hard drive wherein one of the folders was titled "Reports" and within that folder were the following numbered subfolders "27, **174, 174,** 175, 176, 177, 178, 179, 180, 181, 182, 183, 184, 185, 186, 187, 188, 189 190, 191, 192, 193, 194 195, 197." When these reports were printed, an assumption was made that subfolder "174" was simply a duplicate, because of its duplication in the folders. Indeed a printed hard copy of one of the "174" subfolders did not contain that Brady material which you appended to your letter to the Court.

Upon receipt of your letter, I opened both subfolders labeled "174" and saw that: (i) they contained different information; and (ii) the very last two pages of the subfolder named "174" that was not printed are the two pages you provided the Court. Clearly this is Brady material. It is also only 2 of the 23 pages of Brady which you provided to us the day following the Court's inquiry into the People's prior interaction with Cybergenetics. Accordingly, I stand corrected to the extent that I made statements that you had not provided <u>any information</u> pertaining to the use of other LR experts and for that, I apologize.

CANTON
44 COURT STREET
CANTON, NY 13617
(315) 386-8506
(315) 386-8507 (FAX)

POTSDAM
4 ELM STREET
POTSDAM, NY 13676
(315) 265-2264
(315) 265-2611 (FAX)

OGDENSBURG
201 STATE STREET, SUITE 101
OGDENSBURG, NY 13669
(315) 393-1630
(315) 393-9675 (FAX)

MORRISTOWN
316 MAIN STREET
PO BOX 218
MORRISTOWN, NY 13664
(315) 375-8836
(315) 375-4021 (FAX)

Honorable Mary E. Rain
February 8, 2016
Page 2

**Fitzpatrick emails**

Only transparency and broad disclosure will bring the discovery of the truth in this case. Our sole immediate concern is the late disclosure of STRMix and the reasons why. As a matter of fundamental fairness the defense is entitled to know the experts the People interacted or consulted with prior to engaging STRMix in November of this year. As I stated in Court on January 25th, it defies logic that the People did not seek LR from other experts prior to November. With the exception of the two pages found in 174, you did not provide the balance of the Brady material until *after* the Court inquired. Most troubling however is we now know more – specifically, what you knew and what Bill knew when the prosecution was being questioned by the Court on TruAllele. It is our firm belief that the prosecution team is not being forthright with the Court.

On January 25, 2016, Judge Richards asked Mr. Fitzpatrick what about Cybergenetics/TruAllele's prior involvement? Mr. Fitzpatrick stated the following on the record:

> "Immediately upon getting into this case and seeing that report, I began to become aware of this new technique called probabilistic genotyping. And there're correct, the State Police, at the time, did employ a company by the name of TrueAllele. *I have not seen any report from TrueAllele. Obviously, if I did, whether it was inculpatory or exculpatory, I would provide it to the defense.*" 1/26/16 Transcript, Pg. 11.

Upon further questioning from the Court, Mr. Fitzpatrick stated the following:

> "Now, *I don't know if they [SLC DA] went to TrueAllele* and then stopped using TrueAllele because of the scandal that's going on in the State Police. Obviously, I will check with Julie Pizziketti immediately tomorrow, and *if there's some communication, some report, some inconclusive thing, I will get that for the defense.*" Pg.18

Finally, the following colloquy takes place between the Court and Mr. Fitzpatrick:

> "Court: And, you know, I think somehow contact has to be made with TrueAllele. I don't know the method or the form or what's produced from it, but it seems to me the questions have to be answered.

SILVER & COLLINS

44 Court Street
Canton, NY 13617
(315) 386-8506

4 Elm Street
Potsdam, NY 13676
(315) 265-2264

201 State Street, Suite 101
Ogdensburg, NY 13669
(315) 393-1630

316 Main Street
Morristown, NY 13664
(315) 375-8836

Honorable Mary E. Rain
February 8, 2016
Page 3

> Fitzpatrick: *I agree, Your Honor, and I will address that tomorrow.*
> *The guy that owns TrueAllele is Mark Perlin.  Mr. Collins is a little*
> *bit correct that I've used Mr. Perlin in the past.  I will speak to him*
> *personally if I have to, but I will get an answer to that*, and I can't
> imagine it would take longer than tomorrow." Pg.21

So, in essence, Mr. Fitzpatrick is stating, "I got into this late Judge, I have no idea if TruAllele was ever involved.  Judge, if I knew if they were involved in any way, I would of course turn that material over to the defense, whether inculpatory or exculpatory."   At first blush, that sounds both fair and honorable.  And, I will point out, you were sitting silently next to him while he stood before the Court and made those statements to the Court.

Attached, for your review, are emails provided by Dr. Mark Perlin.  Mr. Fitzpatrick, as recently as **November 3, 2015**, emailed Perlin and stated that "TruAllele analyzed [the Hillary data] months ago…..[a]ny thoughts you could share with me?"  Unfortunately, the thoughts that were shared with Fitzpatrick, **as well as a "preliminary report"**, was in part that TruAllele software found "no statistical support for a match between the fingernail scrapings from the left hand of the victim….and Hillary."  These emails make clear that Mr. Fitzpatrick was indeed intimately aware of all the work that TruAllele had done and that he was intimately aware of TruAllele's result of no match.  Moreover, <u>he was aware of these TruAllele results just a few weeks</u> before he walked into the Judge's conference room on December 15 with what he characterized to the court as an "explosive report….you need to reconsider bail Judge because of this report."  He made no mention, whatsoever, that his prior expert found no statistical match in a report that was emailed to him just weeks prior.  Oddly, he "doubled down" before the Court on January 25 and, when asked by the Judge what he knew about TruAllele's involvment, he affirmatively stated that he knew nothing of their prior involvement…..stating,  "Your Honor"….I'll look into it.

A prosecutor's obligation within our system of justice is to seek the truth.  And that means prosecuting cases with honesty and integrity.  As much as it pains me to say this, it is evident that your co-counsel lied to the Court.  That's not "rhetoric" as Bill characterized some of my comments to the Court, it is a fact.  How the Court handles this transgression remains to be seen, but it is both shocking and disappointing and quite frankly outrageous.  The prosecution's approach to this case seems less about the truth and more about the People simply looking for a win regardless of the consequences.   We intend to request sanctions and for the Court to consider the appointment of a Special District Attorney.

<u>February 3 letter – telling the Court no</u>
Whoever handles the prosecution of this case going forward, the next step is analysis of the science behind these likelihood ratios.  Whoever handles this case going forward, we need cooperation with getting in the hands of the experts the material they need to educate the Court

SILVER & COLLINS

44 Court Street
Canton, NY 13617
(315) 386-8506

4 Elm Street
Potsdam, NY 13676
(315) 265-2264

201 State Street, Suite 101
Ogdensburg, NY 13669
(315) 393-1630

316 Main Street
Morristown, NY 13664
(315) 375-8836

Honorable Mary E. Rain
February 8, 2016
Page 4

on how this software does or does not do, what it claims it does.  This discovery will require unfettered access to the STRMix software.   Cooperation, by the way, is not telling the Judge in your last correspondence (three times) that you will ignore the Court's directives on orders the Court directed you prepare in our conference of February 1. Think about it, I honestly don't know as I write this letter whether you intend to produce the materials that the Court directed you to produce because in your letter of February 3 you effectively say I'm not going to do what the Court ordered me to do.

Three months into the taking over the defense of this case, we already have the Onondaga County District Attorney, who is in our county by invite[1], being less than candid[2] with the Court and now we have the St. Lawrence County District Attorney telling the Court she will not prepare the discovery orders the Court ordered her to prepare.

The admissibility of LR software results is being debated heavily in Courts across the country and the world.  The experts are absolutely unsettled on whether it should be admissible at all, or whether it has some value in some fact patterns.  I would appreciate, in the interim, that you advise, a soon as you are able, on whether you do not intend to provide the defense experts the material that has been requested.  Absent hearing from you, I will assume it is being worked on and that you will produce same as soon as you are able.

Sincerely,

SILVER & COLLINS

By: _____
John K. Collins

JKC/ks
cc:      Hon. Jerome J. Richards
         DA William Fitzpatrick

SILVER & COLLINS

44 Court Street
Canton, NY 13617
(315) 386-8506

4 Elm Street
Potsdam, NY 13676
(315) 265-2264

201 State Street, Suite 101
Ogdensburg, NY 13669
(315) 393-1630

316 Main Street
Morristown, NY 13664
(315) 375-8836

[1] The Defense continues to maintain that the invite via County Law §703 has been misapplied and that motion remains pending.
[2] See Ethics Rule 3.3 (a) (1) "Conduct before a Tribunal" "A lawyer shall not make a false statement of fact or law to a tribunal".

Sent from my iPhone

=============

<4>

From: "Dr. Mark W. Perlin" <perlin@cybgen.com>
Subject: Re: Hillary case (SLCNY)
Date: November 3, 2015 10:00:40 AM EST
To: Fitzpatrick William <williamfitzpatrick@ongov.net>
Cc: "data@cybgen.com data@cybgen.com" <data@cybgen.com>, David Ria
<ria@cybgen.com>

Bill,

> Mark, this is the case from Saint Lawrence County that TruAllele analyzed
> months ago. As I look at the mixture results of the DNA under the victim's
> fingernails, I read a full profile from the victim as well as 7 alleles
> from what appears to be an un identified make. All seven of the alleles
> match the defendant and I am wondering why a statistical interpretation
> cannot be made other than to say the defendant cannot be excluded. Any
> thoughts you could share with me? Thanks. Bill Fitzpatrick

Good to hear from you.

My report to the lab on September 10, 2014 (see below) discussed this low-level 5% contributor
to the DNA mixture.  The suspect's alleles drop out, fall in stutter positions, are masked by the
victim's allele, and so on.

Therefore statistical support for the suspect's genotype (a *pair* of alleles, not just one allele) is
missing at some loci.  Since TrueAllele considers *all* loci, both inclusionary and exclusionary,
the net result is an inconclusive match statistic.

I had also advised retesting with a miniplex STR that is specifically designed for degraded DNA
(in emails to the lab on July 10, 2013, and to you on September 10, 2015).  That specialized test
can elicit degraded genotypes from DNA evidence that are not as evident when using
conventional STR testing.  (I have seen a handgun TrueAllele match statistic go from 1/10 to
100,000 after Minifiler retesting.)

Let me know if you'd like to discuss this case further.

Thanks. - Mark

From my preliminary report to the NYSP dated September 10, 2014:

The TrueAllele computer found no statistical support for a match between the fingernail
scrapings from the left hand of the victim Garrett Phillips (item 550C2) and suspect Oral Hillary
(Items 21, 22 and 24).

4