**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**ORAL NICHOLAS HILLARY,**

                **Plaintiff,**

        **v.**

**ST. LAWRENCE COUNTY et al.,**

                **Defendants.**
_____

                      **8:17-cv-659**
                      **(GLS/DEP)**

**APPEARANCES:**

**FOR THE PLAINTIFF:**
Barket, Epstein & Kearon Aldea &
LoTurco, LLP
666 Old Country Road, Suite 700
Garden City, NY 11530

**FOR THE DEFENDANTS:**
_St. Lawrence County, St. Lawrence
District Attorney's Office, Unidentified
Jane/John Doe #1-10 St. Lawrence
County Employees, Unidentified
Jane/John Doe #11-20 St. Lawrence
County District Attorney Employees,
St. Lawrence County Sheriff Kevin
M. Wells, and Unidentified Jane/John
Doe #21-30 St. Lawrence County
Sheriff Employees_
Hancock Estabrook, LLP
1500 AXA Tower I
100 Madison Street
Syracuse, NY 13202

_Mary E. Rain_

**OF COUNSEL:**

ALEXANDER ROBERT KLEIN,
ESQ.
BRUCE A. BARKET, ESQ.
DONNA ALDEA, ESQ.

JOHN L. MURAD, JR., ESQ.
CHRISTINA M. VERONE
JULIANO, ESQ.

| | |
|---|---|
| Casey Law, LLC<br>995 New Loudon Road<br>Cohoes, NY 12047 | JOHN B. CASEY, ESQ. |
| *John E. Jones*<br>Bond, Schoeneck Law Firm<br>One Lincoln Center<br>Syracuse, NY 13202 | BRIAN J. BUTLER, ESQ.<br>JOHN F. BOYD, ESQ. |
| *Village of Potsdam, Village of*<br>*Potsdam Police Department,*<br>*Edward Tischler, Kevin M. Bates,*<br>*and Mark Murray*<br>Johnson & Laws, LLC<br>648 Plank Road, Suite 204<br>Clifton Park, NY 12020 | GREGG T. JOHNSON, ESQ.<br>APRIL J. LAWS, ESQ.<br>COREY A. RUGGIERO, ESQ.<br>LORAINE CLARE JELINEK, ESQ. |
| *Unidentified Jane/John Doe*<br>*Village Of Potsdam Employees*<br>*#31-40* | NO APPEARANCES |
| *Onondaga County and*<br>*William Fitzpatrick*<br>Onondaga County Department<br>of Law<br>John H. Mulroy Civic Center<br>421 Montgomery Street, 10th Floor<br>Syracuse, NY 13202 | JOHN E. HEISLER, JR., ESQ. |
| *New York State Police, Gary Snell,*<br>*Theodore Levinson, Tim Peets, Ray*<br>*Wickenheiser, and Julie Pizziketti*<br>HON. LETITIA JAMES<br>New York State Attorney General<br>The Capitol<br>Albany, NY 12224 | JOSHUA E. MCMAHON, ESQ. |

*Unidentified Jane/John Doe #41-50*
*New York State Police Employees*          NO APPEARANCES

**Gary L. Sharpe**
**Senior District Judge**

## MEMORANDUM-DECISION AND ORDER

### I. Introduction

Plaintiff Oral Nicholas Hillary brings this action seeking damages pursuant to New York State law and 42 U.S.C. § 1983, based on an alleged violation of his First, Fourth, and Fourteenth Amendment rights. (Compl., Dkt. No. 1 ¶ 6.)  Pending are three motions to dismiss Hillary's complaint filed by various defendants.  (Dkt. Nos. 39, 58, 70.)  For the following reasons, State defendants'[1] motion, (Dkt. No. 39), is granted; County defendants'[2] motion, (Dkt. No. 58), is granted; and Village

---

[1] "State defendants" refers collectively to the following defendants: New York State Police (NYSP), NYSP Officer Gary Snell, NYSP Investigator Theodore Levinson, NYSP Investigator Tim Peets, Director of the Crime Lab System for the NYSP Forensic Investigation Center Ray Wickenheiser, and Director of Biological Science for the NYSP Forensic Investigation Center Julie Pizziketti.

[2] "County defendants" refers collectively to the following defendants: St. Lawrence County, unidentified Jane/John Doe #1-10 St. Lawrence County employees, St. Lawrence County District Attorney's Office, unidentified Jane/John Doe #11-20 St. Lawrence County District Attorney's Office employees, St. Lawrence County Sheriff Kevin M. Wells, and unidentified Jane/John Doe #21-30 St. Lawrence County Sheriff

defendants'[3] motion, (Dkt. No. 70), is granted in part and denied in part.

## II. **Background**

### A. **Facts**[4]

This action stems from the October 24, 2011 murder of twelve-year-old Garrett Phillips in the Village of Potsdam, New York.[5] (Compl. ¶¶ 35-40.) After receiving a call from a neighbor stating that she heard moans and the word "help" coming from Phillips' apartment, Potsdam Police responded and found Phillips unconscious. (*Id.*, Attach. 15 at 2.) Phillips was later pronounced dead, and the cause of his death was eventually determined to be strangulation. (*Id.*)

At the time, Hillary, "who is of Jamaican de[s]cent," had known Phillips for one year. (*Id.* ¶¶ 45, 48.) Hillary "met [his] mother, Tandy

---

employees.

[3] "Village defendants" refers collectively to the following defendants: Village of Potsdam, Village of Potsdam Police Department, Village of Potsdam Police Chief Edward Tischler, Village of Potsdam Police Chief Kevin Bates, and Village of Potsdam Police Lieutenant Mark Murray.

[4] Unless otherwise noted, the facts are drawn from Hillary's complaint and presented in the light most favorable to him.

[5] The Village of Potsdam is located in St. Lawrence County. (Compl. ¶ 60.)

Cyrus, in October . . . 2010; they had become friends, dated, [and] lived together . . . [until] September 2011." (*Id.* ¶ 46.)  Two days after Phillips' death, Hillary was taken into custody, strip searched, and held for ten hours.[6]  (*Id.* ¶ 41.)  Hillary asserts that there was evidence pointing to St. Lawrence County Deputy Sheriff John Jones as a prime suspect in the murder investigation[7]; however, Jones was not subjected to the same scrutiny as Hillary, and was allowed to play an active role in the investigation.  (*Id.* ¶¶ 49-56.)

During the investigation,[8] New York State Police (NYSP) forensic

---

[6] Hillary does not specify who took him into custody or conducted the strip search.  (*See generally* Compl.)  However, it can be inferred that Village of Potsdam police officers were responsible.  (*Id.* ¶¶ 57-59.)

[7] Jones was in a prior relationship with Cyrus that had deteriorated. (Compl. ¶ 49.)  For instance, "nine months before . . . Phillips' death, . . . Cyrus . . . made a complaint against Jones, stating that '[he] has been acting in various ways that causes me to fear for the safety of myself and my sons.'"  (*Id.* ¶ 76.)  Jones also had a pending lawsuit against Cyrus at the time of Phillips' death.  (*Id.* ¶ 78.)  Further, Hillary alleges that a video shows Jones in the vicinity of the crime scene at the time of Phillips' murder.  (*Id.* ¶ 84.)

[8] Although Hillary fails to specifically allege the time period of the investigation, it seems that it primarily occurred sometime before Mary Rain became District Attorney, given Hillary's contention that "District Attorney [Nicole] Duvé would not sign off on these baseless accusations." (Compl. ¶ 74.)

units assisted Village of Potsdam Police in collecting and analyzing evidence.  (*Id.* ¶¶ 72, 117.)  The St. Lawrence County District Attorney's Office and Sheriff's Department also assisted in some fashion.[9]  (*Id.* ¶ 72.)  Village of Potsdam Police Lieutenant Mark Murray thought Hillary was "a high[,] high person of interest or potential suspect."  (*Id.* ¶ 63.)  Even though Village of Potsdam Police Chief Edward Tischler would later testify that analysis of Hillary's fingerprints did not place him at the crime scene, (*id.* ¶ 64 (citing Attach. 7)), Lieutenant Murray described a range of circumstantial evidence that he thought connected Hillary to the murder, (*id.*, Attach. 6 at 3-8).[10]  At the time, St. Lawrence County District Attorney Nicole Duvé did not bring charges against Hillary.  (*Id.* ¶¶ 62, 74.)

In September 2012, Hillary filed a lawsuit that ended up in this court (hereinafter "*Hillary I*") against the Village of Potsdam, Chief Tischler, Lieutenant Murray, and other Village of Potsdam Police officers based on his arrest, the seizure of his personal effects, and an incident with police at his home in the fall of 2011.  (*Id.* ¶¶ 57-59; *see Hillary I*, 7:12-cv-1669, Dkt.

---

[9] Hillary does not specifically discuss the role that these defendants played in the investigation.  (Compl. ¶ 72.)

[10] Hillary faults Lieutenant Murray with misrepresenting this evidence.  (Compl. ¶¶ 80-86.)

No. 23.)  Six months after Hillary commenced that action, Mary Rain announced that she would run for St. Lawrence County District Attorney after being "encouraged" to do so by "local law enforcement officials and officers."  (Compl. ¶ 61 (internal quotation marks omitted).)  During her ensuing campaign, Rain criticized District Attorney Duvé for being uncooperative with law enforcement and accused her of "incompetence, mismanagement, and the failure to investigate the . . . Phillips killing."  (*Id.* ¶ 65 (internal quotation marks and footnote omitted).)  "Rain pledged to solve the [Phillips] case and bring the killer to justice."  (*Id.* ¶ 66.)

In November 2013, Rain was elected St. Lawrence County District Attorney, and, on May 15, 2014, "Hillary was charged with the death of . . . Phillips."[11]  (*Id.* ¶¶ 4, 68 n.5.)  At the time of Hillary's indictment, Rain praised "the fabulous job done by [the] Potsdam P[olice Department] and [NYSP]," (*id.* ¶ 68 (internal quotation marks omitted)), and posted on social media that "it was great to see . . . Hillary in handcuffs," (*id.* ¶ 70 (internal quotation marks omitted) (citing Attach. 8)).

_____

[11] It appears that Hillary was indicted on this date.  (Compl. ¶ 68.) However, it is unclear if this occurred before or after Potsdam Police arrested Hillary.  (*Id.* at 11 n.6.)  That is, Hillary does not specify if criminal proceedings were initiated by a summary arrest, the filing of a felony complaint, or the grand jury indictment.

Allegations related to the investigation after District Attorney Rain assumed office are limited.  Hillary alleges that Rain lied in an affidavit when she swore that Hillary was the last person seen with Phillips.  (*Id.* ¶ 79 (citing Attach. 11).)  Hillary also criticizes Rain's public statements that Hillary was "'a habitual marijuana smoker'" and had been "'arrested for having a pound or more of marijuana in 2000.'"  (*Id.* ¶ 87.)  Additionally, Hillary alleges that Rain threatened one of his alibi witnesses with obstruction and another with a grand jury subpoena, which "forc[ed] the [latter] witness to reveal privileged attorney-client communications."  (*Id.* ¶ 88.)  Furthermore, Hillary alleges that Lieutenant Murray and NYSP Officer Gary Snell went to the home of an alibi witness—several times unannounced—and told him that he could change a prior statement without getting in trouble.  (*Id.* ¶ 91 (citing Attach. 12).)  Hillary alleges that "[t]he police" told the witness that the District Attorney was listening and watching their conversation, and that he could be charged for lying or withholding information.  (*Id.* ¶ 89 (citing Attach. 12).)  During one of these encounters, NYSP Investigator Tim Peets was also present and yelled at the witness.  (*Id.* ¶ 90 (citing Attach. 12).)

On October 16, 2014, the initial indictment against Hillary was

dismissed based upon prosecutorial misconduct by Rain. (*Id.* ¶¶ 93-104.) It is unclear whether Hillary was detained at this time and, if so, if and when he was released from detention. (*See generally id.*) On January 21, 2015, the case was presented to a different grand jury, which returned an indictment charging Hillary with second-degree murder. (*Id.* ¶ 108 & n.12.) Also unclear is whether the same evidence was used and if Hillary was arrested again or remained in detention. (*See generally id.*)

At Hillary's trial, Rain enlisted Onondaga County District Attorney William Fitzpatrick to assist the prosecution given the complexities of the case, including "low-copy DNA, video surveillance, and dozens of witness interviews and statements." (*Id.* ¶ 116 (internal quotation marks omitted).) On January 25, 2016, Fitzpatrick informed the St. Lawrence County Court that he did not know whether the NYSP used TrueAllele[12] to analyze DNA

––––––––––––––––––––

[12] "TrueAllele, created by Cybergenetics, is a computerized DNA interpretation system that infers genetic profiles from DNA samples." (Compl. ¶ 135.) Before its implementation, "the [NYSP] [c]rime [l]ab used the Combined Probability of Inclusion (CPI) to statistically evaluate DNA mixtures." (*Id.* ¶ 123.) However, based on concerns with the reliability of CPI, the NYSP transitioned to TrueAllele. (*Id.* ¶¶ 123-39.) Fitzpatrick allegedly knew that CPI "'[wa]s not accepted as valid science [and that all of the] DNA convictions that used CPI [we]re at risk, either because of unreported potentially exculpatory "inconclusive" results, or inaccurate inculpatory match statistics used at trial.'" (*Id.* ¶ 151 (internal footnote omitted).) Despite the NYSP's commitment to transition to TrueAllele,

evidence, despite the fact that "he had received a copy of a report which Cybergenetics[13] had performed for the State in . . . Hillary's case" and "had been told by [Cybergenetics] on September 10, 2015, via email, that they advised retesting and, he was informed that the State lab was also informed of this via an email correspondence." (*Id.* ¶¶ 152, 157, 159.) Hillary attempts to link these allegations to his suggestion that flawed DNA evidence was the only evidence linking him to the crime scene. (*Id.* ¶¶ 118, 121.) However, the majority of Hillary's allegations relating to the DNA analysis, who conducted such analysis, and any underlying impropriety is muddled. (*Id.* ¶¶ 116-66.) Creating a coherent sequence of events requires splicing the factual assertions on the face of the complaint and the accompanying exhibits.

As best the court can tell, sometime prior to 2013, the NYSP crime lab processed samples of the DNA collected from the crime scene, Phillips'

_____

Julie Pizziketti, Ray Wickenheiser, and unidentified Jane/John Does #41-50 allegedly tried to undermine its implementation because it would have disclosed improper activity, refuted the testimony of forensic scientists, and called into question prior convictions. (*Id.* ¶¶ 136, 140-50.)

[13] According to its website, Cybergenetics is a bioinformation company that uses advanced mathematics and computers to translate DNA data into useful information. (Compl. ¶ 134 n.16.)

clothing, and Hillary.  (*Id.*, Attach. 15 at 2-3.)  "[Hillary] was excluded from all samples taken at the [crime scene] where comparisons could be made except for a DNA mixture profile from fingernail scrapings taken from [Phillips'] left hand.  Due to insufficient genetic information, [Hillary] could neither be included nor excluded as a possible contributor to the mixture."[14] (*Id.* at 3.)  In 2013, the NYSP crime lab reached out to Cybergenetics to analyze the fingernail scrapings using TrueAllele.  (*Id.*)  Those results were also inconclusive.  (*Id.*)  After Hillary's initial indictment in 2014, prosecutors directed the NYSP crime lab to send its data to the Institute of Environmental Science and Research, which analyzed it using STRmix.[15] (*Id.*)  The NYSP crime lab was not accredited to employ STRmix and did not conduct any internal validation studies using STRmix.  (*Id.* at 5 n.3.)

---

[14] Hillary alleges "[u]pon information and belief" that "both [District Attorneys Fitzpatrick] and . . . Rain were aware that 'there was no statistical support for a match between . . . fingernail scrapings from the left hand of . . . Phillips . . . and . . . Hillary[.]'"  (Compl. ¶ 121.)  Apparently, "[Lieutenant] Murray's statement reflects that he knew this as well."  (*Id.* ¶ 122.)

[15] Hillary fails to define STRmix or connect it to the issues he associates with CPI.  (*See generally* Compl.)

Ultimately, in August 2016, County Court Judge Felix Catena[16] ruled that the STRmix results were inadmissible at Hillary's trial given "the lack of internal validation by the [NYSP] crime lab." (*Id.* at 8, 10.)

On September 28, 2016, following a bench trial, Hillary was found not guilty. (*Id.* ¶ 167.) After the verdict, Fitzpatrick sent an email to the Cybergenetics CEO that stated, "it is to my everlasting regret that I was unable to convince a judge about the value of [certain] DNA evidence and that as a result of that a sociopathic killer of a helpless 12-year-old boy now walks among us." (*Id.*, Attach. 16 at 3.) Two months after the verdict, St. Lawrence County legislators voted on a resolution requesting Rain's resignation.[17] (*Id.* ¶ 169.)

## B. Procedural History

On May 15, 2017, Hillary commenced this case in the Eastern District of New York. (Compl.) He asserted the following § 1983 claims

---

[16] By this time, the County Court Judge originally assigned to the case had "recused himself from all criminal cases involving District Attorney Rain after filing a complaint against her with the Committee on Professional Standards." (Compl. ¶ 162 (internal footnote omitted).)

[17] Previously, "the St. Lawrence County Board of Legislators voted no confidence in District Attorney Rain citing 'lapses in judg[]ment and unethical behavior.'" (Compl. ¶ 163 (internal footnote omitted).)

against all defendants: false arrest; malicious prosecution; conspiracy; fabrication of evidence; failure to disclose exculpatory evidence; violation of rights under the Equal Protection Clause of the Fourteenth Amendment; retaliatory prosecution in violation of the First Amendment; due process and stigma-plus defamation; and municipal and corporate liability.[18]  (*Id.* ¶¶ 174-79, 180-94,195-208, 209-15, 216-21, 222-27, 228-33, 234-40, 241-49.)  Hillary also asserted the following state law claims against all defendants: negligent hiring, training, supervision, and retention; false imprisonment/false arrest; and abuse of process.  (*Id.* ¶¶ 256-65, 266-71, 272-80.)

On June 15, 2017, the court stayed the proceedings in *Hillary I* pending resolution of this case or until such time as this case becomes trial ready.  *See Hillary I*, 7:12-cv-1669, Text Only Minute Entry of June 15, 2017.  On June 16, 2017, venue in this case was transferred to this court. (Dkt. No. 17.)  On July 27, 2017, State defendants filed a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(1) and (6), (Dkt. No. 39), which was

---

[18] Hillary also purports to assert "supervisor liability" as a separate claim.  (Compl. ¶¶ 250-55.)  However, these assertions merely present a different legal theory by which to impose liability on defendants for the previously enumerated § 1983 claims.

followed by County defendants' motion to dismiss pursuant to Fed. R. Civ. P. 12(c) on November 13, 2017, (Dkt. No. 58), and then Village defendants' motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) and 12(c) on February 27, 2018, (Dkt. No. 70).

### III.  Standards of Review and Papers Considered

#### A.    Rule 12(b)(6)

The standard of review under Fed. R. Civ. P. 12(b)(6) is well settled and will not be repeated here.  For a full discussion of the standard, the court refers the parties to its prior decision in *Ellis v. Cohen & Slamowitz, LLP*, 701 F. Supp. 2d 215, 218 (N.D.N.Y. 2010).

#### B.    Rule 12(b)(1)

Under Fed. R. Civ. P. 12(b)(1), the standard of review is similar, except that the court "may refer to evidence outside the pleadings . . . [and] [a] plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists."  *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).[19]

---

[19] Unless otherwise noted, case quotations omit all internal quotation marks, alterations, footnotes, and citations.

## C.    Rule 12(c)

It is also well settled that

[i]n deciding a Rule 12(c) motion, [the court] employ[s] the same standard applicable to dismissals pursuant to Fed. R. Civ. P. 12(b)(6).  Thus, [it] will accept all factual allegations in the complaint as true and draw all reasonable inferences in [plaintiff's] favor.  To survive a Rule 12(c) motion, [plaintiff's] complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.

*Hayden v. Paterson*, 594 F.3d 150, 160 (2d Cir. 2010).  Nonetheless, in response to both County and Village defendants' motions, Hillary argues that dismissal under Fed. R. Civ. P. 12(c) is "unavailable as a matter of law" because these defendants do not admit or controvert all material allegations of fact in the complaint, which he argues "is the 'only' circumstance in which post-answer dismissal motions are appropriate." (Dkt. No. 64 at 2; Dkt. No. 74 at 9-10.)  However, Fed. R. Civ. P. 12(h)(2)(B) permits a motion for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c) to include the defense of failure to state a claim upon which relief can be granted.  *See* 5C Wright & Miller, Federal Practice & Procedure § 1367 (3d ed. 2018).  "In considering motions under Federal Rule 12(c), district courts frequently indicate that a party moving for a judgment on the pleadings impliedly admits the truth of its adversary's

allegations and the falsity of its own assertions that have been denied by that adversary." *Id.* § 1370 (internal footnote omitted). Under such circumstances, "Rule 12(c) is merely serving as an auxiliary or supplementary procedural device to determine the sufficiency of the case before proceeding any further and investing additional resources in it." *Id.* § 1367 (internal footnote omitted). "The mere fact that . . . procedural defects are raised in the guise of a Rule 12(c) motion should not affect the manner by which the court determines what essentially are Rule 12(b) matters." *Id.*

**D.** **Papers Considered**

As already stated, the court may consider evidence outside the pleadings in deciding a Fed. R. Civ. P. 12(b)(1) motion. *See Makarova*, 201 F.3d at 113.

In deciding a Rule 12(b)(6) or (12)(c) motion, the court may consider the complaint, any exhibit attached to the complaint, materials incorporated by reference, and documents that are integral to the complaint. *See Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004). The court may also take notice of matters of public record, *see Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 75 (2d Cir. 1998), including "the full contents of the published

articles referenced in the complaint," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 568 n.13 (2007).

Here, Hillary attaches seventeen exhibits to his complaint, (Compl., Attachs. 1-17), which the court properly considers at this stage. *See Morton*, 380 F.3d at 67. Additionally, Hillary provides links to various online news articles and videos throughout the complaint. (*See generally* Compl.) To the extent that these public records are referenced by the complaint and accessible, they are considered. *See Twombly*, 550 U.S. at 568 n.13; *Pani*, 152 F.3d at 75. However, certain references are not considered because they are inaccessible, and Hillary has not otherwise provided them to the court. (Compl. ¶ 72 n.7, ¶ 117 n.14.)

## IV. Discussion

### A. Eleventh Amendment

#### 1. *Claims Against the NYSP and State Defendants in their Official Capacities*

State defendants argue that Hillary's claims against the NYSP and individual State defendants in their official capacities are barred by the Eleventh Amendment. (Dkt. No. 39, Attach. 1 at 3-4.) Hillary does not object to this portion of State defendants' motion, but instead requests to

withdraw all claims against State defendants in their official capacities.[20] (Dkt. No. 47 at 15.)

It is well settled that, generally, suits seeking money damages from the states under § 1983 are barred by the Eleventh Amendment.  *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 66 (1989).  "This constitutional bar applies to pendent claims as well."  *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 120 (1984).  Moreover, this bar applies to suits against state officials when sued in their official capacities for damages, *see Ying Jing Gan v. City of New York*, 996 F.2d 522, 529 (2d Cir. 1993), and arms of the state, like the NYSP, *see Estes-El v. Town of Indian Lake*, 954 F. Supp. 527, 537 (N.D.N.Y. 1997).  Here, Hillary sues the individual State defendants in their official capacities and only seeks monetary relief. (Compl. at 1, 41.)  As such, Hillary's claims against the NYSP and the individual State defendants in their official capacities are dismissed.

2.    *Claims Against St. Lawrence County District Attorney's Office*

Similarly, County defendants argue that any claims against the St.

─────────────────

[20] To the extent that Hillary attempts to invoke Fed. R. Civ. P. 41 in an effort to escape a dismissal with prejudice, his effort is stifled by his failure to file a proper notice of voluntary dismissal or a stipulation of dismissal signed by all parties.  *See* Fed. R. Civ. P. 41(a)(1)(A)(i)-(ii).

Lawrence County District Attorney's Office are barred by the Eleventh Amendment.  (Dkt. No. 58, Attach. 3 at 18-19.)  Hillary does not respond to this argument.  (*See generally* Dkt. No. 64.)  Given that Hillary does not object to the facially meritorious case law presented by County defendants standing for the proposition that claims against the District Attorney's Office are barred by the Eleventh Amendment, *see Ying Jing Gan*, 996 F.2d at 529; *Woodward v. Office of Dist. Atty.*, 689 F. Supp. 2d 655, 659 (S.D.N.Y. 2010), those claims are dismissed.  *See Johnson v. Lew*, No. 1:13–CV–1072, 2015 WL 4496363, at *5 & n.6 (N.D.N.Y. July 23, 2015) ("In this District, when a non-movant willfully fails to oppose a legal argument asserted by a movant, the movant's burden with regard to that argument is lightened, such that, in order to succeed on that argument, the movant need only show that the argument possess[es] facial merit, which has appropriately been characterized as a modest burden.").

## B.  Qualified Immunity

Village defendants argue that the claims against them are barred by the doctrine of qualified immunity because none of their alleged conduct violated clearly-established law.  (Dkt. No. 70, Attach. 1 at 24-26.) However, the lone case they cite in support of this theory is inapposite: it

deals with "the absolute immunity that protects prosecutors" and specifically mentions that such immunity "does not prevent a damages action against other defendants." *Schloss v. Bouse*, 876 F.2d 287, 292 (2d Cir. 1989). Because Village defendants' legal analysis needs fine tuning, it is denied with leave to renew.

**C.   *Res Judicata***

Village defendants argue that Hillary's claims are precluded by the court's previous decision in *Hillary I*.[21]  (Dkt. No. 70, Attach. 1 at 8-10.)

"*Res judicata* bars re-litigation if (1) the previous action involved an adjudication on the merits; (2) the previous action involved the plaintiffs or those in privity with them; (3) the claims asserted in the subsequent action were, or could have been, raised in the prior action." *Soules v. Conn., Dep't of Emergency Servs. and Pub. Prot.*, 882 F.3d 52, 55 (2d Cir. 2018). Village defendants assume the first two elements are met, (Dkt. No. 70, Attach. 1 at 8-10), and Hillary concedes as much by arguing only that "the doctrine of *res judicata* does not apply because the claims asserted in this

---

[21] Village defendants also seek dismissal of Hillary's complaint based on a theory of collateral estoppel; however they fail to develop this theory.  (Dkt. No. 70, Attach. 1 at 8.)  Accordingly, to the extent that this is even part of their motion, it is denied.

complaint were not, and could not have been, raised in [*Hillary I*]," (Dkt. No.

74 at 5).  Accordingly, the only issue for the court to decide is whether

Hillary's claims in this action were raised, or could have been raised, in

*Hillary I*.

> [W]hether the second lawsuit concerns the same claim—or nucleus of operative facts—as the first suit, applying three considerations: (1) whether the underlying facts are related in time, space, origin, or motivation; (2) whether the underlying facts form a convenient trial unit; and (3) whether their treatment as a unit conforms to the parties' expectations.

To resolve this issue, courts consider the following:

*Soules*, 882 F.3d at 55.  "The question is not whether the applicable

procedural rules permitted assertion of the claim in the first proceeding;

rather, the question is whether the claim was sufficiently related to the

claims that were asserted in the first proceeding that it should have been

asserted in that proceeding."  *Pike v. Freeman*, 266 F.3d 78, 91 (2d. Cir.

2001).  "For the purposes of *res judicata*, [t]he scope of litigation is framed

by the complaint at the time it is filed."  *Comput. Assocs. Int'l, Inc. v. Altai,

Inc.*, 126 F.3d 365, 369-70 (2d Cir. 1997).  That is, "[t]he *res judicata*

doctrine does not apply to new rights acquired during the action which

might have been, but which were not, litigated."  *Id.* at 370; *see Burgos v.*

*Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994) (finding *res judicata* inapplicable "where the initial forum did not have the power to award the full measure of relief sought in the later litigation").

To be sure, *Hillary I* also included the Village of Potsdam, Lieutenant Murray, and Chief Tischler as defendants and related to the investigation of Hillary regarding the murder of Phillips. *Compare Hillary I*, Dkt. No. 84 at 1-5, *with supra* Part II.A. Moreover, Hillary's allegation in this action that law enforcement "pursued a course to target [him] for . . . Phillips' murder," (Compl. ¶ 72), is the same motivation underlying the events in *Hillary I*, (*see generally* Compl., *Hillary I*).

However, the claims differ in one notable aspect: *Hillary I* originated from Hillary's arrest in 2011, whereas Hillary contends that "the current claims against the [Village] [d]efendants . . . are wholly based on their actions and conduct in arresting and prosecuting [Hillary] in 2014-2015 for [Phillips'] murder." (Dkt. No. 74 at 3, 5.) Moreover, Hillary is correct that he "could not have . . . alleged [certain] claims herein in [*Hillary I*] as they were not yet ripe . . . until his criminal prosecution was favorably terminated on September 28, 2016." (*Id.* at 4-5; *see also Burgos*, 14 F.3d at 790.) In any event, although Hillary had the opportunity to seek leave to amend his

22

complaint in *Hillary I* to assert new claims based on subsequent developments in the investigation and prosecution, he was not required to do so.  *See Altai, Inc.*, 126 F.3d at 370.

As such, despite their similarities, these claims could not have been litigated in *Hillary I*.  Therefore, the doctrine of *res judicata* is inapplicable, and Village defendants' motion in this regard is denied.  That being said, the court construes Hillary's concession that the conduct supporting his current claims against Village defendants occurred between 2014 and 2015 as an abandonment of any claims against Village defendants based on alleged conduct occurring prior to this time period.  *See Jackson v. Fed. Express*, 766 F.3d 189, 196 (2d Cir. 2014) ("Where abandonment by a counseled party is not explicit but such an inference may be fairly drawn from the papers and circumstances viewed as a whole, district courts may conclude that abandonment was intended.").

## D.  <u>Municipal Liability</u>

Generally, in addition to demonstrating an injury to a constitutionally-protected right, a plaintiff bringing a § 1983 action against a municipality is required to identify an official custom or policy of the municipal defendant and establish a causal connection between the alleged injury and that

custom or policy. *See Monell v. Dep't of Soc. Servs. of the City of N.Y.*, 436 U.S. 658, 690, 694 (1978); *Jean-Laurent v. Wilkerson*, 461 F. App'x 18, 22 (2d Cir. 2012). A plaintiff can establish the existence of a custom or policy by: (1) demonstrating that an unconstitutional decision was issued from an authorized policymaker, *see Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 406 (1997); (2) showing that a municipal agent's conduct was part of a widespread practice that constitutes a custom or usage with the force of law, *see City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988); or (3) demonstrating that a municipality was deliberately indifferent in failing to train or supervise its employees, *see Cash v. County of Erie*, 654 F.3d 324, 334 (2d Cir. 2011). Vague and conclusory assertions of a municipal custom or policy are insufficient to effectively plead such a claim, absent "allegations of fact tending to support, at least circumstantially, such an inference." *Zherka v. City of New York*, 459 F. App'x 10, 12 (2d Cir. 2012). It is also well settled that "[a] municipality and its supervisory officials may not be held liable in a § 1983 action for the conduct of a lower-echelon employee solely on the basis of *respondeat superior*." *Ricciuti v. N.Y.C. Transit Auth.*, 941 F.2d 119, 122 (2d Cir. 1991). And "a single incident alleged in a complaint, especially if it

involved only actors below the policy-making level, does not suffice to show a municipal policy."  *Id.* at 123.

Hillary's *Monell* claims are based on "both formal policies, and practices so consistent and widespread that . . . constitute a custom or usage" and  "policymakers['] fail[ure] to provide adequate training or supervision to subordinates to such an extent that it amounted to deliberate indifference."  (Compl. ¶ 244.)

### 1.    State Defendants

Hillary's remaining claims against individual State employees cannot form a basis for municipal liability.  *See Holmes v. LeClair*, No. 9:09–CV–437, 2012 WL 5880360, at *4 n.11 (N.D.N.Y. Oct. 11, 2012) ("Plaintiff is suing individuals who work for the State of New York, not a municipality, thus, municipal liability claims do not exist.").[22]

### 2.    County Defendants

County defendants argue that the complaint is devoid of allegations giving rise to any theory of municipal liability.  (Dkt. No. 58, Attach. 3 at 5-16.)  Hillary confines his response to arguing that the County can be held

---

[22] Moreover, Hillary consents to the dismissal of these claims.  (Dkt. No. 47 at 15.)

liable for the actions of District Attorney Rain and Sheriff Wells because they are final policymakers.  (Dkt. No. 64 at 2-6.)  As constrained by Hillary's response, the court considers any arguments in opposition to the remainder of County defendants' municipal liability argument waived, and, therefore, will only address the issue of whether the complaint alleges that an unconstitutional decision was issued from an authorized policymaker. *See Jackson*, 766 F.3d at 196.

   a.   *District Attorney Rain*

It is well settled that a district attorney's misconduct in prosecuting an individual does not give rise to municipal liability.  *See Baez v. Hennessy*, 853 F.2d 73, 77 (2d Cir. 1988) ("The responsibilities attendant the position of [district attorney] necessitate the exercise of completely impartial judgment and discretion.").  However, "[w]here a district attorney acts as the manager of the district attorney's office, the district attorney acts as a county policymaker."  *Walker v. City of New York*, 974 F.2d 293, 301 (2d Cir. 1992); *see Gentile v. County of Suffolk*, 926 F.2d 142, 152 n.5 & 153 (2d Cir. 1991) (holding a county liable for a district attorney's long practice of ignoring evidence of police wrongdoing).  "Consequently, as long as a plaintiff's claims center . . . not on decisions whether or not, and on what

26

charges, to prosecute but rather on the administration of the district attorney's office, there can be liability against a New York county for an alleged [§ 1983 claim]." *Pinaud v. County of Suffolk*, 52 F.3d 1139, 1153 n.14 (2d Cir. 1995).

Hillary argues that "whether [District Attorney Rain] was acting as prosecutor or more broadly as manager of the office . . . remains in sharp dispute." (Dkt. No. 64 at 2-3.)  In sum, Hillary appears to allege that the following conduct is enough to impute liability on the County: Rain's "campaign promise" to bring Phillips' killer to justice, (Compl. ¶ 66), her criticism of District Attorney D[uvé]'s handling of the investigation before being elected, (*id.* ¶ 65), her decision to prosecute Hillary despite a lack of DNA evidence, (*id.* ¶¶ 68, 121), her employment of Fitzpatrick, (*id.* ¶¶ 116, 156-61), and her conduct leading to an ethics complaint against her as well as the County seeking her resignation, (*id.* ¶¶ 162, 163, 169).  (Dkt. No. 64 at 3.)

Hillary fails to explain how any of these allegations, even if accepted as true, involve the administration of the District Attorney's office.  *Cf. Gentile*, 926 F.2d at 152 n.5.  Several of the allegations relate to conduct that occurred before Rain was even elected District Attorney.  (Compl.

¶¶ 61-66.)  This cannot possibly bind the County vis-à-vis Rain.  *Cf. Brown*, 520 U.S. at 406.  Although two of the newspaper articles referenced by Hillary discuss conduct by Rain that could arguably be described as managerial, they deal with a "lack of prosecution" and do not relate to Hillary's case or any other conduct outlined in the complaint.  (Compl. ¶¶ 163 n.22.)  The remaining allegations that Hillary points to, (*id.* ¶¶ 68, 116, 121, 156-62), clearly fall under the category of whether to prosecute and other discretionary decisions made by Rain during her representation of the people of the State of New York.  *See Baez*, 853 F.2d at 77 ("It is well established in New York that the district attorney, and the district attorney alone, should decide when *and in what manner* to prosecute a suspected offender.") (emphasis added).  Rain's decision on what manner to prosecute Hillary, including her seeking assistance from Fitzpatrick, were "simply implementations of the prosecutorial decision" to prosecute Hillary for a state crime.  *Cf. Eisenberg v. Dist. Attorney of Cty. of King*, No. CV–93–1647, 1996 WL 406542, at *7 (E.D.N.Y. July 16, 1996); *see Baez*, 853 F.2d at 77 ("A county has no right to establish a policy concerning how [the District Attorney] should prosecute violations of State penal laws.").

Accordingly, the allegations relied on by Hillary to invoke municipal

liability based on Rain's conduct are insufficient.

> b.  *Sheriff Wells*

Next, following his confused theory regarding Fed. R. Civ. P. 12(c) motions discussed earlier, Hillary argues that, because he alleges that the County has delegated final policymaking authority to the County Sheriff, (Compl. ¶ 21), and County defendants' deny this allegation, their motion should be denied.  (Dkt. No. 64 at 4-5.)  First, the court need not accept "legal conclusions masquerading as factual conclusions."  *Smith v. Local 819 I.B.T. Pension Plan*, 291 F.3d 236, 240 (2d Cir. 2002).  Second, as discussed more thoroughly below, *see infra* Part IV.E.1, even assuming that Sheriff Wells was a final policymaker capable of binding the County through his acts or omissions, the complaint is void of any such acts or omissions to serve as a basis for imputing liability on the County.  (*See generally* Compl.)

As such, Hillary has not sufficiently stated *Monell* claims against the County, and this portion of County defendants' motion is granted.

> 3.  *Village Defendants*

Village defendants argue that "the vague and conclusory allegations of the [c]omplaint do not specify the alleged conduct of any of the

defendants and, therefore, [Hillary] has not sufficiently pled, and cannot establish, a [*Monell*] claim against . . . Village defendants." (Dkt. No. 70, Attach. 1 at 20.) In response, Hillary argues that complaint pleads the required elements of a *Monell* claim and supports those elements with "specific allegations of fact." (Dkt. No. 74 at 17.) Yet, Hillary fails to identify any allegations that allow the court to reasonably infer the existence of a municipal policy or practice leading to a constitutional injury. (*Id.*) Instead, the only argument Hillary makes regarding a specific theory of municipal liability is that "Chief [Tischler], who was, himself, a policy-maker . . . was directly involved in the acts giving rise to the alleged constitutional violations." (*Id.* at 18.) However, Hillary stops short of identifying specific allegations regarding Chief Tischler's "final policymaking authority in the particular area involved." *Jeffes v. Barnes*, 208 F.3d 49, 57 (2d Cir. 2000). Moreover, as discussed below, there are no allegations that any decision made by Chief Tischler caused a constitutional injury. *See infra* Part IV.E.2.

As such, Hillary has not sufficiently stated *Monell* claims against the Village, and this portion of Village defendants' motion is also granted.

**E.** **<u>Personal Involvement</u>**

"It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995); *see Provost v. City of Newburgh*, 262 F.3d 146, 154, 155 (2d Cir. 2001) (noting that § 1983 liability requires intentional participation in the unconstitutional conduct). Ancillary to this rule,

> [a] supervisory official is liable for constitutional violations if he or she (1) directly participated in the violation; (2) failed to remedy the violation after learning of it through a report or appeal; (3) created a custom or policy fostering the violation or allowed the custom or policy to continue after learning of it; or (4) was grossly negligent in supervising subordinates who caused the violation.

*Sealey v. Giltner*, 116 F.3d 47, 51 (2d Cir. 1997). "Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each [g]overnment-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). Furthermore, "complaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning." *Barr v. Abrams*, 810 F.2d 358, 363 (2d Cir. 1987) (collecting cases).

31

1. *Claims Against Wells, Levinson, Bates, and Doe Defendants #1-30*

The complaint only mentions Sheriff Kevin Wells, NYSP Investigator Theodore Levinson, and Police Chief Kevin Bates in the caption. (*See generally* Compl.) Despite Hillary's arguments to the contrary, (Dkt. No. 74 at 8[23]), there are no allegations in the complaint that can be fairly attributed to these defendants and, as such, the claims against them are dismissed for a lack of personal involvement.[24] *See McAvoy v. DeMarco*, No.

---

[23] Hillary's argument that, because Bates was named in the caption as the former Chief of the Village of Potsdam Police Department, "it is plausible for the court to draw the reasonable inference that [Bates] is liable for the misconduct alleged in the [c]omplaint against the Potsdam Police Department under his control," (Dkt. No. 74 at 8 (citing Compl. ¶¶ 22-23)), is belied by the fact that he names multiple former police chiefs in the caption without ever differentiating which events occurred while they were in charge of the department. (*See generally* Compl.) As such, inferring Chief Bates' personal involvement would not be reasonable. *See Grullon v. City of New Haven*, 720 F.3d 133, 139 (2d Cir. 2013) (finding claims were properly dismissed where "[t]here were no such direct allegations . . . [or] indirect allegations sufficient to permit an inference the [defendant] had acted or failed to act in any of the ways that would subject him to personal liability for the deprivations alleged by [plaintiff]").

[24] Given that Hillary's complaint fails to allege any facts related to these defendants, and because his responsive papers do not articulate a reason why the above finding does not also foreclose his state law claims against these defendants, they too are dismissed. *See Morgan v. County of Nassau*, 720 F. Supp. 2d 229, 235 (E.D.N.Y. 2010); *Smith v. Doe*, No. 10 Civ. 3136, 2010 WL 4964394, at *1 (S.D.N.Y. Dec. 1, 2010).

14–CV–6293, 2015 WL 1802601, at *5 (E.D.N.Y. Apr. 16, 2015) (finding no basis for defendant's personal involvement where he was not named in the body of the complaint).

Likewise, the claims against unidentified Jane/John Doe #1-10 St. Lawrence County employees, unidentified Jane/John Doe #11-20 St. Lawrence County District Attorney's Office employees, and unidentified Jane/John Doe #21-30 St. Lawrence County Sheriff employees defendants are dismissed.[25] *See Shapiro v. Goldman*, 14 Civ. 10119, 2016 WL 4371741, at *14 n.13 (S.D.N.Y. Aug. 15, 2016) (dismissing claims where complaint failed to even attempt to identify any Doe defendant or allege any specific conduct undertaken by such defendant).

2.  *Claims Against Chief Tischler*

Village defendants argue that Hillary has not sufficiently supported his generalized claims of supervisory liability.  (Dkt. No. 70, Attach. 1 at 21.)  In response, Hillary argues that "Chief [Tischler], . . . wielding

_____

[25] It should be noted that County defendants' motion seeks to dismiss Hillary's complaint in its entirety, (Dkt. No. 58 at 2), and Hillary fails to address the County Doe defendants' involvement in his response, (*see generally* Dkt. No. 64).  Given that the remaining Doe defendants are not represented, the court declines to take any action regarding them at this time.

supervisory responsibility, was directly involved in the acts giving rise to the alleged constitutional violations." (Dkt. No. 74 at 18 (citing Compl. ¶¶ 44-45, 64, 72, 117).) However, Hillary cites to paragraphs in the complaint that do not support this theory of personal involvement, either because they are irrelevant, (Compl. ¶¶ 44-45, 117), conclusory, (*id.* ¶ 72), or relate to innocuous conduct, like the fact that Chief Tischler sent Hillary's fingerprints to the lab for analysis, (*id.* ¶ 64 & Attach. 7 at 3). (Dkt. No. 74 at 18.) To the extent that Hillary fails to raise any other allegations that may have adequately alleged the personal involvement of Chief Tischler, he has waived such arguments. *See Jackson*, 766 F.3d at 196. Accordingly, as constrained by Hillary's limited response, the portion of Village defendants' motion seeking dismissal of the claims against Chief Tischler for a lack of personal involvement is granted.

     *3.    False Arrest Claims Against State Defendants*

     In order to adequately allege the personal involvement of a defendant for a claim of false arrest, a plaintiff must allege that individual defendants were involved in plaintiff's arrest or allege facts that give rise to an inference of direct involvement. *See Ogunkoya v. County of Monroe*, 15 CV 6119, 2017 WL 6419146, at *7 (E.D.N.Y. June 2, 2017) (dismissing

false arrest claims in the absence of any allegations giving rise to an inference of direct involvement); *see also Tabaei v. N.Y.C. Health & Hosps. Corp.*, No. 11 Civ. 2013, 2011 WL 6778500, at *4 (S.D.N.Y. Dec. 21, 2011); *Rodriguez v. City of New York*, 649 F. Supp. 2d 301, 305 (S.D.N.Y. 2009).

State defendants argue that Hillary "fails to demonstrate that the arrest in question was initiated, carried out, or intended by any of the[m]." (Dkt. No. 39, Attach. 1 at 6.)  In response, Hillary primarily relies on vague allegations asserted against the NYSP as a whole, without ever pinpointing specific conduct by any of the individual State defendants.  (Dkt. No. 47 at 4-5.)  Indeed, the complaint contains no facts from which to infer that any of the individual State defendants arrested Hillary or directed any other officer to arrest him.  (*See generally* Compl.)

The only conduct specifically attributed to individual State defendants is NYSP Officer Snell and NYSP Investigator Peets' interaction with an alibi witness.  (*Id.* ¶¶ 90-91; Attach. 12.)  First, these allegations can only serve to connect Snell and Peets to the alleged constitutional deprivation.  *See Iqbal*, 556 U.S. at 676.  However, there is nothing from which it could even be inferred that these interactions were linked to Hillary's arrest; there is no

allegation that this alibi witness ever provided information leading to an arrest.  (*See generally* Compl.)  And there are no other allegations describing the individual State defendants' role in any investigation prior to Hillary's arrest.  (*Id.*)  That is, there are no facts from which to infer a link between any of the individual State defendants' conduct and Hillary's arrest.  *See Ogunkoya*, 2017 WL 6419146, at *7.  As such, State defendants' motion to dismiss Hillary's false arrest claim is granted.

    *4.    Malicious Prosecution Claims Against State Defendants*

> In order to prevail on a § 1983 claim against a state actor for malicious prosecution, a plaintiff must show a violation of his rights under the Fourth Amendment and must establish the elements of a malicious prosecution claim under state law.  To establish a malicious prosecution claim under New York law, a plaintiff must prove (1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions.

*Manganiello v. City of New York*, 612 F.3d 149, 160-61 (2d Cir. 2010).  "[I]n order for an individual to 'initiate' a prosecution . . . it must be shown that defendant played an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act."  *Rohman v. N.Y.C. Transit Auth.*, 215 F.3d 208, 217 (2d Cir. 2000); *cf. Manganiello*,

612 F.3d at 163 (finding a detective initiated plaintiff's prosecution where he actively participated in the investigation and regularly collaborated with the prosecutor in an effort to ultimately bring criminal charges); *Frederique v. County of Nassau*, 168 F. Supp. 3d 455, 477 (E.D.N.Y. 2016) ("[A]n arresting officer may be held liable for malicious prosecution when a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, or when she withholds relevant and material information."); *Llerando-Phipps v. City of New York*, 390 F. Supp. 2d 372, 382-83 (S.D.N.Y. 2005) (finding police officers initiated criminal proceedings where they had plaintiff arraigned, filled out complaining and corroborating affidavits, and signed felony complaint).

State defendants argue that "[Hillary] has not asserted th[at] [State] defendants played any role in the initiation of the prosecution against [him]." (Dkt. No. 39, Attach. 1 at 7.) In response, Hillary asserts that "the [c]omplaint here clearly and specifically pleads that . . . [State] [d]efendants 'withh[eld] relevant and material information'—including critical DNA evidence—and exerted pressure on an alibi witness to literally withhold exculpatory evidence." (Dkt. No. 47 at 7.) However, this assertion grossly mischaracterizes the complaint, which fails to link any of the individual

State defendants to the initiation of Hillary's prosecution.

Even assuming that Rain's thanking of the NYSP on social media reflects the NYSP's active involvement in the investigation leading to Hillary's indictment, the post fails to identify any of the individually-named State defendants. (Compl. ¶ 68 (citing Attach. 8).) Likewise, Chief Tischler's indication that the NYSP gathered and analyzed forensic evidence used to connect Hillary to the crime, (*id.* ¶ 117), fails to demonstrate that any of the individually-named State defendants played an active role in initiating prosecution. *Cf. Manganiello*, 612 F.3d at 163. Again, the complaint is void of any mention of the individual State defendants' involvement in the evidence collection or analysis process. (*See generally* Compl.) The individual State defendants cannot be bound to this § 1983 action by way of their employer. *See Iqbal,* 556 U.S. at 676.

Moreover, as discussed more thoroughly below, *see infra* Part IV.E.6, there are no specific allegations supporting Hillary's assertion that evidence was fabricated, and the only alleged withholding of exculpatory evidence is attributable to Fitzpatrick, (Compl. ¶¶ 152-53). Furthermore, there is no allegation from which it could be inferred that Snell and Peets' interaction with an alibi witness, (*id.* ¶ 90-91; Attach. 12), aided in the

initiation of the action against Hillary. (*See generally id.*) Even more, nothing in the complaint allows the court to infer that Snell or Peets had Hillary arraigned, filled out complaining or corroborating affidavits, or signed the accusatory instrument charging him with second degree murder. *Cf. Llerando-Phipps*, 390 F. Supp. 2d at 382-83. Despite Hillary's conjecture, (Dkt. No. 47 at 6-7), the complaint is void of any mention of Snell or Peets creating false information or forwarding that information to prosecutors. *Cf. Frederique*, 168 F. Supp. 3d at 477.

Ultimately, because the complaint does not demonstrate that either Snell or Peets played an active role in Hillary's prosecution, *see Rohman*, 215 F.3d at 217; *Manganiello*, 612 F.3d at 163, the portion of State defendants' motion relating to Hillary's malicious prosecution claims is granted.

### 5. *Conspiracy Claims Against State Defendants*

> To survive a motion to dismiss, a conspiracy claim under 42 U.S.C. § 1983 must allege facts plausibly suggesting that (1) an agreement existed between two or more state actors to act in concert to inflict an unconstitutional injury on plaintiff, and (2) an overt act was committed in furtherance of that goal. Vague and conclusory allegations that defendants have engaged in a conspiracy must be dismissed.

*Vega v. Artus*, 610 F. Supp. 2d 185, 202-03 (N.D.N.Y. 2009).

Again, Hillary primarily relies on the allegations against the NYSP as a whole in an attempt to support a claim against the individual State defendants.  (Dkt. No. 47 at 7-8.)  However, based on the limited allegations related to Peets and Snell described above, the court agrees with State defendants that Hillary "fails to identify how the sparsely-alleged conduct of either of these defendants constitutes involvement in the alleged conspiracy."  (Dkt. No. 39, Attach. 1 at 8.)  Instead, Hillary asserts "conclusory statements relating to an alleged conspiracy among [d]efendants." *Vega*, 610 F. Supp. 2d at 203.  Because such allegations are not "enough to raise a right to relief above the speculative level," *Twombly*, 550 U.S. at 555, the conspiracy claims against State defendants are dismissed.

6. *Fabrication of Evidence and Failure to Disclose Exculpatory Evidence Claims Against State Defendants*

Despite the fact that the complaint contains no allegations that any of the individual State defendants fabricated evidence or failed to disclose exculpatory evidence in his particular case, Hillary clings to conjecture in an effort to save these claims.  (Dkt. No. 47 at 10.)  Ultimately, the court agrees with State defendants' characterization of Hillary's response as a

"convoluted attempt to articulate a claim." (Dkt. No. 48 at 2.)

Throughout his response, Hillary seemingly attempts to mislead the court by asserting that his complaint says something that it does not. (Dkt. No. 47 at 10-11.) For instance, he points to Pizziketti's "creati[on of] false DNA evidence in criminal cases," her "allowing scientists to fabricate testimony concerning 'questionable DNA results,'" and her "g[iving] false testimony 'in criminal cases in which she was neither competent nor proficient to testify.'" (*Id.* at 10) Additionally, Hillary asserts that Pizziketti, Wickenheiser, and other unidentified NYSP employees undermined the State's transition to TrueAllele because it would have jeopardized previous convictions. (*Id.*) However, Hillary fails to connect these assertions to any type of specific actions related to Hillary's case. Instead, the complaint alleges that the relevant DNA evidence here was analyzed using TrueAllele and only criticizes the use of STRmix employed by a third-party. (Compl., Attach. 15.) Lastly, he confusingly attempts to connect the NYSP's alleged awareness that there was no statistical support for linking Hillary to the crime with Fitzpatrick misinforming the County Court that he had not seen any such report from TrueAllele. (Dkt. No. 47 at 11.)

Even if the court accepts Hillary's interpretation of his

complaint—which tiptoes the delicate border between zealous advocacy and outright falsehood—Hillary's legal theory still fails.  As noted, there are no allegations that any of the individual State defendants were responsible for collecting, analyzing, or presenting evidence in the investigation giving rise to Hillary's prosecution.  (*See generally* Compl.)   There are also no allegations that any malfeasance on the part of Pizziketti, Wickenheiser, or the unidentified NYSP employees was related to the investigation of Phillips' murder or Hillary's subsequent criminal trial.  (*Id.*)  Lastly, the court will not add two and two together to get five by attaching liability to State defendants based on Fitzpatrick's alleged withholding of evidence. (Compl. ¶¶ 152-53; Attach. 17.)

Accordingly, this portion of State defendants' motion is granted.

7.    *Equal Protection Claims Against State Defendants*

State defendants argue that Hillary's § 1983 claim based on a violation of his rights under the Equal Protection Clause of the Fourteenth Amendment should be dismissed because "there are no factual allegations that would serve to support a claim that any action by . . . State defendants was based on purposeful, impermissible considerations."  (Dkt. No. 39, Attach. 1 at 9-10.)  The court agrees.

Hillary contends that he was arrested because he was a black man of Jamaican descent, whereas "[the] Potsdam Police Department obtained evidence against Jones, but ignored it and allowed him to participate in the investigation, even though he should have been a prime suspect." (Dkt. No. 47 at 11-12 (citing (Compl ¶¶ 48-56).)  First, it is worth noting that Hillary himself explicitly blames the Village of Potsdam Police Department, as opposed to any of the individual State defendants, for treating Hillary differently than Jones.  (*Id.* at 11.)  Next, even assuming that Hillary was treated differently than others similarly situated because of his race or national origin, there is nothing in the complaint to suggest how the individual State defendants were personally involved in Hillary's arrest or prosecution so as to fairly attribute such conduct to them.  (*See generally* Compl.)  As discussed ad nauseam by now, the only specific allegations in the complaint regarding individual State defendants relate to Snell and Peets, (*id.* ¶¶ 90-91; Attach. 12), and there are no allegations to suggest that their conduct was based on the impermissible considerations required to state an Equal Protection claim.  *See LeClair v. Saunders*, 627 F.2d 606, 609-10 (2d Cir. 1980).

Accordingly, this portion of State defendants' motion is also granted.

*8.    First Amendment Retaliatory Prosecution Claims Against State
       Defendants*

State defendants also seek dismissal of Hillary's retaliatory

prosecution claim for a violation of his First Amendment rights.  (Dkt. No.

39, Attach. 1 at 10-11.)

> In addition to a chilling effect or concrete harm, a First
> Amendment retaliation claim requires that the plaintiff show (1)
> that the speech or conduct at issue was protected, (2) that the
> defendant took adverse action against the plaintiff, and (3) that
> there was a causal connection between the protected speech and
> the adverse action.

*Norton v. Town of Brookhaven*, 47 F. Supp. 3d 152, 156-57 (E.D.N.Y.

2014).  Given that Hillary indicates that his prosecution was the adverse

action supporting his claim, (Compl. ¶ 230-32), and the court has already

determined that there are no allegations in the complaint describing the

role that the individual State defendants played in initiating the proceedings

against him, *see supra* Part IV.E.4, Hillary's First Amendment retaliatory

prosecution claim is also dismissed as against State defendants.  *See*

*Norton*, 47 F. Supp. 3d at 156-57.

*9.    "Due Process and Stigma-Plus Defamation" Claims Against
       State Defendants*

In response to State defendants' facially meritorious argument

44

seeking dismissal of Hillary's defamation claim, (Dkt. No. 39, Attach. 1 at 11), Hillary requests to withdraw this claim, (Dkt. No. 47 at 15). Accordingly, this claim is considered abandoned against State defendants, and it is dismissed.  *See Johnson*, 2015 WL 4496363, at *5 & n.6; N.D.N.Y. L.R. 7.1(b)(3).

## F.    **Failure to State a Claim**

### 1.    *False Arrest & Malicious Prosecution[26] Claims Against Village Defendants*

When evaluating false arrest and malicious prosecution claims under § 1983, the law that governs is the law of the state where the underlying events occurred.  *See Russo v. City of Bridgeport*, 479 F.3d 196, 203 (2d Cir. 2007); *McClellan v. Smith*, 439 F.3d 137, 145 (2d Cir. 2006).  To prevail on a false arrest claim under New York law, a plaintiff must show that "(1) the defendant intended to confine him, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the

---

[26] Although the distinction between false imprisonment and malicious prosecution is important, there is no pragmatic difference between false imprisonment and false arrest.  False arrest is simply a species of false imprisonment involving an arrest warrant, and the elements of both are the same.  *See Jenkins v. City of New York*, 478 F.3d 76, 88 & n.10 (2d Cir. 2007); *Singer v. Fulton Cty. Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995); *McClellan v. Smith*, No. 1:02–CV–1141, 2009 WL 3587431, at *1 n.1 (N.D.N.Y. Oct. 26, 2009).

confinement[,] and (4) *the confinement was not otherwise privileged*."
*Jocks v. Tavernier*, 316 F.3d 128, 134-35 (2d Cir. 2003) (emphasis added).
In order to state a claim for malicious prosecution, a plaintiff must allege that: (1) defendants initiated or continued a criminal proceeding; (2) *without probable cause*; (3) the proceedings terminated in plaintiff's favor; and (4) defendants were motivated by malice. *See Boyd v. City of New York*, 336 F.3d 72, 76 (2d Cir. 2003) (emphasis added).

Although both claims focus on a slightly different probable cause inquiry, "the existence of probable cause is a complete defense to both claims." *McClellan v. Smith*, No. 1:02–CV–1141, 2009 WL 3587431, at *6 (N.D.N.Y. Oct. 26, 2009). "In New York, the fact that [a] Grand Jury returned an indictment against [a defendant] creates a presumption that his arrest and indictment were procured with probable cause." *Bernard v. United States*, 25 F.3d 98, 104 (2d Cir. 1994); *see Colon v. City of New York*, 60 N.Y.2d 78, 83 ("[T]he trial court may not weigh the evidence upon which the police acted . . . after the indictment has issued."). "To rebut this presumption, the plaintiff must establish that the indictment was produced by fraud, perjury, the suppression of evidence[,] or other police conduct undertaken in bad faith." *Bernard*, 25 F.3d at 104.

Hillary was indicted in May 2014 and again in January 2015.[27] (Compl. ¶¶ 4, 68, 108.)  As noted, this creates a presumption that there was probable cause for both Hillary's arrest and prosecution.  *See Bernard*, 25 F.3d at 104.  Hillary argues that the complaint overcomes this presumption by pointing to a host of allegations which he characterizes as demonstrating that Village defendants targeted him, "suppress[ed] exculpatory evidence," "made false statements under oath," and "participated in the fabrication of DNA evidence."  (Dkt. No. 74 at 11-12 (citing Compl. ¶¶ 48-69, 74, 76, 80-84, 91, 117-18).)  However, the complaint tells a different story.

The complaint does not allege what, if any, false information was provided to the grand jury by any of the individual Village defendants or what, if any, relevant and material information was withheld from the grand jury by any of the individual Village defendants such that the procurement

_____

[27] Hillary's initial indictment was dismissed with leave to re-present the case to a different grand jury, not based on any misconduct on the part of Village defendants, but because of "[District Attorney Rain]'s improper questions, direct and indirect expression of opinion, and use of numerous exhibits without proper foundation."  (Compl., Attach. 13 at 7.) Although Hillary does not argue that this negates the presumption of probable cause, it is dubious that it would, in light of the second indictment.

of the indictment was tainted.  *See Colon*, 60 N.Y.2d at 82-83 (finding that

there must be "evidence establishing that the police . . . have not made a

complete and full statement of facts either to the [g]rand [j]ury or to the

District Attorney, that they have misrepresented or falsified evidence, that

they have withheld evidence[,] or otherwise acted in bad faith").  That is,

allegations that Hillary was "immediately targeted" by law enforcement

despite the existence of evidence that pointed to Jones as a potential

suspect, (Compl. ¶¶ 48-56, 76), are insufficient absent allegations that this

information was withheld from the grand jury.  *Cf. Gisondi v Town of

Harrison*, 72 N.Y.2d 280, 285 (1988) ("[T]he police are not obligated to

pursue every lead that may yield evidence beneficial to the accused, even

though they had knowledge of the lead and the capacity to investigate it.").

Likewise, although Hillary alleges that his lawsuit against the Village

motivated "local law enforcement officials and officers" to encourage Rain

to run for office to replace the District Attorney who did not indict Hillary,

(Compl. ¶¶ 57-69), this again does not establish that the indictment was

procured in bad faith.  *See Bernard*, 25 F.3d at 104.

Hillary also points to Lieutenant Murray's testimony, from a

deposition in *Hillary I*, that he saw Hillary in video surveillance footage.

Murray later testified that he did not actually see Hillary himself—he merely inferred it was Hillary because the car depicted on video was the same color, make, and model as Hillary's car and located at the same place Hillary testified that he was parked. (Compl. ¶¶ 80-84 (citing Attach. 6 at 139, 145).) Even if such semantics could be fairly said to constitute perjury, there is nothing in the complaint from which to infer that this testimony—from a completely separate civil action—somehow tainted the grand jury proceedings. *See Bernard*, 25 F.3d at 104. Lastly, as described above, there is no view of the allegations from which to infer that any DNA evidence was fabricated. (*See generally* Compl.) In fact, the portion of the complaint Hillary cites to support this contention merely alleges a lack of DNA evidence connecting Hillary to the crime scene. (*Id.* ¶¶ 117-18). Hillary's characterization is further contradicted by the fact that "[a]lthough the testimony of several grand jury witnesses implie[d] that there may have been an attempt to assess potential DNA evidence during the investigative phase of the case, no DNA evidence was presented to the grand jury." (*Id.,* Attach. 13 at 1.)

As such, Hillary fails to rebut the presumption of probable cause created by the grand jury's indictment. Accordingly, the portion of Village

defendants' motion seeking dismissal of Hillary's false arrest and malicious prosecution claims is granted.

> ### 2. Fabrication of Evidence and Failure to Disclose Exculpatory Evidence Claims Against Village Defendants

Village defendants argue that "[Hillary] has not identified a single Village [d]efendant whom he claims fabricated evidence and/or had the ability to disclose [the] same." (Dkt. No. 70, Attach. 1 at 18.) In response, Hillary tries to stretch familiar paragraphs of the complaint to save his claim. (Dkt. No. 74 at 15 (citing Compl. ¶¶ 48-56, 76, 80-84, 91, 117-18).) As previously discussed, *see supra* Part IV.E.6; Part IV.F.1, this attempt is futile. The complaint presents no basis to infer that any evidence was fabricated, (Compl. ¶¶ 116-51), and the only arguable withholding of exculpatory evidence is attributable to Fitzpatrick, (*id.* ¶¶ 152-53). Accordingly, this portion of Village defendants' motion is granted.

> ### 3. Retaliatory Prosecution Claims Against Village Defendants

Next, Village defendants, citing a single case involving employment discrimination, assert that the complaint is "devoid of any factual allegations that could reasonably support a causal connection between [Hillary]'s 'protected activity' and the ongoing criminal investigation." (Dkt.

50

No. 70. Attach. 1 at 19.)  However, at this stage, a causal connection

between the filing of *Hillary I* and Hillary's subsequent criminal prosecution

can be inferred.  *See Gorman-Bakos v. Cornell Co-op Extension of*

*Schenectady Cty.*, 252 F.3d 545, 554 (2d Cir. 2001) ("In this Circuit, a

plaintiff can indirectly establish a causal connection to support

a . . . retaliation claim by showing that the protected activity was closely

followed in time by the adverse . . . action.").  As such, this portion of

Village defendants' motion is denied.[28]

### 4.   Defamation Claims Against Village Defendants

Village defendants also argue that Hillary fails to allege that any

statements made by them "were public, as opposed to . . . made during the

criminal investigation and in furtherance thereof."  (Dkt. No. 70. Attach. 1 at

19.)  However, this cursory argument fails to explain why statements made

during a widely-covered murder investigation and subsequent criminal trial

are not considered sufficiently public.  Accordingly, this portion of Village

---

[28] Village defendants do not address whether this claim is
extinguished by the existence of probable cause.  *See Reichle v.*
*Howards*, 566 U.S. 658, 666-69 (2012).

defendants' motion is denied.[29]

### 5.    *Equal Protection Claims Against Village Defendants*

Village defendants also tersely argue that the complaint fails to state a claim for a violation of Hillary's rights under the Equal Protection Clause of the Fourteenth Amendment.  (Dkt. No. 70, Attach. 1 at 16-18.)  Without citing to any legal authority, they assert that "there was presumptive probable cause to arrest [Hillary], to detain him[,] to indict him[,] and to prosecute him."  (*Id.* at 18.)  However, the existence of probable cause does not necessarily obviate the need to examine whether Hillary was treated worse than he otherwise would have been because of a malicious or bad faith intent to injure him.  *See Berger v. Schmitt*, No. 02–CV–155E, 2003 WL 21383007, at *4 (W.D.N.Y. Apr. 18, 2003).  Given the nature of Village defendants' arguments, the court is not convinced that this claim should be dismissed at this juncture.  For now, it is sufficient that the complaint specifically alleges that Hillary "was a [b]lack individual of Jamaican de[s]cent," (Compl. ¶ 223), "immediately targeted as a suspect," (*id.* ¶ 48), and eventually indicted, (*id.* ¶ 68), as opposed to Jones, who it

---

[29] Village defendants do not address who allegedly made the statements referenced in the complaint or whether they were capable of binding Village defendants.

can be reasonably inferred is white, (*id.* ¶ 223), also dated Phillips' mother, and who was nearby the scene of the crime at the time of Phillips' murder but was not pursued as a suspect, (*id.* ¶¶ 49-52).  Accordingly, this portion of Village defendants' motion is denied.

### 6.    *Conspiracy Claims Against Village Defendants*

Village defendants also argue that the complaint fails to state a claim for conspiracy given its conclusory nature.  (Dkt. No. 70, Attach. 1 at 16-18.)  Indeed, it is well settled in this District that "[a] complaint containing only conclusory, vague, or general allegations of conspiracy to deprive a person of constitutional rights cannot withstand a motion to dismiss."  *Serbalik v. Gray*, 27 F. Supp. 2d 127, 132 (N.D.N.Y. 1998).  However, in an abundance of caution, given the surviving § 1983 claims against Village defendants, the court denies this portion of Village defendants' arguments with leave to renew.

### 7.    *State Law Claims Against All Defendants*

#### a.    *Abuse of Process*

First, State and County defendants both argue that Hillary's abuse of process claim is barred by the statute of limitations but make no attempt to

pin down an accrual date.[30] (Dkt. No. 39, Attach. 1 at 13; Dkt. No. 58, Attach. 3 at 25.) As another court in this District aptly noted, pinning down the accrual date of an abuse of process claim is a "thorny issue." *See Douglas v. N.Y. State Adirondack Park Agency*, No. 8:10–CV–299, 2012 WL 5364344, at *7 (N.D.N.Y. Oct. 30, 2012) (collecting cases regarding whether the statute of limitations governing an abuse of process claim accrues upon initiation of the underlying proceeding or the termination of that proceeding). Because Hillary points to authority that arguably supports the notion that his abuse of process claim accrued upon his acquittal on September 28, 2016, (Dkt. No. 47 at 13-15; Dkt. No. 64 at 6-7 (citing cases))—which would make the May 15, 2017 filing of this claim, (Compl.), timely—this portion of the State and County defendants' motion is denied.

More persuasive is Village and County defendants' alternative argument that Hillary's abuse of process claim should be dismissed for

_____

[30] State defendants also argue that the court should decline to exercise jurisdiction over Hillary's supplemental state law claims. (Dkt. No. 39, Attach. 1 at 13.) However, in light of the related federal claims that remain in the case, the court declines to do so. *See* 28 U.S.C. § 1367(a).

failure to state a claim.  (Dkt. No. 58, Attach. 3 at 24-25; Dkt. No. 70, Attach. 1 at 24.)

In New York, "[a]buse of process has three essential elements: (1) regularly issued process, either civil or criminal, (2) an intent to do harm without excuse or justification, and (3) use of the process in a perverted manner to obtain a collateral objective." *Curiano v Suozzi*, 63 N.Y.2d 113, 116 (1984).  "The gist of the action for abuse of process lies in the improper use of process after it is issued." *Dean v Kochendorfer*, 237 N.Y. 384, 390 (1924).  "If the process is employed from a bad or ulterior motive, the gist of the wrong is to be found in the use which the party procuring the process to issue attempts to put it." *Hauser v Bartow*, 273 N.Y. 370, 373 (1937).  "If [a person] is content to use the particular machinery of the law for the immediate purpose for which it was intended, he is not ordinarily liable, notwithstanding a vicious or vindictive motive." *Id; see Savino v. City of New York*, 331 F.3d 63, 77 (2d Cir. 2003) ("[I]t is not sufficient for a plaintiff to allege that the defendants were seeking to retaliate against him by pursuing his arrest and prosecution.  Instead, he must claim that they aimed to achieve a collateral purpose beyond or in addition to his criminal prosecution.").

Here, the complaint vaguely alleges that "[t]he [d]efendants . . . issued legal process to place [Hillary] under arrest." (Compl. ¶ 273.)  However, it does nothing to specify which legal process was abused.  (*See generally* Compl.)  Despite being prompted to do so, Hillary fails to specify the particular process at issue in his responsive papers.  (Dkt. No. 74 at 20-21.)  As noted, this claim cannot arise out of Hillary's 2011 arrest or underlying process because Hillary has effectively abandoned such claims. *See supra* Part IV.C.  Although it can arguably be inferred that Hillary was arrested again on May 15, 2014, (Compl. ¶¶ 4, 68), the legal process underlying this arrest is unclear.  The only legal process that the complaint specifically mentions is Hillary's indictment "within six months of [District Attorney Rain being elected]," (*id.* ¶ 68), and a subsequent indictment on January 21, 2015, (*id.* ¶¶ 107-08).  Yet, nothing in the complaint specifically mentions if he was arrested upon legal process before the initial indictment, his detention status between indictments, or if he was arrested upon legal process before the second indictment.  (*See generally id.*)  Given the great deal of uncertainty caused by Hillary's vague pleadings, and his inability to clear this up after Village defendants pointed out the same in their motion papers, Hillary has failed

to nudge his claim across the line from conceivable to plausible.  *See Twombly*, 550 U.S. at 570.  Additionally, the complaint identifies defendants' "collateral purpose" as "making an immediate arrest regardless of whether reasonable or probable cause existed for the arrest."  (*Id.* ¶ 276.)  In other words, the complaint affirmatively alleges that there was no ulterior purpose or objective other than arresting Hillary and facilitating his prosecution.  *See Savino*, 331 F.3d at 78.

Accordingly, Hillary's abuse of process claims are dismissed as against all defendants.[31]

     *b.*    *Negligent Hiring, Training, Supervision, and Retention*[32]

---

[31] Although State defendants did not raise this argument, Hillary had adequate opportunity to address the argument raised by County and Village defendants, which is equally applicable to State defendants.  *See D'Antonio v. Metro. Transp. Auth.*, No. 06 Civ. 4283, 2008 WL 582354, at *7 & n.18 (S.D.N.Y. Mar. 4, 2008) (dismissing claim against defendant based on an argument that the defendant did not raise when co-defendants raised that argument and plaintiff "had the opportunity to brief this issue with respect to [codefendants'] motions").

[32] In response to State defendants' facially meritorious arguments that his state law claims for false imprisonment and negligent hiring, training, and retention should be dismissed, (Dkt. No. 39, Attach. 1 at 13), Hillary withdraws these claims, (Dkt. No. 47 at 15).  Thus, these claims against State defendants are dismissed.  *See Johnson*, 2015 WL 4496363, at *5 & n.6; N.D.N.Y. L.R. 7.1(b)(3).  Likewise, in response to County defendants' argument that all of Hillary's state law claims should be dismissed, (Dkt. No. 58, Attach. 3 at 21-25), and that the District

Village defendants argue that this claim must be dismissed because the complaint alleges that all of their underlying conduct was undertaken within the scope of their employment, (Compl. ¶ 23), and a claim for negligent hiring, training, supervision, or retention requires that the underlying conduct occur outside the scope of employment. (Dkt. No. 70, Attach. 1 at 22-23.) Indeed, "it is well settled under New York law that [a] claim for negligent hiring or supervision can only proceed against an employer for an employee acting outside the scope of [his] employment." *Robinson v. County of Yates*, 821 F. Supp. 2d 564, 569 (W.D.N.Y. 2011), *aff'd sub nom* 508 F. App'x 7 (2d Cir. 2013). Hillary fails to specifically respond to this argument, (Dkt. No. 74 at 20), and Village defendants easily meet the lowered burden created as a result. *See Johnson*, 2015 WL 4496363, at *5 & n.6; N.D.N.Y. L.R. 7.1(b)(3). Accordingly, this portion of Village defendants' motion is granted.

### c. False Imprisonment/False Arrest

_____

Attorney's Office is not a suable entity under state law, (*id.* at 21-22), Hillary only argues that his abuse of process claim is viable, (Dkt. No. 64 at 6-8). As such, County defendants' arguments regarding the remainder of Hillary's state law claims are considered unopposed and because they meet the modest burden of demonstrating facial merit, they are granted. *See Johnson*, 2015 WL 4496363, at *5 & n.6; N.D.N.Y. L.R. 7.1(b)(3).

Because "[t]he elements of false arrest . . . under § 1983 are substantially the same as the elements under New York law . . . the analysis of the state and the federal claims is identical." *Boyd*, 336 F.3d at 75. Accordingly, this portion of Village defendants' motion is granted for the same reasons addressed above.[33] *See supra* Part IV.F.1.

## V. Conclusion

**WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED** that State defendants' motion to dismiss (Dkt. No. 39) is **GRANTED**; and it is further

**ORDERED** that County defendants' motion to dismiss (Dkt. No. 58) is **GRANTED**; and it is further

**ORDERED** that Village defendants' motion to dismiss (Dkt. No. 70) is **GRANTED IN PART AND DENIED IN PART** as follows:

**DENIED** with respect to Hillary's § 1983 claims based upon (1) a violation of the Equal Protection Clause of the Fourteenth

---

[33] Hillary's claims against the Village of Potsdam Police Department, an administrative arm of the Village of Potsdam without a separate legal identity, are redundant and thus dismissed along with the claims against the Village of Potsdam. *See, e.g.*, *Pooler v. Hempstead Police Dep't*, 897 F. Supp. 2d 12, 21 (E.D.N.Y. 2012); *Caidor v. M&T Bank*, No. 5:05-CV-297, 2006 WL 839547, at *2 (N.D.N.Y. Mar. 27, 2006).

Amendment, (2) retaliatory prosecution in violation of the First

Amendment, (3) defamation, and (4) conspiracy *only* as against

Murray; and

**GRANTED** in all other respects; and it is further

**ORDERED** that defendants, who have not already done so, shall file

an appropriate responsive pleading within the time allotted by the Rules;

and it is further

**ORDERED** that the Clerk shall terminate defendants NYSP,

Levinson, Snell, Peets, Wickenheiser, Pizziketti, Does #1-10, Does #11-20,

Does #21-30, St. Lawrence County, St. Lawrence County District

Attorney's Office, Wells, and Bates from this action; and it is further

**ORDERED** that the parties shall contact Magistrate Judge David E.

Peebles to schedule further proceedings in accordance with this

Memorandum-Decision and Order; and it is further

**ORDERED** that the Clerk provide a copy of this Memorandum-

Decision and Order to the parties.

**IT IS SO ORDERED.**

February 28, 2019
Albany, New York

Gary L. Sharpe
U.S. District Judge