UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

ORAL NICHOLAS HILLARY,

          Plaintiff,

    -against-

ST. LAWRENCE COUNTY, et al.,

          Defendants.

Case No. 17-CV-659 (GLS) (DJS)


**PLAINTIFF'S MEMORANDUM OF LAW**
**IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**


**BARKET EPSTEIN KEARON ALDEA**
**& LOTURCO, LLP**
666 Old Country Road, Suite 700
Garden City, New York 11530

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ...............................................................................................................1

BACKGROUND ................................................................................................................2

    Garrett Phillips is Killed, and Officer Wentworth Hears a Lone
    Set of Footsteps inside the Residence at 5:24pm..............................................................2

    Garrett's Mother Dates and Breaks Up with Two Men, Both of
    Whom are Seen Near Garrett Shortly before he Dies.........................................................3

    Alibis Emerge for Both Jones and Hillary ........................................................................6

    Hillary and Jones are Treated Differently from Each Other from
    Death to Trial. ...................................................................................................................9

STANDARD.....................................................................................................................14

ARGUMENT ...................................................................................................................15

    I.       PLAINTIFF'S EQUAL PROTECTION CLAIM SHOULD
               BE SUSTAINED. ...............................................................................15

           A.  Nick Hillary and John Jones were Similarly Situated. .........................16

           B.  Whether Race motivated the Differential Treatment
               Afforded Hillary and Jones presents a Question of Fact
               fit for a Jury.........................................................................................24

    II.      QUALIFIED IMMUNITY DOES NOT WARRANT
               SUMMARY JUDGMENT. ...................................................................26

CONCLUSION.................................................................................................................29

## <u>INTRODUCTION</u>

After years of investigating the tragic murder of Garrett Phillips, the lead investigator on the homicide took a handcuffed Black man for a perp-walk in front of the media.  For years the evidence against this target was too flimsy to indict.  During that time, the target had been harassed, strip searched, tested and dehumanized, and in response he had had the temerity to file a civil rights action complaining of his treatment.  Yet based upon no additional evidence beyond the target's own civil rights testimony, he soon found himself in the bullseye of the homicide's lead investigator—Mark Murray.

The suspect was Oral Nicholas Hillary, and there was overwhelming evidence of his innocence.  For instance, as Mark Murray was aware, there was sworn eyewitness testimony confirming that Hillary was in a different home during the exact same time that law enforcement heard the perpetrator creep around the victim's residence.  The perpetrator was thought to have leapt out of a window so high that for some it would have been "catastrophic," yet only hours later Hillary was coaching and playing soccer without any visible impairment at all.  There had been no evidence of violence between Hillary and Garrett, or between Hillary and his mother.  The victim appeared to have been punched with a left hand, but Hillary was a righty.  And even though Murray thought the culprit wore gloves during the murder, a stray glove was indeed found nearby Garrett's home and it did not match Hillary's DNA.

The present case is based upon the differential treatment that Hillary received in comparison to an incredibly similarly situated White man, John Jones, at the hands of a police department that has not employed a single Black person in a quarter century.  Faced now with the claim that Hillary's rights under the Equal Protection Clause were violated, and confronting the possibility of having the case decided by a jury of his peers, Defendant Murray asks the Court to

detour the case into summary dismissal.  When he is not asking the Court for "immunity" against claims that he selectively prosecuted a suspect on the basis of race, he offers a defense that is dripping with an even nastier undertone: after years of bringing the full force of his police department to bear against one Black man, and years more after that man's acquittal, Defendant Murray still perpetrates the idea that he did it.

Nobody in this case will deny that Hillary and Jones were treated differently from each other.  Instead the question presented is whether they were similarly situated and, if so, whether the differential treatment of these two men was based in part upon race.  Because those questions should be resolved by a jury, Defendant Murray's motion to summarily dismiss Hillary's claim under the Equal Protection Clause should be denied.

## **BACKGROUND**

### **Garrett Phillips is Killed, and Officer Wentworth Hears a Lone Set of Footsteps inside the Residence at 5:24pm.**

At an unknown time between 4:56pm and 5:07pm on October 24, 2011, Garrett Phillips was murdered in his home at 100 Market Street in Potsdam.  *See* Deposition of Mark Murray ("Exhibit A"), at 45-46.  The first ones to report the commotion were neighbors living across the hallway.  In their bedroom area watching Netflix, they heard what sounded like horseplay.  But they grew increasingly concerned when they thought they heard a cry for help.  *Id*. at 57.  As they continued listening, one of those neighbors, Marissa Vogel, went to Garrett's front door, knocked, and heard footsteps inside the apartment followed by the engagement of the dead bolt.  *Id*.  At that point, she looked up the number for the local police and placed the call.  The time was 5:07pm.  *Id*. at 33.

Officer Mark Wentworth of the Potsdam Police Department arrived at 100 Market Street at 5:16pm. *See* Exhibit B, at 1. He knocked on the door and could hear someone walking around the apartment quietly. *Id*. Eight minutes later—at 5:24pm—he knocked on the door again, this time with his patrol stick, "telling the occupant to open the door." *Id*. Once again, Officer Wentworth heard "what sounded like movement in the apartment," movement as if there was "a single person walking around." *Id*.

Shortly thereafter the building's landlord arrived and let Officer Wentworth into the residence. In the hallway's first room on the left, Officer Wentworth learned that it was not Garrett who had been walking around—for he found Garrett lying on the floor without a pulse. *Id*. at 2.

### Garrett's Mother Dates and Breaks Up with Two Men, Both of Whom are Seen Near Garrett Shortly before he Dies.

Leading up to her son's murder, Tandy Cyrus had been romantically involved and broken up with two men—both of whom had had successful athletic careers and had served in our Armed Forces. First for approximately three years she had dated and lived with John Jones, a White deputy sheriff working for St. Lawrence County.[1] *See* Exhibit D, at 1. Then she subsequently broke up with Jones to begin a relationship with Oral Nicholas Hillary,[2] the Black soccer coach at Clarkson University. *See* Exhibit E, at 99-100.

Her relationship with John Jones soon exploded into acrimony. In September of 2010, Jones went to the home she shared with her sons and removed her belongings. *See* Complaint of Tandy Cyrus ("Exhibit F"); Deposition Testimony of John Jones ("Exhibit C"), at 75 ("Q  So is it

---

[1] John Jones had served in the military for four years and played semi-professional football. *See* Deposition of John Jones (Exhibit C), at 83 and 165.

[2] Mr. Hillary commonly uses his middle name, Nick.

your testimony that you went into the dresser, removed her clothing from the dresser and then placed it on some other part of the property? [*objection*] A That's correct. Q Why would you do that? A Because at that point there was no need for our relationship to continue and she could remove herself and her personal belonging[s] from my residence"). He sent her "threatening text messages." Exhibit F. He went to her home "unannounced and uninvited," and sued her in Small Claims Court. *Id*. He physically laid his hands on her. *See* Exhibit C, at 97-98 (admitting he pushed her, but stating "I don't want to consider it a battery. I consider it a defense"). He started spying on her and "watching" her to see "who was going and coming" to her apartment. *See* Deposition of Stacia Lee ("Exhibit G"), at 86-87. And, as claimed by Garrett's mother in a formal complaint to law enforcement, taken by "jealousy," Jones began "acting in various ways that cause[d] [her] to fear for the safety of [her]self and [her] sons." *See* Exhibit F.

Jones's jealousy was volatile not just against Tandy Cyrus. It found another expression in behavior toward Nick Hillary and his family. For instance, he visited Hillary's ex-girlfriend at her place of work to inform her that Hillary and Garrett's mother were having an affair. *See* Exhibit G, at 86. He came uninvited to the home of Hillary and his children at 6:00am, threatening to kick in his front door if he discovered that Hillary and Garrett's mother were dating. *See* Exhibit H. And at around the same time, Hillary's car was "keyed"—an incident Hillary reported to the Potsdam Police Department, to whom Jones then denied wrongdoing by falsely reporting a confession by a third-party. *See* Police Report ("Exhibit I"), at 3 (claiming "Jones spoke with Stacia Lee about it and she admitted to Jones that she scratched his car;" whereas "Officer Wentworth interviewed Stacia Lee … [who] denie[d] any knowledge of the car being scratched," adding that "if she [had done] anything to the car it would not be anything small like scratching

it"). *See also* Exhibit G, at 72 (denying she had ever confessed to any member of law enforcement at all).

By October 2011, Tandy Cyrus had broken up with both men, and on a rainy 24th of the month Garrett stayed at school after dismissal to play basketball with his friends. He left shortly before 5 o'clock on his rip-stick[3] and was captured by several video cameras on his way home. These videos are the last time that Garrett can be seen alive.   In close succession, they depict Garrett riding by Hillary and then, finally, Jones. *See* Exhibit K and L.  *See also* Def. Memorandum of Law, Video Exhibit E, at 4:52pm.

Shortly before 5:00pm, one video depicts Garrett riding out of the school's parking lot, where Hillary had been sitting in his car in the opposite end of the lot and facing the opposite direction.  *See* Def. Memorandum of Law, Video Exhibit E, at 4:52pm.  At around the same time that Garrett exited, however, Hillary can be seen exiting as well.  *See id*.  Both Garrett and Hillary can then be seen making a left out of the parking lot onto Leroy Street, but they immediately diverge from there:  while Garrett makes an immediate right hand turn off of Leroy Street (*see* Exhibit M, at 50), Hillary stays straight.  *See* Exhibit A, at 253.

The next video captures Garrett riding on the sidewalk past John Jones, who was sitting in his truck in the abutting driveway of his home.  *See* Exhibit K (video).  *See also* Exhibit C, at 156-57.  This moment—Garrett skating by Jones's driveway—is actually captured on two cameras. One clocks it at 4:50pm at 36 seconds (the "Cottage Street" camera), and the other depicts it two minutes later, at 4:52pm and 36 seconds (the "Radiology" camera).  *Compare* Exhibit K and Exhibit L.  *See also* Exhibit A, at 87-89 (culminating in the question and answer, "Q … Cottage

---

[3] A rip-stick is a device analogous to a skateboard, except it offers a toggle function that allows users to propel themselves without ever having to lift their feet off of the board.

Street is 2 minutes slower than radiology, right?  A  Yes").  In turn, the Radiology camera was itself ninety seconds slow.  *See* Exhibit N.  So the videos not only depict the last moment Garrett is seen alive on camera, but, as proves to be important, they show that the Cottage Street camera— the one facing Jones's home—is three and a half minutes behind real time.[4]

### Alibis Emerge for Both Jones and Hillary.

The Potsdam Police Department is a law enforcement agency that has not had a single Black employee in a quarter-century.  *See* Exhibit A, at 166 ("Q How many Black people have worked for the Potsdam Police Department at any time during your tenure?  A  None.") and at 9 (describing that he joined the Potsdam Police Department in 2003).  *See also* Deposition of Police Officer Mark Wentworth ("Exhibit O"), at 106 (from 1995 to 2016, the number of Black officers on the force was "Zero").  At all relevant times, Defendant Mark Murray was a lieutenant in that police department.  And contrary to what he says now in his Declaration, he was the lead investigator in the Garrett Phillips murder by all accounts other than his own.  *See* Deposition of District Attorney Mary Rain (Exhibit P), at 42 ("Q  Who was the lead investigator from police on the case?  [*objection*]  A  Chief Murray"); Exhibit Q, at 121 (referring to Murray:  "his office was running the investigation so if he asked me to do something, I would go out and do it"); Exhibit O, at 106 ("Q  Who was leading the investigation at the Potsdam Police Station?  A  Chief Murray, I believe.  He was a lieutenant at the time").[5]

---

[4] It is two minutes behind Radiology, which is an additional 90 seconds behind real time.  See, e.g., Exhibit A, at 90 (Q … Radiology is a minute and 30 seconds slower than AT&T [real time], right? … A  Yes.  Q  Okay.  And it appears as though Cottage Street video is 2 minutes slower than radiology, right?  A  Yes").  After admitting these points, Defendant Murray backed away—noting that the lead sheet depicting radiology as 90 seconds slow was dated in March 2012.  See *id.* at 100.  However, in law enforcement's own words, the very purpose of that lead sheet was to "complete timeline and verify accuracy of times."  *See id.  See also* Exhibit N.  And yet there is no other lead sheet in the massive case file that ever offers a different assessment of the radiology camera than this one—that it was 90 seconds behind real time.

[5] See also Exhibit DD, depicting Hillary getting accompanied on a "perp walk" by one and only one agent of the investigation:  Mark Murray.

He claims that John Jones could not have killed Garrett Phillips because it is "really hard to be in two places at once." *See* Exhibit A, at 40.  By that, Murray is referring to the Cottage Street camera, which depicts Jones exiting his home with an umbrella and his dog at 5:05pm. *Id*. at 124. *See also* Exhibit K (video).

However, Jones lived at 17 Cottage Street—about 0.2 miles from Garrett's bedroom. *See* Deposition of Investigator Daniel Manor ("Exhibit R"), at 101 (identifying 17 Cottage Street), and 119 (confirming a ballpark distance of 0.2 miles).  Jones himself estimates that he could run from one home to the other in about "a minute and 30 seconds." *See* Exhibit C, at 165.  And while the lead investigator in the homicide, Murray, cannot narrow down the time of Garrett's murder beyond the eleven minute timeframe between 4:56pm and 5:07pm (Exhibit A, at 45-46), the Cottage Street Camera, once recalibrated to real time, does not depict Jones and his dog until close to 5:09pm. *See supra* footnote 4.  Here now a decade removed from Garrett's death, Defendant Murray's exclusion of Jones based upon the "two places at once" claim is simply fiction.  While the timing is close, so are the distances in involved, and the window leaves enough room for Jones to have seen Garrett skating home, killing him at, say, 5:02pm, and then returning home through his back door in time to exit out his front door on camera.

If this sounds fantastical, compare it to the exact theory that Defendant Murray propagates against Nick Hillary.  At 5:21pm, Hillary was in the second-floor apartment of his assistant soccer coach, Ian Fairlie, not out of breath and acting "perfectly normal." *See* Exhibit S (confirming time by matching it up with records of a phone call he knew to be contemporaneous with when Hillary arrived); Exhibit Q, at 49 ("Q  Now, Ian Fairlie, according to these notes, told you that at 5:21 Mr. Hillary was at his house, correct?  A  Yes."). *See also* Deposition of Ian Fairlie ("Exhibit T"), at 97 (confirming second floor location), and at 105 (stating "he was perfectly normal" and

confirming "yes" that he "didn't appear out of breath" and "no" that he did not notice any sweat). Fairlie lived "[a]bout 200, maybe 250 yards" from Garrett's home.  *See* Exhibit A, at 111.  Yet Officer Wentworth heard footsteps in Garrett's apartment at both 5:16pm and 5:24pm.  *See* Exhibit B.  To be the perpetrator, then, Hillary would have had to escape Garrett's home at some point after 5:16pm and then run to Fairlie's house in time to be seen not out of breath and "perfectly normal" five minutes later.

Thus, it might seem questionable that Jones would have committed murder just to run home in time to create an alibi, but this was exactly Defendant Murray's claim against Hillary:  "Q  Is it your belief that he then went to Ian Fairlie's house to establish an alibi?  A  Yes."  *See* Exhibit A, at 260.  But even this does not explain the full scope of the absurdity of blaming Hillary for the murder:  after leaving Fairlie's apartment, Hillary would have had to sneak ***back*** into Garrett's home in time for Officer Wentworth at 5:24pm to "again hear what sounded like movement in the apartment," movement that was "faint but … sounded as if it was a single person walking around." *See* Exhibit B.

When Garrett's body was found deceased, he had a "golf ball size abrasion to the right side of his face."  *See* Exhibit C, at 169.  It appeared he had been "punched."  *Id*. a 175.  *See also* Exhibit D, at 3.  Given the positioning, Jones himself stated that the punch "would have been with a left hand."  *See* Exhibit C, at 176.  Defendant Murray did not personally try to identify Hillary's dominant hand, however, and does not know whether this endeavor was made by anyone on his team.  *See* Exhibit A, at 142-43.  Yet we do know the dominant hand of John Jones:  his left.  *See* Exhibit C, at 175 ("Q  What's your dominant hand?  A  Left hand.").

**Hillary and Jones are Treated Differently from Each Other from Death to Trial.**

In the aftermath of Garrett's death, Hillary and Jones were treated differently from each other. Jones was scarcely investigated[6] while Hillary was indicted, and the case was taken to trial based upon a body of evidence collected in the shadow of Hillary's presumed guilt and Jones's presumed innocence. This affected not just the evidence that was collected, but also the evidence that was not. The night of the murder, for example, Defendant Murray sought to gather evidence by personally questioning Hillary at his home. *See* Exhibit U. The same night, the Potsdam Police Department under Murray's stewardship sought leads on Cottage Street by going home to home— but skipped over Jones's altogether. *See* Exhibit O, at 72-78. Thus this remarkable moment emerged during Officer Wentworth's deposition:

> A     I didn't talk with him.
> Q     Well, was he home?
> A     I don't recall.
> Q     Did you actually go up to 17 Cottage Street?
> A     I don't recall.
> Q     Well, you went up to 11 Cottage Street and spoke to 3 people. You went up to 5 Cottage and spoke to 3 people. You went to 3 Cottage and spoke to 2 people, spoke to a bunch of people at 102 Market and you notated all of this[.]  [Y]et on 17 Cottage there's no notes and you don't even note that he didn't answer the door. You simply say, "did not talk with him," right? [*objection*]
> A     That's what I wrote.
> …
> Q     Had you already made up your mind that he was not the perpetrator? [*objection*]
> A     I don't recall.

---

[6] For instance, Jones was permitted to accompany the victim's mother to the police station and participate in the immediate debriefing. *See* Exhibits BB and CC (depicting Jones next to Tandy Cyrus, first looking over Defendant Murray's shoulder at his notes and then Jones and Murray shaking hands).

*See* Exhibit O, at 77-78.[7]

The differential treatment spanned from verbal communications to physical evidence. Defendant Murray thought the killer exited Garrett's home by leaping from a second story window. *See* Exhibit A, at 32.  Yet despite similar backgrounds in sports and the military, and playing on classic tropes concerning the comparative athletic prowess of Black people,[8] Murray thought Hillary to be "athletic" enough for the feat whereas for John Jones it would have been physically "catastrophic."  *See* Exhibit A, at 200.  Standing in Defendant Murray's office, Hillary was thus strip searched and subjected to photographs of his face, body, penis, legs, and feet.  This made sense to Defendant Murray, because "this was a significant struggle between the murderer and Garrett Phillips[;] it all came down to a grappling match or struggle for his life that he lost, [so] there were potential injuries we were trying to document including bite marks, scratches, kicks, [or] punches that Garrett might … have been able to inflict on the murderer."  *See* Exhibit A, at 201-02.  Yet this rationale did not apply to Jones.  Despite the claimed search for "potential injuries" that could have identified the culprit, Jones's torso was not photographed, his back was not photographed, his knees were not photographed, his anus was not photographed, his waist was not photographed, and his penis was not photographed.  *Id*. at 203.[9]

Where the visual evidence did not inculpate Hillary, this did not stop Defendant Murray from claiming that it did.  The day after Garrett's murder, he personally went to a soccer game

---

[7] Of note, when Officer Wentworth knocked on a door and got no answer, he said so in his notes.  *See* Exhibit O, at 81-82.

[8] See, e.g., Matthew Hutson, *Whites See Blacks as Superhuman*, SLATE (Nov. 2014), available at: https://slate.com/technology/2014/11/whites-see-blacks-as-superhuman-strength-speed-pain-tolerance-and-the-magical-negro.html.  See also Adam Waytz, Kelly Marie Hoffman, and Sophie Trawalter, *A Superhumanization Bias in whites' Perception of Blacks*, 6 SOCIAL PSYCHOLOGICAL AND PERSONALITY SCIENCE 352 (2015) (summarizing this phenomenon) (attached as Exhibit J for ease of reference).

[9] Indeed, it appears that Potsdam did not even take a photograph of John Jones's face.

being coached by Hillary.  Based upon that visit, Defendant Murray swore under oath that he observed Hillary with a "significant limp"—an allegation that aligned with his theory that the perpetrator had leaped out of a second story window.  *See* Search Warrant Affidavit of Mark Murray ("Exhibit V").  The problem was, this "significant limp" was a complete fabrication.  *See, e.g.,* Exhibits W, X and Y (videos).  Indeed, at his deposition, Defendant Murray was given an opportunity to identify a single limp and he did not.  *See* Exhibit A (playing videos), at 212 ("Q We've watched for 35 seconds.  Any significant limp so far?  A  No;" "Q  We watched 1 minute, 4.  Any significant limp so far?  A  No, there is other aspects in the affidavit;"); 213-16 ("It's a minute and 50 and Mr. Hillary has begun walking, correct?  A  Yes.  Q Two minutes 4 seconds he is still walking, correct?  A  Yes.  Q  Unobstructed view of him walking now, 2:10, correct?  A Yes. … Q  Can you see a significant limp on this video; yes or no?  A  I can't say either way") (blaming the camera, as it was "extremely grainy, bouncy and the camera appears to constantly be moving"); 217 ("Q  Mr. Murray, 7:03 on the [next] video, do you see any limps yet?  A  No.  Q 7:15 on the video, did you see any limps yet?  A  No").

This aligned with what eyewitnesses reported.  The night of Garrett's murder—the same night that Murray thinks the culprit leapt out of a second story window—Hillary was out playing and coaching soccer with no visible impairments whatsoever.  *See* Exhibit T, at 122-24 ("Q  And did you tell law enforcement that in and around 2011, '12 and thereafter that you had actually kicked the ball with Nick on that particular day?  A  Yes, multiple times, yes.  Q  And did you notice anything about Nick as he was kicking the ball that seemed to be awry?  A  No.  Q  Was he limping at all?  A  No. … Q  And this information about him having no signs of limping or injury— did you give that information to law enforcement as well?  [*Objection*]  A  Correct.").

11

The disparate collection of evidence swelled from the visible to the microscopic. Defendant Murray came to believe that the killer wore gloves.  But when a glove was found during the course of the investigation, Defendant Murray tested it for Hillary's DNA; he "do[es]n't know" if he did the same for Jones.  *See* Exhibit A, at 205-06.  Likewise, "dozens" of DNA samples were taken from Garrett's body, residence, and room.  *See* Exhibit Z, at 2.  These were all tested against DNA from Hillary to the extent that comparisons could be made, and in that realm Hillary was definitively excluded from all samples except for one.  *Id*. at 3 ("The defendant was excluded from all samples taken at the apartment, where comparisons could be made except for a DNA mixture profile from fingernail scraping taken form the victim's left hand.  Due to insufficient genetic information, the defendant could neither be included nor excluded as a possible contributor to the mixture"). By comparison, "DNA helped contribute to [Murray] ruling [Jones] out" as a suspect. *See* Exhibit A, at 132.  Yet when asked how many of the samples measured against Hillary's DNA were also measured against Jones's—i.e. the extent to which Jones was even subject to the DNA investigation—Defendant Murray claimed ignorance.  *Id*. at 131-32.  He then belittled the relevance that such a match to Jones's DNA would have anyway, for Jones was "in that room on prior occasions." *Id*. at 134. He was right.  But of course, he was not the only man who had been with Garrett on prior occasions.  So had Nick Hillary.  *Id*.

[Please turn to next page.]

In contrast to what could only be investigated under a microscope, on May 15, 2014, Defendant Murray was the lone agent on the investigation to spike the football on the culmination of the targeting that had come before: he gave Hillary a perp-walk as the media stood ready to seize the moment:



Leading up to trial, in early 2015, Defendant Murray became aware of a witness who ultimately swore that he saw Jones—not Hillary—around Garrett's apartment near the time of the murder. *See* Exhibit LL. He went to Attica to meet with this witness, took notes of the meeting, but then buried these notes until trial. *See* Exhibit P, at 30 (claiming that Murray did not even disclose these *Brady* materials to the District Attorney). Asked why she did not receive a copy of this report for more than a year, District Attorney Mary Rain testified, "You would have to ask Lieutenant Murray why he did not provide it." *See* Exhibit P, at 38. For his part, Defendant Murray swears that he did turn over the notes to the prosecution—but asked to identify the person to whom he gave them, he simply did not recall. *See* Exhibit A, at 235. This was especially notable, because the People's trial attorney, William Fitzpatrick, kept a timeline of events surrounding the case, and this included several meetings between Murray and the prosecution team. *See* Exhibit NN (describing meetings with Murray and others on April 8, 2014; April 25-27, 2015 to "devise a 'game plan'"; October 1-2, 2015; November 23-24, 2015).

Overall, while basic investigative steps were taken against Hillary and not Jones, and while Hillary and not Jones was indicted, Hillary, in his own words, was "wrongfully accused of causing the death of a little boy [despite] having worked with kids [his]entire life[.]" *See* Deposition of Oral Nicholas Hillary ("Exhibit AA"), at 130. "I was a college coach that worked with young people," he went on, "and being accused of taking the life of a twelve-year-old boy—that has directly impacted my reputation within that community. It has directly affected my capacity to function at an optimal level as a college coach. It has affected my reputation to interact with my kids." *Id*.

In the investigation surrounding the death of Garrett Phillips, and at the hands of a police department that has not had a Black officer in 25 years, Hillary and Jones were treated differently. Whether that treatment was motivated by race is a question of fact that should be decided by a jury.

## **STANDARD**

"At summary judgment, the court must … construe the reasonable inferences in favor of the non-moving party," such that "even in the face of implausible claims" "courts must still proceed very cautiously[.]" *R.B. Ventures, Ltd. v. Shane*, 112 F.3d 54, 58 (2d Cir. 1997) (internal quotations omitted). "If reasonable minds could differ as to the import of the evidence …, and if there is any evidence in the record from any source from which a reasonable inference in the nonmoving party's favor may be drawn, the moving party simply cannot obtain a summary judgment." *Id*. (internal quotations and ellipses omitted).

## ARGUMENT

### I.   PLAINTIFF'S EQUAL PROTECTION CLAIM SHOULD BE SUSTAINED.

Under the Fourteenth Amendment to the U.S. Constitution, "No State ... shall ... deny to any person within its jurisdiction the equal protection of the laws."  This constitutional provision—the Equal Protection Clause—"requires that the government treat all similarly situated people alike."  *Harlen Associates v. Incorporated Village of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001). "The prototypical equal protection claim involves discrimination against people based on their membership in a vulnerable class" (*id.*), and, to that end, "[a]lthough discretionary, the decision to prosecute 'may not be based on an unjustifiable standard such as race....'"  *Jones v. J.C. Penney's Dept. Stores, Inc.*, 2007 WL 1577758, at *8 (W.D.N.Y. 2007) (quoting *United States v. Armstrong*, 517 U.S. 456 [1996]).

More specifically, "[a] successful selective prosecution claim requires that plaintiff 'show both (1) that they were treated differently from other similarly situated individuals, and (2) that such differential treatment was based on impermissible considerations such as race....'"  *Id.* at *9 (quoting *Cobb v. Pozzi*, 363 F.3d 89, 110 [2d Cir. 2004]).  "In contrast to a claim under the Fourth Amendment," however, "the existence of … reasonable suspicion or probable cause[] does not automatically defeat an Equal Protection claim."  *Raza v. City of New York*, 998 F. Supp.2d 70, 79 (E.D.N.Y. 2013).  Equal Protection claims survive even where there are "mixed motives," so that the claimed existence of "permissible motives," as here, "does not preclude a finding that an impermissible discriminatory purpose was a factor in the government's actions."  *Id.*  The question is whether race was one "motivating factor," but a plaintiff "'need not show … that a government decisionmaker was motivated solely, primarily, or even predominantly by' improper concerns

based on [race]."  *Id.* (quoting *United States v. City of Yonkers*, 96 F.3d 600, 611-12 [2d Cir. 1996]).

As set forth below, Nick Hillary and John Jones were similarly situated yet treated differently.  With a question then on whether race was one motivating factor for that difference, the issue becomes who should give the answer—a judge or a jury.  But as is typically true of this question, the answer is the latter.  *Rahab v. Buchanan*, 2018 WL 3743993, at *2 (S.D. Ohio 2018) ("Courts regularly treat motive, when it is a material issue in a case, as a question of fact to be proved to the jury") (citing cases); *Clark v. Bd. Of Educ. Of Franklin*, 2009 WL 1586940, at *11 (D.N.J. 2009) ("If, as Defendants appear to argue, D.C. was treated differently based on his behavior and not his race, such a question of fact should be reserved for a jury to decide").

Applied here, the Court should deny Defendant Murray's request for summary judgment because while all parties agree that Hillary and Jones were treated differently, they were nevertheless similarly situated; and whether that differential treatment was based on race should be decided by finders of fact.

**A.  Nick Hillary and John Jones were Similarly Situated.**

"[W]hether … two [people] are similarly situated present[s] classic issues of fact." *Kirschner v. Zoning Bd. of Appeals of Incorporated Village of Valley Stream,*, 924 F. Supp. 385, 394 (E.D.N.Y. 1996).  Nevertheless, abundant evidence demonstrates the analogous positions occupied by Hillary and Jones in the immediate and long-term aftermath of Garrett Phillips's death—far more than what is sufficient to present a jury with this "classic" factual question.

From an initial personal perspective, Hillary and Jones had similar backgrounds.  Hillary had served for several years in the United States military, had had a successful athletic career, and

16

had developed a long-term and live-in relationship with Garrett's mother. *See* Exhibit EE (describing that he was a four-year player for a collegiate-level soccer team and its captain for two years); Exhibit FF (identifying that Hillary's soccer team won a national championship) (BEKAL_0006828). All three were true for Jones as well. In his words, between 1985 and 1989 he "entered the United States military" (Exhibit C, at 83) and he played "semi professional football" as an "inside linebacker" (*id*. at 84 and 165); and he too developed a long-term and live-in relationship with the victim's mother. *See* Exhibit D, at 1. That last point is especially material. Garrett's home did not appear to have been broken into, so Defendant Murray theorized that the killer had had regular access to the residence. Hillary had a key to the home—but, as a fourth similarity between the two men, so did Jones. *See* Exhibit GG (Sgt. Bates confirming that "Jones … gave me a key to Tandy's apt").

Fifth, like Hillary's, Jones's relationship with Tandy Cyrus came to an end before Garrett was killed—and his ended in particular acrimony. He had removed her belongings from the residence without her permission. *See* Exhibit F; Exhibit C, at 75 ("Q  So is it your testimony that you went into the dresser, removed her clothing from the dresser and then placed it on some other part of the property? [*objection*]  A  That's correct.  Q  Why would you do that?  A  Because at that point there was no need for our relationship to continue and she could remove herself and her personal belonging[s] from my residence"). He had sent her "threatening text messages" and gone to her home "unannounced and uninvited." Exhibit F. He had physically laid his hands on her. *See* Exhibit C, at 97-98 (admitting he pushed her, but stating "I don't want to consider it a battery. I consider it a defense"). He had started spying on her and "watching" her to see "who was going and coming" to her apartment. *See* Exhibit G, at 86-87. Thus Garrett's mother, before her son died, had filed a formal complaint to law enforcement about Jones—that taken by "jealousy," she

17

reported, he began "acting in various ways that cause[d] [her] to fear for the safety of [her]self and [her] sons." *See* Exhibit F.

While (sixth) Hillary and Jones were both seen in Garrett's vicinity shortly before he died, *see* Exhibits K-L, they also (seventh) both had alibis that strongly cut against the likelihood that they were responsible for Garrett's death.  Garrett was killed at an unknown time between 4:56pm and 5:07pm, *see* Exhibit A, at 45-46, and the perpetrator was heard inside the home at 5:16pm and 5:24pm.  *See* Exbibit B.  Yet Jones was seen on the Cottage Street camera exiting his home with his dog near 5:09pm.  *See* Exhibit A, at 124; Exhibit K.  *See also supra* fn. 4.  And Hillary was at Ian Fairlie's apartment at 5:21pm.  *See* Exhibit B;  Exhibit S (confirming time by matching it up with records of a phone call he knew to be contemporaneous with when Hillary arrived); Exhibit Q, at 49 ("Q  Now, Ian Fairlie, according to these notes, told you that at 5:21 Mr. Hillary was at his house, correct?  A  Yes.").  Particularly as to Hillary, then, the alibi is incredibly strong:  not only would it require Hillary to have snuck out of the house and then appeared at Fairlie's apartment within five minutes, but, absurdly, it would require Hillary to have then snuck ***back*** into the victim's home while a police officer was at the front door.

Nevertheless, Defendant Murray claims that Hillary and Jones were differently situated. But the basis for these claims is an unsworn and almost completely unsubstantiated declaration by Defendant Murray that cites factors that are either (i) applicable to both Hillary and Jones, (ii) false, or (iii) inadmissible.  Ultimately, Jones and Hillary offer circumstances that are highly analogous to each other and, at the very least, present a question of fact fit for the review of jurors.

***First***, the defense claims that Hillary was an "obvious person of interest" based upon: his "familiarity with the victim," "familiarity with the victim's mother," "prospects for entering

Garrett Phillips' apartment without force," "physical ability to accomplish the second-story escape from the homicide scene," and "opportunity."  *See* Def. Memorandum of Law, at 9.  Yet all of these factors apply to John Jones.  He had familiarity with Garrett, with Garrett's mother, and he had a key to enter the apartment without the need for force.  *See* Exhibits D and GG.  To whatever extent Hillary had the necessary "physical ability," the same was true for Jones:  he had served for four years in the military and played semi-professional football (Exhibit C, at 83 and 165), had served as an agent of law enforcement for years (*id*. at 10-12), was active in an adult league for hockey (*id*. at 145-47) ("I participated in an adult hockey night" and "I oversaw a men's league hockey team") and even in his own mind was comparatively athletic enough to physically threaten Hillary to his face.  *See* Exhibit H (threatening to kick in Hillary's door).  Whether he had an "opportunity" to kill Garret is a close question, but, given the comparative alibis, whatever opportunity he had was ***better*** than Hillary's.

  ***Second***, the defense claims that Hillary was a target because he had a "hostile relationship" with and "motive to eliminate the victim who … stood in the way of [a] continued romance with the victim's mother," showed a "lack of cooperation" with police, "stalk[ed]" the victim in his Honda CRV, and had a "flawed alibi theory."  *See* Def. Memorandum of Law, at 9.  But these allegations are simply wrong.  For one thing, if Hillary had wanted to continue dating Ms. Cyrus, it is difficult to imagine how he would further those efforts by murdering her son.  This would be especially bizarre if, as the defense says, "many observers" thought he possessed this motive to be the perpetrator.  But instead of driving down the unsubstantiated avenue of what "many observers" thought, take it from the lead sheets of Murray's own investigation.  With Ms. Cyrus's permission, they interviewed Garrett's therapist.  The point of the conversation was to determine if Garrett himself feared Hillary.  And the answer was an unequivocal no:  "No concern about Nick hurting

[him]," but "slight" concern about something else—"friends picking on him about Nick being of a different race."  *See* Exhibit HH.[10]

Blaming Hillary's level of "cooperation" is equally hollow.  As the defense highlights, even before he was indicted in 2014, Hillary brought civil rights claims in connection with the treatment he received surrounding Garrett's murder—claims for which he gave sworn testimony while knowing that the murder investigation remained an open case.  *See* Def. Memorandum of Law, at 14 (describing his "sworn testimony on April 30, 2012 and January 20, 2014).  This is in addition to a meeting he gave to Defendant Murray in his own home, without counsel, the night that Garrett died.  *See* Exhibit U.  Compare that to the level of "cooperation" offered by Jones:  a four-page statement written more than half a week after Garrett had been killed—by which time Hillary had already met with Murray in his home and been strip searched in Murray's office.  *See* Exhibit A, at 201-02.

Next, while it is unclear what part of Hillary's "alibi theory" the defense claims to be "flawed," there is a far more basic and tangible flaw in the alibi lent to John Jones.   Namely, Jones's alibi is based upon a timing error.  During the investigation and even now, Jones was alleged to have been seen walking his dog at 5:05pm—and, in some cases, is alleged to have been walking ***home*** with his dog at that time.  *See* Exhibit II.  *See also* Exhibit A, at 124.  While Jones only lived about "a minute and 30 seconds" away from Garrett's house (Exhibit C, at 165), if Garrett had been killed at, say, 5:02pm, a 5:05pm appearance on camera walking home with his dog would be bulletproof.  The problem is, Jones is not seen at 5:05pm walking home, and indeed he is not seen at 5:05pm at all.  The video in question—visible in the Cottage Street camera

---

[10] In addition, if Hillary had been "stalking" Garrett then he would have appeared on camera on either the Cottage Street or Radiology cameras near the time of the murder.  But of Hillary and Jones, the only one to appear on these cameras either before or after the murder is Jones—who is seen before and after.  *See* Exhibits K and L.

(Exhibit K)—shows Jones leaving his home, not returning to it; and the time-stamp on the video is three-and-a-half minutes slow.  *See* Exhibit A, at 90 ("Q … it appears as though Cottage Street video is 2 minutes slower than radiology, right?  A  Yes," and "Q … Radiology is a minute and 30 seconds slower than AT&T [real time], right? … A Yes").  *See also* Exhibit N (lead sheet taken in order to "complete timeline and verify accuracy of times").  So while the face of Jones's alibi raises the specter of, in Murray's words, the "difficulties that would lie with jumping out a second story window with your dog in tow" (Exhibit A, at 32), the reality is that a murder at 5:02pm would have left more than enough time for Jones to return home and appear on camera near 5:09pm.

Finally, the lynchpin of the prosecution against Nick Hillary was a video showing him leave the school parking lot shortly after Garrett is seen skating out on his rip-stick.  Hillary's admission that he was the one driving the car "reinvigorated" the investigation, in the defense's words.  *See* Def. Memorandum of Law, at 14.  But the notion that this video shows Hillary "stalking" Garrett is and always has been a fabrication.  Not only is Hillary parked on the opposite side of the lot from the school despite many closer and available parking spaces (*see* Def. Memorandum of Law, Video Exhibit E, at 4:52pm), and not only is his car facing away from the school (*id.*), but while they both exit left out of the parking lot they go different directions almost immediately thereafter.  *See* Exhibit A, at 253.  Hence this admission at Murray's deposition on this very point:

> Q … Garrett … turned left onto Leroy Street?
> A  Yes.
> Q And did he then make a right onto Cottage Street?
> A  Yes.
> Q Nick Hillary made a left … onto Leroy Street as well, correct?
> A  Yes.
> Q Did he make a right onto Cottage Street?
> A  No.

21

*Id.*

**Third**, these alleged bases for targeting Hillary are based on the unsworn Declaration of an interested-party, Mark Murray, conspicuous for its almost complete lack of substantiation.  In light of the admissibility requirements for affidavits under Rule 56(e) of the Federal Rules of Civil Procedure, "a court may strike portions of an affidavit that are not based upon the affiant's personal knowledge, contain inadmissible hearsay or make generalized and conclusory statements."  *New York ex rel. Sptizer v. Sain Francis Hosp.*, 94 F. Supp.2d 423, 425 (S.D.N.Y. 2000).  *See also Cox v. Quick & Reilly, Inc.*, 401 F. Supp.2d 203, 209 (N.D.N.Y. 2005).  Yet here, Defendant Murray's allegations are littered with these problems: of 67 paragraphs of allegations against Hillary (*see* Murray Declaration, at ¶16), there is no citation to the record **in 62 of them**.  *Id*.  Of 18 more paragraphs of allegations favoring Jones (*id*. at ¶17), there is no citation in all but one.

For many claims, Defendant Murray would have had no personal knowledge of the allegations—which instead would have been based entirely on records that ought to have been readily available for inclusion here.  For instance, he says that Tandy Cyrus "repeatedly informed law enforcement that Plaintiff and Garrett … had a hostile relationship," yet he does not actually attach those reports.  *Id*. at ¶16(d).  *See also* ¶16(e-k, m-p, v-y) (all of which appear to be based upon un-attached claims by Tandy Cyrus).[11]  He says that the "investigation revealed that Plaintiff had been arrested three … times prior to the homicide investigation," but attaches no arrest records.  *Id*. at ¶16(ccc).  He says Hillary was trained in "silent kill techniques" according to "military

---

[11] Relatedly, the only "statement" offered by Tandy Cyrus is hearsay through a newspaper clipping.  *See* Exhibit G to Def. Memorandum of Law.  *See, e.g., Mandal v. City of New York*, 2006 WL 3405005, at *1 (N.D.N.Y. 2006) ("newspaper articles containing quoted remarks are hearsay within hearsay—they contain out of court statements by the quoted individual, within a document that is itself an out of court statement").  *See also Lorick v. Stanford*, 2019 WL 1386794, fn. 7 (N.D.N.Y. 2019).  Reliance upon years-old hearsay is especially conspicuous given the witness involved—Garrett's mother—whom one would expect to have a working relationship with law enforcement.

records," but he does not offer these records for the Court's review either (*id*. at ¶16(lll))—nor does he mention whether Jones received the same training during his military tenure.  He refers to what "Tandy Cyrus's sister, Tonya Cyrus, witnessed," but here again there is no citation.  *Id*. at ¶16(l).  Nor is there any citation to what was allegedly "believed" by "[f]amily friends," "Garrett Phillips' uncle," or "[o]ther members of Garrett Phillips' family" (*id*. at ¶16(q-s)), or whom Tandy Cyrus's ex-husband "had serious concerns about" or whom Plaintiff himself "blamed."  *Id*. at ¶16(n and t).

In other cases, it is difficult to even guess at the source of knowledge for Murray's allegations.  He says that on October 26, 2011, Hillary "was witnessed" to have acted furtively with cigarettes at the police station—but he does not identify who witnessed this or how Murray was allegedly informed.  *Id*. at ¶16(jjj).  Apparently to explain why he targeted Hillary, Murray says that "Garrett Phillips was well-liked by his family, friends, and his peers at school"—with no stated basis for the assertion.  *See id.*, at ¶16(hh).  He says that "small threads of dark-colored clothing material were collected from the crime scene," but he does not say whether he knows this personally, was informed verbally by a colleague, or saw it stated on a report.  *Id*. at ¶16(xx).

In a tacit admission of these problems, the defense offers a Rule 56.1 Statement spanning 67 paragraphs—i.e. the list of allegedly uncontested allegations upon which this summary judgment application is based.  Of these, only ***three*** are based upon Murray's Declaration.  *See* Def. Rule 56.1 Statement, at ¶¶45-47.

Because Murray's Declaration is rampant with allegations that are not based upon his personal knowledge or, worse, derive from sources that he does not identify, and because the failure to produce admissible evidence to support his allegations renders almost all of them

generalized, conclusory, or downright hearsay, *Cox v. Quick & Reilly, Inc.*, 401 F. Supp.2d 203, 209 (N.D.N.Y. 2005), the Court should disregard Murray's affidavit in deciding his application for summary judgment.

For these reasons, the Court should hold that whether Hillary and Jones were similarly situated raises a question of fact fit for a jury determination.

**B. Whether Race motivated the Differential Treatment Afforded Hillary and Jones presents a Question of Fact fit for a Jury.**

While questions of motive are regularly treated as jury-bound, *Rabab*, 2018 WL 3743993, at *2, that destination is especially appropriate in a case like this one—with a Black man accused and acquitted of killing his White girlfriend's son, in a case marshalled by a then-lieutenant and now-Chief of a police department that has not seen a single Black officer in a quarter century.  *See* Exhibit A, at 166 ("Q How many Black people have worked for the Potsdam Police Department at any time during your tenure?  A  None.") and at 9 (describing that he joined the Potsdam Police Department in 2003).  *See also* Deposition of Police Officer Mark Wentworth ("Exhibit O"), at 106 (from 1995 to 2016, the number of Black officers on the force was "Zero").

Of course, proof of racial-motivation does not always emerge from a smoking gun.  But the only other Black people associated with this case were Hillary's lawyer, his daughter, and the mother of his children.  His lawyer, Mr. Tafari, found himself criminally investigated and labeled a "subject" of the investigation.  *See* Exhibit FF.  *See also* Exhibit JJ.  His daughter, Shannah-Kay, was treated so poorly in the grand jury that the first indictment had to be dismissed.  *See* Exhibit KK.  And in the lead-up to Garrett's murder, when Hillary's car had been keyed, Defendant Murray tanked the investigation into the White deputy sheriff based upon a blatantly false allegation that the crime had been committed by Hillary's Black ex-girlfriend.  *See* Exhibit I, at 3 (claiming that

Stacia Lee had confessed and handling the file to Murray). *See also* Exhibit G, at 72 (Stacia Lee denying she had ever confessed to any member of law enforcement at all). This pattern alone does not prove racial animus, but it is worth noting that after a 21 year career, Officer Mark Wentworth was asked how many racial bias trainings he could recall receiving at the hands of the Potsdam Police Department:  his answer was zero. *See* Exhibit O, at 109 ("I don't remember any, no.").

Questions of fact emerge from the opposite direction, as well. If Hillary's race were ***not*** a factor in targeting him, then one would expect a race-neutral explanation for why he was targeted so quickly, narrowly and extensively whereas Jones was scarcely suspected of wrongdoing at all. Yet every such explanation is razor thin. The perpetrator was thought to know Garrett and have access to the home, but ***Jones*** knew Garrett and had access to the home. *See* Exhibits D and GG. The perpetrator was thought to be athletic, but ***Jones*** was athletic. *See* Exhibit C, at 83, 145-47, and 165. The alibi of Hillary was thought to be imperfect, but the alibi of ***Jones*** was imperfect. *See* Exhibit A, at 90 ("Q … it appears as though Cottage Street video is 2 minutes slower than radiology, right?  A  Yes," and "Q … Radiology is a minute and 30 seconds slower than AT&T [real time], right? … A Yes"). *See also* Exhibit N (lead sheet taken in order to "complete timeline and verify accuracy of times"). Hillary was said to have bad blood with Garrett, but ***Jones*** had physically laid his hands on his mother, sent her threatening text messages, and thrown her belongings out of the home they shared. Exhibit C, at 75, 97-98. *See also* Exhibit F. It appeared as though the perpetrator had punched Garrett in the face with a left hand, but ***Jones*** was the lefty. *See* Exhibit C, at 175-76.

One way to identify an illicit motivation for behavior is to look for a "departure from ordinary procedure." *See Saget v. Trump*, 375 F. Supp.3d 280, 372 (E.D.N.Y. 2019). This case is flush with those departures. If this were truly a methodical investigation based on videos, DNA,

and interviews with friends and family, John Jones would not have immediately been allowed to be present in Murray's office as emotional support for Garrett's mother.  *See* Exhibits BB and CC. The night of the murder, the Potsdam Police Department under Murray's lead would not have been visiting Hillary at his home while they literally skipped over Jones's.  *See* Exhibit O, at 72-78. Defendant Murray would not have buried *Brady* material that favored Hillary and targeted Jones. *See* Exhibit P, at 38 ("You would have to ask Lieutenant Murray why he did not provide it").  *See also* Exhibit MM (the criminal court holding:  "Here there is no question that the oral statements contained in Court Exhibit 5, together with any note taken from Lieutenant Murray during the interview process were potentially exculpatory evidence that fell within the ambit of Brady").  And Officer Wentworth would know that on day 1—only hours after Garrett was killed—he had not yet ruled out Jones as a suspect.  *Id.* at 77-78 ("Q  Had you already made up your mind that he was not the perpetrator?  [*Objection*]  A  I don't recall").  These factors do not prove racial animus, but they are "suggestive of a pre-determined outcome not anchored in an objective assessment."  *Saget*, 375 F. Supp.3d at 372.

Ultimately, rampant factual clouds descend over the existence and motivations behind the differential treatment of the similarly situated Hillary and Jones.  For these reasons, we respectfully request that Defendant Murray's application for summary dismissal of the pending Equal Protection claim be denied.

## II.   QUALIFIED IMMUNITY DOES NOT WARRANT SUMMARY JUDGMENT.

For purposes of civil rights claims arising under Section 1983 of Title 42, "[q]ualified immunity shields government officials performing discretionary functions from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional

rights of which a reasonable person would have known." *Zellner v. Summerlin*, 494 F.3d 152, 155 (2d Cir. 2007). But while the defense claims that "[t]here was absolutely no controlling case as of 2014 or 2015 holding that a police officer acting under similar circumstances as Murray was held to have violated an arrestee's constitutional rights,"[12] this premise is simply wrong. Here at the summary judgment stage, all facts are to be construed "in the light most favorable to the non-moving party"—Hillary—and "all ambiguities … and … reasonable inferences" are to be construed against Defendant Murray. *See Lucente v. County of Suffolk*, 980 F.3d 284, 296 (2d Cir. 2020). With these rules in place, even in cases where there is alleged to be probable cause, it has long been abundantly clear that a high-level police officer may not selectively target one suspect but not another based upon the officer's own ill-will.

In 2007, for example, the Second Circuit decided *Massi v. Flynn*, 254 Fed. Appx. 84 (2d Cir. 2007). As here, the plaintiff brought a selective prosecution claim against a police chief arising under the Fourteenth Amendment. As here, he "introduced evidence sufficient to allow a reasonable jury to conclude that [a third party] was similarly situated to [him]," he did "not concede[] the valid objective of [the] Chief['s] actions, but instead h[e] pointed to facts from which the district court [could hold that] a reasonable juror could infer malice or ill-will." *Id*. at 86. As here, the Chief offered "a different motivation"—that he targeted the plaintiff for committing a crime—but there, as here, this was "simply an attempt to attack the [proposition of having] material facts in dispute regarding the element of malice." *Id*. at 87. Thus, "[r]esolving all factual disputes .. in [plaintiff's] favor, as we must at this stage, [plaintiff there and here] has … alleged conduct that amounts to a violation of his constitution right to be free from malicious selective treatment." *Id*. On the question whether the plaintiff's claim, assuming its truth, presented a violation of

---

[12] See Def. Memorandum of Law, at 24 (internal quotations and ellipses omitted).

sufficiently clear rights, the answer was and is a resounding yes: "[T]here can be no dispute that, at the time of [the Chief]'s conduct, this constitutional right was clearly established such that an objectively reasonable officer would know such selective treatment to be unlawful, and [the Chief] was therefore properly denied qualified immunity." *Id.*[13]

Ultimately, if determining the reasonableness of Defendant Murray's conduct requires further fact-finding, this alone is a basis to deny his application for summary judgment—for, in that case, "it is appropriate to submit the issue of qualified immunity to the jury," or, alternatively, "the better course of action is for the Court to decide qualified immunity as a matter of law ***after*** the jury has resolved the factual issues in dispute[.]" *See Kogut v. County of Nassau*, 2013 WL 3820826, at *15 (E.D.N.Y. 2013) (emphasis added). *See also Rosario v. City of New York*, 2021 WL 199342, at *14 (S.D.N.Y. 2021) ("Defendant's qualified immunity arguments require resolution of factual disputes by the jury and cannot be adjudicated now"); *Thevenin v. City of Troy*, 2019 WL 4242247 (N.D.N.Y. 2019) ("the Court will submit special interrogatories ot he jury to be answered by them to assist the Court in deciding qualified immunity").

Because there is sufficient evidence for the jury to decide whether Jones and Hillary were similarly situated and treated differently on the basis of race, and because a finding in favor of

---

[13] The case law is equally clear with regard to whether probable cause diffuses Equal Protection, as the defense appears to claim. *See* Memorandum of Law, at 24 (block quoting case law for the relationship between qualified immunity and a retaliatory claim arising under the First Amendment). As for the Equal Protection Clause, "the existence of … reasonable suspicion or probable cause[] does not automatically defeat an Equal Protection claim." *Raza v. City of New York*, 998 F. Supp.2d 70, 79 (E.D.N.Y. 2013). Equal Protection claims survive even where there are "mixed motives," so that the claimed existence of "permissible motives," as here, "does not preclude a finding that an impermissible discriminatory purpose was a factor in the government's actions." *Id.* The question is whether race was one "motivating factor," but a plaintiff "'need not show … that a government decisionmaker was motivated solely, primarily, or even predominantly by' improper concerns based on [race]." *Id.* (quoting *United States v. City of Yonkers*, 96 F.3d 600, 611-12 [2d Cir. 1996]).

Hillary on those counts would trigger a violation of his clearly established rights under the Fourteenth Amendment, the Court should reject the defendant's plea for qualified immunity.

## <u>CONCLUSION</u>

For these reasons, we respectfully request that Defendant Murray's application for summary dismissal of Plaintiff's Equal Protection claim be DENIED.


Dated: Garden City, New York
   January 26, 2021

          Respectfully,

          **BARKET EPSTEIN KEARON ALDEA**
          **& LOTURCO, LLP**


          /s/ *Alexander Klein*
          Alexander Klein, Esq.
          666 Old Country Road, Suite 700
          Garden City, New York 11530